# EXHIBIT C

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| MARK OWEN, Individually and On Behalf of All Others Similarly Situated,<br><br>                                        Plaintiffs,<br><br>                    v.<br><br>ELASTOS FOUNDATION, FENG HAN "AKA SUNNY FENG HAN," RONG CHEN, FAY LI, ZACH WARSAVAGE, STEVEN S. NAM, LEE WILSON, BEN LEE, HBUS HOLDCO INC. and HUOBI GLOBAL LIMITED,<br><br>                                        Defendants. | Index No. 650628/2019<br>Hon. Marcy S. Friedman<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |

Plaintiffs Mark Owen and James Wandling ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through their undersigned counsel, bring this Class Action Complaint against Defendants Elastos Foundation ("Elastos" or "ELA"), Rong Chen, Feng Han (a/k/a Sunny Feng Han), Fay Li,  and Ben Lee ("Defendants"), and allege the following upon personal knowledge as to themselves and their own acts, and, as to all other matters, upon information and belief, including the independent investigation of Plaintiffs' counsel.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    Plaintiffs bring this action on behalf of themselves and all other similarly situated investors against Defendants for their violations of §§ 5, 12(a)(1), and 15 of the Securities Act of 1933  (the "Securities Act").  15 U.S.C. §§ 77e, 77l(a)(1), 77o(a).  Specifically, in connection with the Elastos Initial Coin Offering (the "Elastos ICO"), Defendants raised between $94 million and more than $200 million in digital cryptocurrencies by offering and selling unregistered securities in the form of ELA tokens ("ELA Tokens"), in direct violation of the

Securities Act.  Subsequent to the completion of the Elastos ICO, Defendants continued to violate the Securities Act by actively offering, and soliciting purchases of, ELA Tokens on the secondary market.

2.      The Elastos ICO was an offer and sale of securities.  Defendants' own offering documentation states that the sale of ELA Tokens is a form of "Private & Public Crowdfunding" and purchasers of ELA Tokens would become part of the Elastos "**investor** community" (emphasis added).  Defendants also promoted the sale of ELA Tokens by promising that they were "intrinsic" to accessing and participating in the "new internet of wealth" that Elastos was purportedly developing, and were limited in supply, and therefore would increase in value.  Additionally, Defendants created a sense of urgency for investors to capitalize on the potential of the investment, and continued to do so after the ELA Tokens began to trade on the secondary market.

3.      Thousands of investors participated in the Elastos ICO by purchasing ELA Tokens.  Defendants conducted the ICO between January 1, 2018 and January 31, 2018, approximately.  Elastos delivered the tokens to investors on January 31, 2018.  On February 1, 2018, ELA was listed on the Huobi Exchange.

4.      After the Elastos ICO, Defendants continued to participate in the offer and sale of ELA Tokens by offering, and soliciting the purchase of, ELA Tokens through an intensive marketing campaign that included social media postings, internal and third-party public relations efforts, and participation in various investor events in the United States.

5.      On July 18, 2018, Elastos Tokens were listed on the KuCoin cryptocurrency exchange.  Elastos Tokens also became available for purchase on at least four other cryptocurrency exchanges since the Elastos ICO: LBank, Hadax, Bit-Z, and Netcoins.  In

2

addition to the thousands of investors that participated in the Elastos ICO, thousands of other investors purchased ELA Tokens on the secondary market.

6.     The Securities Act's registration requirements are designed to protect investors by ensuring that they are provided with adequate information upon which to base their investment decisions.  Absent registration and approval by the Securities and Exchange Commission ("SEC"), issuers of securities are able to improperly tout their investments with no supervision. For example, an issuer could withhold information that would be important to potential investors, or promote its securities by exaggerating the progress of its products or business plan.

7.     Due to the varied and innumerable schemes through which investors can be manipulated and harmed absent any protections under the federal securities laws, § 12(a)(1) of the Securities Act provides for strict liability against any person who offers or sells an unregistered security, unless a registration exemption applies.  The Elastos ICO, and the subsequent solicitations of purchases of ELA Tokens on the secondary market, are offers and sales of unregistered securities by Defendants without an exemption, and Defendants are strictly liable under the Securities Act.

8.     Proof of Defendants' intent or deceptive conduct is not required nor is it an element of Plaintiffs' claims.  Plaintiffs, on behalf of themselves and the Class, seek compensatory and rescissory relief, providing rescission and repayment of all investments in the Elastos ICO and ELA Tokens.

## II.     JURISDICTION AND VENUE

9.      The claims alleged herein arise under §§ 5, 12(a)(1), and 15 of the Securities Act.  Jurisdiction is conferred by, and venue is proper pursuant to, § 22 of the Securities Act, which states that "[e]xcept as provided in Section 16(c), no case arising under this Act  and

3

brought in any State court of competent jurisdiction shall be removed to any court of the United States." Section 16(c) is not applicable to this action. Section 16(c) applies to "covered class actions," which are defined as lawsuits brought as class actions or brought on behalf of more than 50 persons asserting claims *under state statutory or common law*. This action does not assert state statutory or common law claims and is brought only pursuant to the Securities Act. Consequently, this action is not a "covered class action" under § 16 and is not removable to federal court. The Supreme Court has recently held that actions such as this one are not removable. *See Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 138 S.Ct. 1061, 1065 (2018).

10. The Court has personal jurisdiction over each of the Defendants under NY CPLR §§ 301 and 302. Defendants conducted business in this County, including the sale and offering of ELA Tokens during the Elastos ICO and thereafter. Additionally, each Defendant either conducts business and maintains operations in New York City, or is an individual who either is present in New York City for jurisdictional purposes, or has sufficient minimum contacts with New York City as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

## III. PARTIES

11. Plaintiff Mark Owen ("Owen") is an individual and resident of New York. On or about September 28, 2018, Owen invested in ELA by purchasing ELA Tokens on the Huobi Exchange. Defendants offered ELA Tokens and solicited Owen's purchase.

12. Additional plaintiff James Wandling ("Wandling") is an individual and resident of Kentucky. Wandling purchased ELA Tokens in the Elastos ICO from ELA with cryptocurrency. During the Elastos ICO, Elastos repeatedly informed Wandling that Elastos would deliver the

4

tokens by February 1, 2018.  Elastos delivered the ELA Tokens to Wandling on January 31, 2018.

13.     On or about February 14, 2018, Wandling elected to participate in a token lock-in program developed by Elastos.  Under the terms of the program, investors agreed not to sell their tokens for a pre-specified amount of time in exchange for accruing interest in the form of additional ELA Tokens.  Wandling agreed not to sell his ELA Tokens for 3 years.  On November 5, 2018, Elastos delivered additional ELA Tokens to Wandling for payment of accrued interest. This delivery constituted an additional sale of unregistered securities.

14.     Defendant Elastos is purportedly registered in Singapore, and has its primary offices in Shanghai and Beijing, China.  The Defendants, including Elastos, broadly used U.S.-based social media platforms to engage in their illegal activities perpetrated throughout the entire United States, including New York City, as described herein.

15.     Defendant Rong Chen ("Chen") is the Co-Founder and Executive Chairman of the Elastos Foundation.  Chen has conducted business and promoted the offer and sale of ELA Tokens throughout the U.S., including New York City.  At all times relevant to the complaint, Chen acted as a control person of Elastos by virtue of his role as a key senior management executive and decision maker.

16.     Defendant Feng Han ("Han") is a Co-Founder, CEO, and Board Member of the Elastos Foundation.  Han has conducted business and promoted the offer and sale of ELA Tokens throughout the U.S., including New York City.  At all times relevant to the complaint, Han acted as a control person of Elastos by virtue of his role as a key senior management executive and decision maker.

5

17.     Defendant Fay Li ("Li"), at all times relevant to the complaint, was the Chief Marketing Officer for the Elastos Foundation.  Li has conducted business and promoted the offer and sale of ELA Tokens throughout the U.S., including New York City.  At all times relevant to the complaint, Li acted as a control person of Elastos by virtue of her role as a key senior management executive and decision maker.

18.     Defendant Ben Lee ("Lee") is a Board Member and Chief Operating Officer ("COO") of Elastos.  Lee has conducted business and promoted the offer and sale of ELA Tokens throughout the U.S., including New York City.  At all times relevant to the complaint, Lee acted as a control person of Elastos by virtue of his role as a key senior management executive and decision maker.

## IV.     FACTUAL ALLEGATIONS

### A. Background on Elastos

19.     Elastos purportedly seeks to "create a new kind of Internet, powered by blockchain technology" where users will be able to "own digital assets" such as digital books, movies, music, and games, and "generate wealth from them."  Users will be able to own, buy, and sell digital property without middlemen like Amazon or Apple, in the same manner that property is sold outside of the internet.  Elastos claims that it will leverage blockchain technology to ensure digital assets are not compromised and to ensure transactions are safe and secure.

20.     Elastos markets itself as the "smartweb powered by blockchain."  The "smartweb" refers to a web of apps that are decentralized.  That is, they can connect with each other, but do not connect with the internet.  This will purportedly allow transactions of digital property without middlemen and without risk of that data being compromised by a third-party.

6

21.     According to Elastos, "The Elastos Web will be a special economic zone where Elastos tokens function as the base currency."  Defendants further described ELA Tokens as "the intrinsic token on the Elastos blockchain.  It can be used for trading, investing in digital assets, paying for blockchain processing fees and so on."

22.     While Elastos purports to take advantage of the new and compelling blockchain technology, its origins go back nearly two decades.  The Elastos technology was developed by Elastos co-founder Chen, a former Microsoft Senior Software Engineer from 1992 to 2000. After leaving Microsoft he founded the software company Kortide in Beijing, China.  Kortide's "lead product" was the operating system Elastos SDK.  Chen purports to have come up with the name Elastos in 2002.

23.     In June 2017, during the height of the blockchain and cryptocurrency mania, Chen abandoned Kortide after 17 years to co-found Elastos with Han.  Prior to co-founding Elastos, Han worked for 25 years as a principal at various schools in China.

### B. Initial Elastos Investors

24.     Merely a month after founding Elastos, Defendants Chen and Han began to solicit investors.  In or around July or early August 2017, Elastos developed its first "White Paper" explaining the Elastos project.  This initial Whitepaper was written entirely in Chinese and preceded Elastos's "Angel Investment" sale of ELA Tokens to "founders and key partners." Huobi Global Limited, was one of Elastos's key Angel Investors.

25.     Between August 10 and August 20, 2017, Elastos held a "private investment sale" in China during which it raised approximately 4,300 Bitcoins ("BTC") and released approximately six million ELA Tokens.  Elastos then planned to conduct a public sale only in

China and to only subsequently allow global investors to purchase ELA Tokens on exchanges on the secondary market.

26.     However, on or about September 5, 2017, China banned all ICOs, finding that they constituted "illegal fundraising."  As a result, Elastos changed strategy and decided that the Elastos ICO would be open to anyone except Chinese citizens.  In November 2017, Defendants Elastos, Han, and Li began to actively promote the Elastos technology on Western social media, including Twitter and Facebook.

### C. The Elastos Initial Coin Offering

27.     Because Chinese investors could no longer participate in the ICO, Elastos specifically targeted investors in the United States.  To do so, Elastos shifted its promotional efforts to English speakers and Western social media in November 2017.  On December 27, 2017, Elastos admitted that it was targeting U.S. investors when it posted responses to "Frequently Asked Questions" from interested investors on the Elastos website and Medium.com.  One of the questions asked, "Can US citizens buy Elastos tokens? How can I do that?"  The response said, "Elastos Foundation adheres to [the] highest standards in many regulating nations across the world.  We have gone through due diligence analysis from leading law firms in California, U.S. and we will be opening our token sale to US residents through a whitelist process."  A "whitelist" is a registration process whereby potential investors in an ICO sign up for the opportunity to purchase tokens.

28.     Defendants promoted the ICO to potential investors though a variety of outlets, including the Elastos website, www.elastos.org.  In or around December 2017 or January 2018, Elastos's website changed from being primarily in Chinese to primarily in English.  In or around late December 2017, Elastos posted its second White Paper (the "ICO White Paper") to its

8

website.  The English language ICO White Paper was dated January 1, 2018 and contained a

technical description of the Elastos platform as well as an explanation of the ELA Token

distribution plan.

29.     Elastos also maintained the web page tokensale.elastos.org.  This page contained

a variety of information useful for potential investors, such as a countdown clock to the opening

of the whitelist registration; links to Elastos's social media pages, including Twitter, Facebook,

Reddit, and Telegram; a link to the ICO White Paper; a written "Introduction to Elastos"; a video

explaining the Elastos platform; answers to "Token sale FAQ"; a "Roadmap" of key operational

milestones; and a link to register for the whitelist.

30.     Defendants also promoted the ICO through social media outlets and platforms

such as Twitter, Facebook, Reddit, and Telegram.  Elastos's official Twitter account,

@Elastos_org, began promoting Elastos at least as early as November 29, 2017.  Elastos's

official Facebook account began promoting Elastos at least as early as November 17, 2017.

31.     On December 27, 2017, Elastos published a press release titled, "Elastos ICO

Offers a Cross-Platform Operating System and Public Blockchain Designed for a Smart

Economy" on Accesswire, a U.S. based global news agency.  The press release announced that

the ICO would "launch in the first week of January 2018" and noted that "six million ELA

tokens have been sold in China, raising nearly 4,000 bitcoins."  The press release also explained

the Elastos platform and provided background information on Defendant Chen.  Elastos included

six contacts where potential investors could get "more information,"  including the Elastos

Investor Relations email address, the Elastos webpage, the Elastos Twitter feed, the Elastos

Facebook page, and the Elastos Reddit page.  Yahoo! Finance, among other outlets, picked up

9

and posted the press release. Elastos's official Facebook page also posted a link to the press release on December 29, 2017.

32.     Before and during the Elastos ICO, on both Twitter and Facebook, Elastos repeatedly posted links to the ICO White Paper, reminded its followers of dates and deadlines for the Elastos ICO, repeatedly urged them to sign up for the whitelist registration before it was too late, posted positive articles about Elastos, and promoted Defendants Chen's and Han's speaking engagements. Defendant Li also used her Twitter account to promote the Elastos ICO. During the month of January 2018, she posted repeated reminders about the whitelist registration and the ICO.

33.     On or around January 1, 2018, Elastos opened its whitelist registration, allowing potential investors to sign-up for the chance to participate in the ICO. The registration period was set to last until January 15, 2018, or until 10,000 investors registered. On January 1, 2018, Defendant Li tweeted a picture of a countdown clock hosted on the Elastos website counting down the days, hours, minutes and seconds until the end of the whitelist registration process. In the tweet, Li stated "we noticed that too many people have clicked the site on the same second! Thanks for your support! However, please be noted [sic] this is a WHITELIST REGISTRATION (not yet a token sale yet [sic]), so no rush guys. TAKE YOUR TIME. Thank you again for your support!"

34.     On January 3, 2018, Defendant Li created a sense of urgency by tweeting, "It's the LAST chance and we only have 2 million ELAs to release, we have 9209 submissions & will be closing when it hits 10k (NOT 12 DAYS). Register here: Elastos.org If you believe in our over 10 million lines of code and 18 years of hard work."

10

35. Due to high investor interest, the registration closed on or around January 4, 2018. Defendant Li tweeted, "Got 11915 submissions, thanks for everyone's support. Unfortunately, we had to bring it down much earlier, apologies for those who wanted to join but missed it." The price for the ICO was set at 1 Bitcoin for 800 ELA (investors could also pay with NEO cryptocurrency), though limits were set on the amount that could be purchased.

36. On January 12, 2018, after the whitelist registration closed but before investors could purchase ELA Tokens, Defendant Li tweeted a link to a Medium.com article that listed the "11 Blockchain startups to Watch in 2018" and listed Elastos as number one. In her tweet, Li stated, "#elastos is listed Number 1 again!" The linked article focused on the potential future value of blockchain companies and noted that "the blockchain industry is expected to grow to $20 billion by 2024," and "the total market cap of cryptocurrencies … recently crossed $700 billion." The article referred to cryptocurrencies as "an asset class."

37. On January 16, 2018, Li tweeted, "Emails will be sent to those who have passed the KYC within 24 hours. Get your BTC/NEO ready." KYC stands for "know your customer" and is a process by which companies purportedly vet and verify the identities of potential investors.

38. On or around January 18, 2018, Elastos selected 5,702 individuals and 75 entities to participate in the first round of the token sale. At this time, investors were instructed to transfer either Bitcoins or NEO to a designated "contribution address" on the internet. Elastos then conducted two additional rounds of sales for investors who made the largest allowable investments in the previous rounds. Round two occurred on or around January 23, 2018, and the third and final round occurred on or around January 24, 2018. The transactions were not completed until January 31, 2018 when Elastos delivered the ELA Tokens to investors.

11

### D. Defendants Offered, and Solicited Purchases of, ELA Tokens on the Secondary Market

39.     Defendants offered, and actively solicited purchases of, ELA Tokens after the ICO through a sustained and intensive marketing campaign.  Defendants were motivated by their own financial interests and/or that of the Company.  Defendants offered, and solicited purchases of, ELA Tokens on the secondary market in hopes of increasing the number of investors and ultimately driving up the market price of ELA Tokens.  An increase in the price of ELA Tokens benefitted Elastos by increasing its market capitalization, thus strengthening its financial position, and providing opportunities to raise additional funds in the future by conducting additional offerings.  Defendants Chen and Han were also motivated by their own financial interests because, as founders, they participated in the Angel Investor sale and own large quantities of ELA Tokens.

40.     On January 31, 2018, the Elastos official twitter accounted tweeted, and Defendant Li retweeted, an announcement that ELA would begin trading on the Huobi Exchange.  Specifically, the tweet announced, "#elastos Airdrop & Trading Campaign. World Premier of #ELA at 12:00, Jan 30th (GMT+8). View Details on #HuobiPro…"

41.     On or about February 1, 2018, ELA was listed on the secondary market on the Huobi Exchange and went live for trading.  Immediately, Defendants ramped up their promotion and solicitation of purchases of ELA Tokens.

42.     On February 4, 2018, while in New York City, Defendant Han tweeted that "[j]ust before the [E]lastos launch time, the price value surpass [sic] more than 250000 Bitcoin."

43.     Also on February 4, 2018, an Elastos supporter tweeted, and Defendant Li retweeted, "Elastos and $ELA showing how to run a platform. Top 10 Market Cap Project incoming. Still a great buy right now, but rising fast."

12

44.     On February 7, 2018, Defendant Li tweeted, and Defendant Han and the official Elastos Twitter account retweeted, a picture of an Elastos advertisement on the NASDAQ digital screen located in Times Square in New York City.

45.     On February 9, 2018, an Elastos supporter tweeted, and Defendant Li retweeted, "I don't expect the price of $ELA to remain affordable much longer for the average investor."

46.     On or about February 13, 2018, Elastos entered into an agreement with the Chicago, Illinois based business advisory firm ChinaWise to help Elastos promote and offer ELA Tokens to potential investors.  ChinaWise purports to "help North American and Chinese enterprises conduct business with each other."

47.     On February 13, 2018, Elastos, through ChinaWise, published a press release that was distributed throughout the United States including New York City, promoting Defendant Han's attendance and speech at CryptoCon 2018 on February 15, 2018, in Chicago, Illinois. According to the press release, the conference topics included "ICOs, bitcoin mining, the socio-political aspects of cryptocurrency, futures trading, and cryptocurrency exchanges, as well as the legal, regulatory and taxation issues surrounding cryptocurrency."  The press release also noted that ELA Tokens (1) are "used for trading, investing in digital assets, paying processing fees, etc."; (2) were listed on the Huobi Exchange; and (3) had a total market value of more than $1.7 billion.

48.     On February 15, 2018, Elastos, again through ChinaWise, published a press release, distributed throughout the United States including New York City, promoting Defendant Han's appearance at CryptoCon 2018.  The press release discussed the content of Defendant Han's speech, including that, "Dr. Han believes that data can and will become a wealth-generating asset, reinforcing that Elastos's mission is [sic] 'we will change data into wealth.'"

49.     On February 16, 2018, an Elastos supporter tweeted, and Defendant Li retweeted, "Volume on @Elastos_org keeps rising every day. 70M+ and it is only on ONE exchange, @Huobi_Pro, also the **market cap** is still unknown on @CoinMarketCap, this is still flying under the radar. Some very smart people are accumulating."

50.     On February 23, 2018, Defendant Han tweeted a screenshot of a line chart depicting the price of ELA Tokens increasing in value.

51.     On April 2, 2018, Elastos posted the transcript of a March 19, 2018 discussion Defendant Chen had with a representative of an entity known as Huoxing Financial on the Company's Medium.com page.  During the discussion, Chen stated that "Elastos is not exactly Security currency, which allowed us to do an ICO in the United States around January 2nd. It was very successful.  This was the first coin to pass the United States' Howey Test, a public offering [sic] based on the legal and regulatory requirements of the United States."

52.     On April 4, 2018, Defendant Han tweeted a picture of himself during a speech at a New York University event "about Blockchain and [E]lastos at NYU."  Defendant Han promoted ELA at this event and attempted to gain additional investors.

53.     On April 24, 2018, Defendant Han spoke at the 2nd Annual FinTech Conference at Fordham University in New York City.  Defendant Han promoted ELA at this event and attempted to gain additional investors.

54.     From May 4 through May 6, 2018, Elastos sponsored and participated in the 5th Annual "Omaha Summit."  The Omaha Summit is organized, in part, by ChinaWise and purports to bring Chinese and American business leaders together to discuss investment strategies and U.S-China relations.  The summit is affiliated with investment guru Warren Buffet and his company Berkshire Hathaway, which has its headquarters in Omaha.  Summit participants attend

14

Berkshire Hathaway's annual shareholders meeting and Warren Buffet often participates in the summit.  Defendants Chen and Han both attended the 2018 Omaha Summit and spoke to the attendees about Elastos during a VIP dinner.

55.     On May 10, 2018, a supporter of Elastos tweeted, and Defendant Han retweeted, an article discussing the end of Net Neutrality. The body of the tweet states, "Another reason $ELA can be a great **investment**.  @Elastos_org is a SmartWeb Powered by Blockchain" (emphasis added).

56.     On May 12, 2018, Defendant Han spoke during a "meetup" at Fordham University in New York City.  Elastos, Han, and Li all tweeted about this event on May 12, 2018.  Defendant Han promoted ELA at this event and attempted to gain additional investors.

57.     On June 6, 2018, a supporter of Elastos tweeted, and Defendant Han retweeted, "The Internet of Wealth is coming. Wall Street knows it. Governments know it. Digital assets are the future, and blockchain enables #Elastos to complete their long-running vision. We are blessed to be involved so early."

58.     On June 18, 2018, a supporter of Elastos tweeted, and Defendant Han retweeted, "It's crazy cheap now – most of my friends bought between [$]50 – [$]80 – so I wouldn't expect it to go much lower. I never trust the market though, so I just load up when I think something is good value.  $ELA @ [$]28 is incredibly cheap in my opinion."

59.     On July 13, 2018, Defendant Li retweeted a link to an episode of the CNBC Africa television program *Crypto Trader*, which included an interview with Defendant Chen. *Crypto Trader* bills itself as "the World's only televised Crypto show."

60.     On July 16, Elastos tweeted, and Defendant Li retweeted, a link to the segment of the *Crypto Trader* episode containing Defendant Chen's interview.  At the start of the segment, a

15

graphic was displayed showing the July 13, 2018 price of ELA Tokens in U.S. dollars, the

trading volume of ELA Tokens on that day, the "Low" and "High" price of ELA Tokens for the

day, and the percentage increase in the ELA Token price for the day.  In the interview, Chen

touted the ELA platform.

61.     On July 18, 2018, Elastos was listed on the cryptocurrency exchange KuCoin.  On

that day KuCoin tweeted, and Defendants Han and Li retweeted, the news of the listing.

62.     On July 20, 2018, Defendant Li retweeted a tweet by Visionz Capital with a link

to an 86 page research and analysis report on Elastos published by Visionz Capital.  Visonz

Capital describes itself as "an investment and research firm focused exclusively on cryptoasset

and blockchain technology."

63.     On August 1, 2018, Defendant Li tweeted a link to a July 31, 2018 interview with

Defendant Chen on *Crypto 101*, a popular podcast that bills itself as "the average consumer's

guide to cryptocurrency."  Defendant Chen discussed his background and the Elastos platform on

the podcast.

64.     On August 24, 2018, Elastos posted a 22 minute promotional video on YouTube

commemorating Elastos's one year anniversary and explaining the Elastos platform.  On the

same day, Elastos tweeted "Welcome to Elastos! #Elastos $ELA #ElastosVideo

#ElastosOneYear" with a link to the YouTube video.

65.     On September 23, 2018, an Elastos supporter tweeted, and Defendant Han

retweeted, "[ELA is] [t]he most undervalued and misunderstood project."

66.     On September 28, 2018, based on Defendants' offers and solicitations set forth

above, Plaintiff Owen purchased ELA Tokens on the secondary market.

16

67.     On October 16, 2018, a supporter of Elastos tweeted and Defendant Han retweeted, "Elastos slow steady climb while everything is sideways. … Looking like it's catching on.  Has me thinking how I should have went all in at the $5-7 mark, not surprised. $ELA is the best project in crypto!"

68.     On November 6, 2018, an Elastos supporter tweeted, and Defendant Han retweeted, "I honestly feel @Elastos_org has now cleared out the moonboys, Riff Raff and people wanting a quick buck… Now we are left with a very strong community and support bade [sic] to bounce off… Real believers are left…"

69.     On November 10, 2018, Defendant Han retweeted a tweet by BBOD Research that included a link to a post on the BBOD Research Blog titled "Fundamental Pick: Elastos (ELA)."  BBOD Research purports to "produce comprehensive, unbiased, evidence-based research and reports on crypto-coins and blockchain technology."  The post included BBOD's rating for ELA Tokens, information about the availability of ELA Tokens on the secondary market including the total supply of ELA Tokens, a partial list of exchanges on which ELA Tokens could be purchased, and information about the Elastos platform.  BBOD rated ELA Tokens as a "SPEC BUY," which it defined as, "A speculative opportunity for investors with a higher risk tolerance."

70.     On November 21, 2018, a supporter of Elastos tweeted, and Defendant Han retweeted, "Best website in crypto no doubt. … And it's going for $3? Feel like a kid holding out the bag for trick or treating."

### E.  ELA Tokens Are Securities

71.     ELA Tokens are securities under U.S. law, legal precedent, and SEC guidelines.

72.     Under 15 U.S.C. § 77b, the definition of a "security" includes an "investment contract."

73.     The seminal Supreme Court case *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946) established a four part test for determining the existence of an investment contract. The four part test requires:

(1) An investment of money;

(2) In a common enterprise;

(3) With the expectation of profits;

(4) Solely from the efforts of others.

*Id.* at 298-99.

74.     The SEC has endorsed and utilized the *Howey* test to determine whether certain cryptocurrencies are securities in recent enforcement actions and in recent investor bulletins disseminated to the public.

75.     The Elastos Tokens satisfy the *Howey* test and are investment contracts for the reasons stated below.

### 1)     The Class Invested Money

76.     Plaintiffs and all members of the Class paid either Bitcoin or NEO cryptocurrency to purchase their ELA Tokens from Defendants during the ICO.  On the secondary market, investors paid for ELA Tokens with at least Bitcoin, Ethereum, or cash.   Such investments are the type of contribution of value that creates an investment contract.  The investment of "money" need not take the form of cash.

### 2) In a Common Enterprise

77.     Defendants have acknowledged that investors who purchased ELA Tokens were participating in a common enterprise, as all funds raised would be pooled under the control of the Defendants.  According to the January 1, 2018 ICO White Paper, "The investor community is the backbone of Elastos, and it will support and facilitate Elastos development.  **All the raised cryptocurrency will belong to the Elastos Foundation, and it will be used to develop the Elastos platform**" (emphasis added).

78.     Additionally, the fortunes of each investor was, and continues to be, tied to Defendants' ability to use the funds raised from investors to successfully develop and launch the Elastos platform.  Indeed, the value of ELA Tokens are expected to rise upon the successful development and launch of the Elastos platform.  Relatedly, the value of ELA Tokens is also dependent upon, and is expected to rise with, the adoption of the platform by consumers, entrepreneurs, and the business community.  The failure by Defendants to successfully develop or launch the Elastos platform, or an inability to attract users to the platform, would ultimately render the ELA Tokens worthless.

### 3) Investors Had an Expectation of Profit

79.     Through their words and actions, Defendants led potential investors in the Elastos ICO to expect a profit from the purchase of ELA Tokens.  Defendants repeatedly referred to purchasers of ELA Tokens as "investors."   Elastos also made it clear that it would "issue a scarce amount of tokens," a total of 33 million, and led potential investors to believe that ELA Tokens would be the exclusive form of currency on the Elastos platform, where users would be able to "generate wealth" by buying and selling digital assets.  Therefore, it is logical that

19

potential investors believed that the development and growth of the Elastos platform would create additional demand for ELA Tokens and increase their value.

80.     In fact, in the December 27, 2017 "Frequently Asked Questions" post, Elastos pegged the Elastos ICO pricing to heavy demand for ELA Tokens.  Responding to the comment, "This is the most expensive token sale price I have ever heard," Elastos told potential investors, "[W]e feel this is a responsible valuation based on current market demand for our upcoming token sale."  "Sale price," "valuation," "market," and "demand" are all functional hallmarks of securities.

81.     Defendant Chen has explained the direct relationship between the successful development of the Elastos platform and the market price of the ELA Token.  On April 2, 2018, Elastos posted a March 19, 2018, "Q&A" involving Defendant Chen on the Company's Medium.com page.  Defendant Chen addressed the market price of ELA Tokens and implied that their value would increase as more progress was made on the platform – which is equivalent to companies publicly promoting their future growth and concomitant rise in share value. Specifically, he stated:

> The recent decline in the currency price was actually due in large part to its rapid rise.  Everyone knows that there are more than a thousand kinds of Tokens, but those with real technology or high traffic are few and far between…. As for the currency price of Elastos, I basically do not look at it. I do not look at other coin prices either.  Out of sight out of mind.  Our progress in the project has been relatively smooth, so I think we can get through the winter.  Winter has come and many ICOs have returned to normal.

82.     Defendants also encouraged investors to focus on the profit potential of ELA Tokens by seeking to have ELA Tokens listed on cryptocurrency exchanges in order to reach more investors in the United States and make their efforts and successes known to potential investors.

83.      Finally, Defendants developed a token lock-in program (similar to lock-ups in initial public offerings) in which investors could earn additional ELA Tokens by simply agreeing not to sell a committed portion of their tokens for a predetermined period of time.  On or around February 14, 2018, Elastos ICO investors were given the opportunity to "lock-in" their ELA Tokens for up to three years in exchange for additional ELA Tokens at a rate of 4% of their total locked in tokens for the first year, 5% for the second year, and 6% for the third year.  Investors that locked in tokens had additional expectations of profit in the form of the ELA Tokens they would earn through the lock-in.

84.      On October 24, 2018, Elastos announced the end of its lock-in program.  In a letter by Chen to the Elastos "Community," titled "Modification to Token Lock-in and Return Program," he said, "[b]eginning today, lock-in ELA holders will receive an official communication from the Elastos Foundation regarding the coin return mechanism.  As further described in that communication, all locked up coins, **including a 4% bonus,** will be returned to lock-in ELA holders on November 5th, 4am UTC. ELA coins will also be returned to angel investors on November 20th, 4am UTC" (the "Lock-In Sale").

85.      The "Lock-In Sale" constituted an offer and sale of unregistered securities.

86.      Chen also added in the letter the following:

As a matter of openness, honesty and transparency, I would like to explain how we reached this decision. First, it is our understanding that in order to be fully compliant for expansion into Western markets, it is critical that these coins be unlocked. If Elastos is to succeed as an international project, compliance with Western laws is paramount. When we launched this lock up program, it was not clear to us that these types of programs could be seen as out of sync with compliance. Now that we have been informed that the continuation of this program may cause compliance risk, we feel strongly that this modification is in the best interest of Elastos' long term success.

21

4)    **Investors' Realization of Profit is Dependent on the Efforts of the Defendants**

87.    ELA investors' profits, if any, will derive from Defendants' managerial efforts. Defendants have sole control over the money that they raised through the ICO and the management of those funds in connection with the Elastos platform.  Plaintiffs and members of the Class have had no input into how the funds raised in the ICO would be allocated or how they actually were, and are, being spent.

88.    When Plaintiffs and members of the Class invested in ELA Tokens, the Elastos platform had not launched for public use.  In fact, it still has not launched.  **As a result, the ELA Tokens have never had any functionality or utility.**  Plaintiffs and members of the Class had no power to bring about the implementation of the Elastos platform.  Indeed, they relied, and still rely, on Defendants' managerial and entrepreneurial efforts to make Elastos fully available to the public, as promised.

89.    Plaintiffs and members of the Class also relied, and still rely, on Defendants to: (a) market the Elastos ICO and generate publicity by posting on social media and other outlets; (b) attract additional investors and Elastos users; and (c) continue to raise the necessary funding to finance the Elastos project.

90.    Investors are also forced to rely on Defendants to maintain the ELA token listing on the various cryptocurrency exchanges that allow for active trading.

**F.    The SEC Has Cracked Down on Unregistered ICOs**

91.    Beginning in mid-2017, the SEC has proceeded to methodically bring enforcement actions against companies that conduct unregistered ICOs.  On July 25, 2017, the

22

SEC published a 21A investigative report into The DAO, an organization that issued and sold

cryptocurrency (the "DAO Report").[1]  According to the DAO Report:

> The DAO was created … with the objective of operating as a for-profit entity that would create and hold a corpus of assets through the sale of DAO Tokens to investors, which assets would then be used to fund "projects." The holders of DAO Tokens stood to share in the anticipated earnings from these projects as a return on their investment in DAO Tokens. In addition, DAO Token holders could monetize their investments in DAO Tokens by re-selling DAO Tokens on a number of web-based platforms ("Platforms") that supported secondary trading in the DAO Tokens.

92.     The DAO ICO raised approximately $150 million in Ethereum-based

cryptocurrency.  After the ICO, investors were allowed to sell their tokens freely on

cryptocurrency exchanges.  Subsequent to the ICO, The DAO was hacked and approximately

one-third of its funds were stolen.

93.     The SEC's investigation and its final report addressed the question of whether the

DAO tokens should be classified as securities.  The SEC applied the *Howey* test and determined

the tokens were investment contracts, and therefore were securities that should have been

registered under the Securities Act.

94.     In the DAO Report, the SEC stated, "the U.S. federal securities law may apply to

various activities, including distributed ledger technology, depending on the particular facts and

circumstances, without regard to the form of the organization or technology used to effectuate a

particular offer or sale."

95.     On September 25, 2017, the SEC announced a new Cyber Unit in its Enforcement

Division with a mandate to "address cyber-based threats and protect retail investors."  Among

---

[1] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, Exchange Act Release No. 81207, 2017 WL 7184670, (July 25, 2017), https://www.sec.gov/litigation/investreport/34-81207.pdf.

23

the items the new Cyber Unit was to focus on was, "[v]iolations involving distributed ledger technology and initial coin offerings."

96.     The Cyber Unit has brought actions against companies for failing to register ICOs.  For example, in December 2017, the SEC charged the California-based company Munchee Inc. with selling unregistered tokens in an ICO relating to purported blockchain-based food review service.  In its press release announcing the action, the SEC stated, "[w]e will continue to scrutinize the market vigilantly for improper offerings that seek to sell securities to the general public without the required registration or exemption."  Munchee immediately halted its ICO and returned all proceeds before issuing any tokens.

97.     On December 11, 2017, SEC Chairman Jay Clayton issued a Public Statement titled *Statement on Cryptocurrencies and Initial Coin Offerings*[2] that addressed the application of U.S. securities laws to ICOs and attempts by companies to skirt the securities laws:

> Following the issuance of the [DAO Report], certain market professionals have attempted to highlight utility characteristics of their proposed initial coin offerings in an effort to claim that their proposed tokens or coins are not securities. Many of these assertions appear to elevate form over substance. Merely calling a token a "utility" token or structuring it to provide some utility does not prevent the token from being a security. Tokens and offerings that incorporate features and marketing efforts that emphasize the potential for profits based on the entrepreneurial or managerial efforts of others continue to contain the hall marks of a security under U.S. Law.

## V.     CLASS ACTION ALLEGATIONS

98.     Plaintiffs seek certification of the following Class:

All persons or entities who purchased or acquired Elastos Tokens in domestic transactions in the Elastos ICO, the Lock-In Sale, or the secondary market.

Excluded from the Class are Defendants and their immediate family members, subsidiaries, affiliates, employees, officers, agents, and directors. Also excluded from the Class are any and all exchanges that traded or currently trade the ELA Tokens including, but not limited

---

[2] Statement on Cryptocurrencies and Initial Coin Offerings, SEC Chairman Jay Clayton, (Dec. 11, 2017), https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11.

to, Huobi Exchange, KuCoin, LBank, Hadax, Bit-Z, and Netcoins, and any subsidiaries, affiliates or U.S. counterparts thereof.

99.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

100.     The members of the Class are so numerous that joinder of all members is impracticable.  On information and belief, there are at least thousands of Class members.  The precise number or identification of members of the Class is presently unknown to Plaintiffs, but may be ascertained from Defendants' books and records.  Class members may be notified of the pendency of this action by mail, email, internet postings, and/or publication.

101.     Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting only individual members of the Class.  These common questions of law or fact include, but are not limited to the following:

a)  whether Defendants offered and sold unregistered securities, in violation of federal securities laws, to Plaintiffs and the Class in the Elastos ICO, the Lock-In Sale and on the secondary market;

b)  whether the Elastos Tokens are  securities;

c)  whether the Class is entitled to compensatory and/or rescissory relief as a result of Defendants' wrongful conduct as alleged herein.

102.     Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and the other members of the Class.  Similar or identical statutory law violations and injuries are involved.  Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

25

103.    Plaintiffs' claims are typical of the claims of the other members of the Class

because, among other things, all such claims arise out of the same wrongful course of conduct

engaged in by Defendants in violation of the federal securities laws as complained of herein.

Further, the damages of each member of the Class were caused directly by Defendants' wrongful

conduct in violation of the federal securities laws as alleged herein.

104.    Plaintiffs are adequate Class representatives because they are members of the

Class and their interests do not conflict with the interests of the other members of the Class they

seek to represent.  Plaintiffs have also retained counsel competent and experienced in complex

class action litigation.  Plaintiffs and their counsel intend to prosecute this action vigorously for

the benefit of all members of the Class.  Accordingly, the interests of the members of the Class

will be fairly and adequately protected by Plaintiffs and their counsel.

105.    A class action is superior to any other available means for the fair and efficient

adjudication of this controversy, and no unusual difficulties are likely to be encountered in the

management of this class action.  The damages and other financial detriment suffered by

Plaintiffs and the members of the Class are relatively small compared to the burden and expense

that would be required to individually litigate their claims against Defendants.  As such, it would

be impracticable for members of the Class to individually seek redress for Defendants' wrongful

conduct.  Even if Class members could afford individual litigation, that would pose an undue

burden on the courts. And individualized litigation creates a potential for inconsistent or

contradictory judgments and increases the delay and expense to all parties and the courts.  By

contrast, the class action device presents far fewer management difficulties, and provides

benefits of single adjudication, economy of scale, and comprehensive supervision by a single

court.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### Violations of §§ 5 and 12(a)(1) of the Securities Act
### Against All Defendants

106.    Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

107.    Section 5(a) of the Securities Act prohibits the direct or indirect use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of any prospectuses or otherwise; or to carry or cause to be carried through the mails or in interstate commerce, by any means or instrument of transportation, any security for the purpose of sale or for delivery after sale, unless a registration statement is in effect as to such security.

108.    Section 5(c) of the Securities Act makes it unlawful for any person to directly or indirectly make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or buy through the use or medium of any prospectus or otherwise any security, unless a registration has been filed as to such security.

109.    Section  12(a)(1) of the Securities Act grants Plaintiffs and the Class a private right of action against any person who offers or sells a security in violation of § 5, and states that such person:

> Shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77l(a)(2).

110. In connection with the sale of unregistered ELA Tokens through the Elastos ICO, the Lock-In Sale, and the secondary market, Defendants unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails for the purpose of offering, selling, or delivering unregistered securities in direct violation of §§ 5(a), 5(c), and 12(a)(1) of the Securities Act.

111. Defendants are "sellers" and "offerors" within the meaning of the Securities Act because Defendants sold ELA Tokens in the Elastos ICO and Lock-In Sale to Plaintiffs and the Class, and offered and solicited Plaintiffs and the Class to invest in ELA Tokens in the Elastos ICO, Lock-In Sale, and in the secondary market.

112. The sales of ELA Tokens constituted sales of unregistered securities under controlling federal law. ELA Tokens exhibit the following hallmarks of a security under the test articulated in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946): (a) in order to receive any ELA Tokens, an investment of money in the form of a cryptocurrency was required; (b) the investment of money was made into the common enterprise that is ELA and the potential future ELA platform; c) there was an expectation of returns on the investment; and d) the potential returns depended on Defendants' ability to launch and grow the Elastos platform.

113. The Elastos platform is both a horizontal common enterprise because ELA investments were pooled and under the control of Defendants, and a vertical common enterprise because any profits investors may receive from the investments are dependent on Defendants' efforts.

114. To purchase ELA Tokens, Elastos ICO investors paid either Bitcoins or NEO cryptocurrency into Defendants' online account – a common pool of funds that commingled each

investor's investment. Investors who purchased ELA Tokens on the secondary market paid

Bitcoins, Ethereum, or cash to cryptocurrency exchanges.

115.     Defendants told Elastos ICO investors that their assets would be pooled together

and all of the funds initially raised would be invested in the company and the development of the

Elastos platform. The ICO Whitepaper states that "All the raised cryptocurrency will belong to

the Elastos Foundation, and it will be used to develop the Elastos platform. The Bitcoin

proceeds will go to the Elastos Foundation." Defendants had, and continue to have, sole and

exclusive control over the allocation and use of the funds raised in the Elastos ICO.

116.     Profits among the investors are also expected to be divided proportionately. The

number of ELA Tokens purchased by investors was dependent upon the size of an investment

and the price paid. An investor's return on an Elastos ICO investment – potential profits

stemming from the future valuation of ELA Tokens – is directly proportional to the amount of an

investor's financial stake and the number of ELA Tokens owned.

117.     Defendants offered or sold the ELA Tokens to the Plaintiffs and the Class.

Plaintiff Wandling purchased ELA Tokens from Defendants pursuant to the ICO and Plaintiff

Owen purchased ELA Tokens based on Defendants offers and solicitations to buy.

118.     No registration statements have been filed with the SEC or have been in effect

with respect to the sale of ELA Tokens alleged herein. The sale of ELA Tokens was not a

transaction exempt from the registration requirements of the Securities Act. By reason of the

foregoing, Defendants have violated §§ 5(a), 5(c), and 12(a)(1) of the Securities Act.

119.     As a direct and proximate result of Defendants' unregistered sale of securities in

violation of the Securities Act, Plaintiffs and Class members have suffered damages in

connection with their purchases or acquisitions of ELA Tokens in the Elastos ICO, Lock-In Sale, and on the secondary market.

120.    Defendants are liable to Plaintiffs and the Class pursuant to the Securities Act for compensatory and equitable relief, including rescission, together with pre- and post-judgment interest, reasonable attorneys' and experts' fees and costs of suit.

**COUNT II**
**Violations of § 15 of the Securities Act**
**Against Defendants Chen, Han, Li, and Lee**

121.    Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

122.    Section 15 of the Securities Act provides for joint and several liability for "controlling persons" who had sufficient power or influence over an entity that violated federal securities laws:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o.

123.    Defendant Chen is subject to liability by virtue of his top-level executive position with Elastos and his significant influence and supervisory authority over Elastos. Chen is a Co-Founder and Executive Chairman of Elastos, which provided him the power to control or influence the company's actions. Chen developed the Elastos technology and was responsible for its continued technical development. At all relevant times, Chen has given numerous interviews and made public statements promoting the Elastos ICO and the Elastos platform. As

30

a controlling person of Elastos, Chen knew of and actively participated in the Elastos ICO and the sale of unregistered securities in direct violation of the Securities Act.

124.    Defendant Chen had the power to influence and control, and did influence and control, directly or indirectly, Defendant Elastos's conduct in offering the Elastos Tokens for sale in the Elastos ICO, resulting in the violation of the federal securities laws.  Chen is a culpable participant in the Elastos ICO alleged herein and caused Elastos to engage in the acts which give rise to liability under §§ 5 and 12(a)(1) of the Securities Act.  Accordingly, Chen is a "controlling person" of Elastos within the meaning of § 15 of the Securities Act.

125.    Similarly, Defendant Han is subject to liability by virtue of his top-level executive position with Elastos and his significant influence and supervisory authority over Elastos.  Han is a Co-Founder of Elastos, the Chief Executive Officer, and a Board Member, which provided him the power to control or influence Elastos's actions.  He is responsible for Elastos's operations and business management, including its interactions with Plaintiffs and Class members.  At all relevant times, Han has given numerous interviews and made public statements promoting the Elastos ICO and the Elastos platform.  As a controlling person of Elastos, Han knew of and actively participated in the Elastos ICO and the sale of unregistered securities in direct violation of the Securities Act.

126.    Defendant Han had the power to influence and control, and did influence and control, directly or indirectly Defendant Elastos's conduct offering the ELA Tokens for sale in the Elastos ICO, resulting in violation of the federal securities laws.  Han is a culpable participant in the Elastos ICO alleged herein and caused Elastos to engage in the acts which give rise to liability under §§ 5 and 12(a)(1) of the Securities Act.  Accordingly, Han is a "controlling person" of Elastos within the meaning of § 15 of the Securities Act.

127.     Defendant Li is subject to liability by virtue of her top-level executive position with Elastos and her significant influence and supervisory authority over Elastos.  Li served as the Chief Marketing Officer of Elastos, which provided her the power to control or influence Elastos's actions.  She was responsible for commercial strategy and the marketing and advertising of the Elastos ICO and the Elastos platform to Plaintiffs and Class members.  At all relevant times, Li made numerous public statements promoting the Elastos ICO and the Elastos platform.  As a controlling person of Elastos, Li knew of and actively participated in the Elastos ICO and the sale of unregistered securities in direct violation of the Securities Act.

128.     Defendant Li had the power to influence and control, and did influence and control, directly or indirectly, Defendant Elastos's conduct in offering the ELA Token for sale in the Elastos ICO, resulting in the violation of federal securities laws.  Li was a culpable participant in the Elastos ICO alleged herein and caused Elastos to engage in the acts which give rise to liability under §§ 5 and 12(a)(1) of the Securities Act.  Accordingly, Li is a "controlling person" of Elastos within the meaning of § 15 of the Securities Act.

129.     Defendant Lee is subject to liability by virtue of his top-level executive position with Elastos and his significant influence and supervisory authority over Elastos.  Lee serves as the Chief Operating Officer and a Board Member of Elastos, which provided him the power to control or influence Elastos's actions.  He is responsible for the company's day-to-day operations.  As a controlling person of Elastos, Lee knew of and actively participated in the Elastos ICO and the sale of unregistered securities in direct violation of the Securities Act.

130.     Defendant Lee had the power to influence and control, and did influence and control, directly or indirectly, Defendant Elastos's conduct in offering the ELA Tokens for sale in the Elastos ICO, resulting in violation of the federal securities laws.  Lee is a culpable

32

Case 1:19-cv-05462-GHW   Document 1-3   Filed 06/11/19   Page 34 of 35

participant in the Elastos ICO alleged herein and caused Elastos to engage in the acts which give

rise to liability under §§ 5 and 12(a)(1) of the Securities Act.  Accordingly, Lee is a "controlling

person" of Elastos within the meaning of § 15 of the Securities Act.

131.   Plaintiffs and Class members have suffered damages as a result of Defendants

Chen, Han, Li, and Lee's individual roles as a "controlling person" in Elastos's violations of §§ 5

and 12(a)(1) of the Securities Act.

## VII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of other members of the Class,

respectfully request that the Court enter judgment and relief as follows:

A.   Declaring this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing the undersigned counsel as Class Counsel for the Class;

B.   Declaring the ELA Tokens a security under the federal securities laws;

C.   Declaring that Defendants offered and sold unregistered securities in violation of the federal securities laws;

D.   Declaring that Defendants are liable to Plaintiffs and the Class under §§ 5, 12(a)(1) and 15 of the Securities Act;

E.   Ordering rescission of the investments made by Plaintiffs and the Class in ELA Tokens;

F.   Awarding Plaintiffs the costs of this action, including reasonable allowance for attorneys' fees and litigation costs and expenses;

G.   Leave to amend this Complaint to conform to the evidence presented at trial; and

H.   Ordering such other and further relief as may be just and proper.

## VIII.   JURY DEMAND

Plaintiffs respectfully request a trial by jury of all issues so triable.

Dated: May 28, 2019

Respectfully submitted,

___/s/ Warren A. Raiti_____

Warren A. Raiti, Esq.
**RAITI, PLLC**
80 Broad Street, 25th Floor
New York, New York 10004
Telephone: (646) 916-1404
wraiti@raitipllc.com

*Counsel for Mark Owen and James Wandling*

**BLEICHMAR FONTI & AULD LLP**
Javier Bleichmar
Ross Shikowitz
Nicholas J. Dennany
7 Times Square, 27th Floor
New York, New York 10036
Telephone: (212) 789-1340
Facsimile:  (212) 205-3960
jbleichmar@bfalaw.com
rshikowitz@bfalaw.com
ndennany@bfalaw.com

*Additional Counsel for James Wandling*

34