**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARK OWEN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) Hon. Gregory H. Woods |
| Plaintiff, | ) ) Civil Action No. 1:19-cv-5462-GHW ) ) <u>CLASS ACTION</u> |
| v. | ) ) |
| ELASTOS FOUNDATION, RONG CHEN, and FENG HAN, | ) ) ) |
| Defendants. | ) ) ) |

**AMENDED COMPLAINT FOR VIOLATIONS OF THE**
**FEDERAL SECURITIES LAWS**

Lead Plaintiff Mark Owen and James Wandling ("Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by and through its undersigned counsel, brings this Amended Class Action Complaint against Defendants Elastos Foundation ("Elastos" or "ELA"), Rong Chen, and Feng Han (a/k/a Sunny Feng Han) ("Defendants"), and alleges the following upon personal knowledge as to itself and its own acts, and, as to all other matters, upon information and belief, including the independent investigation of Lead Plaintiff's counsel. Lead Plaintiff files this Amended Complaint as of right under Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure.[1]

## I.    NATURE AND SUMMARY OF THE ACTION

1.    Lead Plaintiff brings this action on behalf of itself and all other similarly situated investors against Defendants for their violations of §§ 5, 12(a)(1), and 15 of the Securities Act

---

[1] Attached as Exhibit A is a "Red Line" comparison of this Amended Class Action Complaint and the original complaint (ECF No. 1-3) for the Court's convenience. Lead Plaintiff's PSLRA certifications have previously been filed in this action. *See* ECF No. 48-1.

of 1933 (the "Securities Act").  15 U.S.C. §§ 77e, 77l(a)(1), 77o(a).  Specifically, in connection

with the Elastos Initial Coin Offering (the "Elastos ICO"), Defendants raised between $94

million and more than $200 million in digital cryptocurrencies by offering and selling

unregistered securities in the form of ELA tokens ("ELA Tokens"), in direct violation of the

Securities Act.  Subsequent to the completion of the Elastos ICO, Defendants continued to

violate the Securities Act by actively offering, and soliciting purchases of, ELA Tokens on the

secondary market.

      2.      The Elastos ICO was an offer and sale of securities.  Defendants' own offering

documentation states that the sale of ELA Tokens is a form of "Private & Public

Crowdfunding" and purchasers of ELA Tokens would become part of the Elastos "***investor***

community."[2]  Defendants also promoted the sale of ELA Tokens by promising that they were

"intrinsic" to accessing and participating in the "new internet of wealth" that Elastos was

purportedly developing, and were limited in supply, and therefore would increase in value.

Additionally, Defendants created a sense of urgency for investors to capitalize on the potential

of the investment, and continued to do so after the ELA Tokens began to trade on the secondary

market.

      3.      Thousands of investors participated in the Elastos ICO by purchasing ELA

Tokens.  Defendants conducted the ICO between January 1, 2018 and January 31, 2018,

approximately.  Elastos delivered the tokens to ICO investors on January 31, 2018.  On

February 1, 2018, ELA was listed on the Huobi Exchange.

      4.      After the Elastos ICO, Defendants continued to participate in the offer and sale of

ELA Tokens by offering, and soliciting the purchase of, ELA Tokens through an intensive

---

[2] All emphasis provided unless otherwise stated.

marketing campaign that included social media postings, internal and third-party public relations efforts, and participation in various investor events throughout the United States.

5.      On July 18, 2018, Elastos Tokens were listed on the KuCoin cryptocurrency exchange.  Elastos Tokens also became available for purchase on at least four other cryptocurrency exchanges since the Elastos ICO: LBank, Hadax, Bit-Z, and Netcoins.  In addition to the thousands of investors that participated in the Elastos ICO, thousands of other investors purchased ELA Tokens on the secondary market.

6.      The Securities Act's registration requirements are designed to protect investors by ensuring that they are provided with adequate information upon which to base their investment decisions.  Absent registration and approval by the Securities and Exchange Commission ("SEC"), issuers of securities are able to improperly tout their investments with no supervision. For example, an issuer could withhold information that would be important to potential investors, or promote its securities by exaggerating the progress of its products or business plan.

7.      Due to the varied and innumerable schemes through which investors can be manipulated and harmed absent any protections under the federal securities laws, § 12(a)(1) of the Securities Act provides for strict liability against any person who offers or sells an unregistered security, unless a registration exemption applies.  The Elastos ICO, and the subsequent solicitations of purchases of ELA Tokens on the secondary market, are offers and sales of unregistered securities by Defendants without an exemption, and Defendants are strictly liable under the Securities Act.

8.      Proof of Defendants' intent or deceptive conduct is not required nor is it an element of Lead Plaintiff's claims.  Lead Plaintiff, on behalf of itself and the Class, seek

compensatory and rescissory relief, providing rescission and repayment of all investments in the Elastos ICO and ELA Tokens.

## II.      JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and Section 22 of the Securities Act (15 U.S.C. § 77v) because Lead Plaintiff alleges violations of Sections 12(a)(1) and 15 of the Securities Act.

10.      The Court has personal jurisdiction over each Defendant pursuant to 15 U.S.C. § 77v(a) because Defendants purposefully directed their activities toward residents of the United States by offering, soliciting and selling ELA Tokens to U.S. investors, and this action arises out of or relates to those activities.  Defendants had continuous and systematic general business contacts with the United States and Defendant Chen "reside[s] and work[s] near Redmond, Washington." *Declaration of Rong Chen in Support of Defendants' Motion to Dismiss Plaintiffs' Complain*t, ECF No. 64.  Defendant Han resides or resided in Cambridge, Massachusetts from September 2018 until at least the inception of this action because Han was served in this action at his residence in Cambridge, Massachusetts.

11.      The Court also has personal jurisdiction over each of the Defendants under NY CPLR § 302.  Defendants conducted business in this County, including the solicitation, sale and offering of ELA Tokens during the Elastos ICO and thereafter.  Additionally, each Defendant either conducts business and maintains operations in New York City, or is an individual who either is present in New York City for jurisdictional purposes, or has sufficient minimum contacts with New York City as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

### III.    PARTIES

12.    Plaintiff Mark Owen ("Owen") is an individual and resident of New York.  On or about September 28, 2018, Owen invested in ELA in New York by purchasing ELA Tokens on the Huobi Exchange.  Defendants offered ELA Tokens and solicited Owen's purchase.

13.    Plaintiff James Wandling ("Wandling") is an individual and resident of Kentucky. Wandling purchased ELA Tokens in the Elastos ICO from ELA with cryptocurrency. Defendants offered ELA Tokens and solicited Wandling's purchase.  During the Elastos ICO, Elastos repeatedly informed Wandling that Elastos would deliver the tokens by February 1, 2018.  Elastos delivered the ELA Tokens to Wandling on January 31, 2018.

14.    On or about February 14, 2018, Wandling elected to participate in a token lock-in program developed by Elastos.  Under the terms of the program, investors agreed not to sell their tokens for a pre-specified amount of time in exchange for accruing interest in the form of additional ELA Tokens.  Wandling agreed not to sell his ELA Tokens for 3 years.  On November 5, 2018, Elastos delivered additional ELA Tokens to Wandling for payment of accrued interest. This delivery constituted an additional sale of unregistered securities.

15.    Defendant Elastos is purportedly registered in Singapore, and has its primary offices in Shanghai and Beijing, China.  By December 2017, Elastos maintained a significant presence in San Francisco, California and by March 15, 2018 had an official "base in Silicon Valley."  The Defendants, including Elastos, used U.S.-based social media platforms to engage in their illegal activities targeted to U.S. investors and perpetrated throughout the entire United States, as described herein.

16.    Defendant Rong Chen ("Chen") is the Co-Founder and Executive Chairman of the Elastos Foundation.  Chen "reside[s] and work[s] near Redmond, Washington." *Declaration*

*of Rong Chen in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint*, ECF No. 64.

Chen has conducted business and promoted the offer and sale of ELA Tokens throughout the

U.S.  At all times relevant to the complaint, Chen acted as a control person of Elastos by virtue

of his role as a key senior management executive and decision maker.

17.     Defendant Feng Han ("Han") is a Co-Founder, CEO, and Board Member of the

Elastos Foundation.  Han has conducted business and promoted the offer and sale of ELA

Tokens throughout the U.S.  At least by February 2018 and until September 2018, Han claimed

to be a "Writing Scholar and Research Associate at Columbia University" which is located in

New York City.  Han resides or resided in Cambridge, Massachusetts from September 2018 until

at least the inception of this action because Han was served at his residence in Cambridge,

Massachusetts.  At all times relevant to the complaint, Han acted as a control person of Elastos

by virtue of his role as a key senior management executive and decision maker.

## IV.   FACTUAL ALLEGATIONS

### A.  Background on Elastos

18.     Elastos purportedly seeks to "create a new kind of Internet, powered by

blockchain technology" where users will be able to "own digital assets" such as digital books,

movies, music, and games, and "generate wealth from them."  Users will be able to own, buy,

and sell digital property without middlemen like Amazon or Apple, in the same manner that

property is sold outside of the internet.  Elastos claims that it will leverage blockchain

technology to ensure digital assets are not compromised and to ensure transactions are safe and

secure.

19.     Elastos markets itself as the "smartweb powered by blockchain."  The

"smartweb" refers to a web of apps that are decentralized.  That is, they can connect with each

other, but do not connect with the internet.  This will purportedly allow transactions of digital property without middlemen and without risk of that data being compromised by a third-party.

20.     According to Elastos, "The Elastos Web will be a special economic zone where Elastos tokens function as the base currency."  Defendants further described ELA Tokens as "the intrinsic token on the Elastos blockchain.  It can be used for trading, investing in digital assets, paying for blockchain processing fees and so on."

21.     While Elastos purports to take advantage of the new and compelling blockchain technology, its origins go back nearly two decades.  The Elastos technology was developed by Elastos co-founder Chen, a former Microsoft Senior Software Engineer from 1992 to 2000.  After leaving Microsoft he founded the software company Kortide in Beijing, China.  Kortide's "lead product" was the operating system Elastos SDK.  Chen purports to have come up with the name Elastos in 2002.

22.     In June 2017, during the height of the blockchain and cryptocurrency mania, Chen abandoned Kortide after 17 years to co-found Elastos with Han.  Prior to co-founding Elastos, Han worked for 25 years as a principal at various schools in China.

### B. Initial Elastos Investors

23.     Merely a month after founding Elastos, Defendants Chen and Han began to solicit investors.  In or around July or early August 2017, Elastos developed its first "White Paper" explaining the Elastos project.  This initial Whitepaper was written entirely in Chinese and preceded Elastos's "Angel Investment" sale of ELA Tokens to "founders and key partners."  Huobi Global Limited, was one of Elastos's key Angel Investors.

24.     Between August 10 and August 20, 2017, Elastos held a "private investment sale" in China during which it raised approximately 4,300 Bitcoins ("BTC") and released

approximately six million ELA Tokens.  Elastos then planned to conduct a public sale only in China and to only subsequently allow global investors to purchase ELA Tokens on exchanges on the secondary market.

25.     However, on or about September 5, 2017, China banned all ICOs, finding that they constituted "illegal fundraising."  As a result, Elastos changed strategy and decided that the Elastos ICO would be open to anyone except Chinese citizens.  In November 2017, Defendants, as well as Elastos Chief Marketing Officer ("CMO") Fay Li ("Li") began to actively promote the Elastos technology in the United States, including on U.S. based social media such as Twitter, Facebook, and Reddit.

**C. The Elastos Initial Coin Offering**

26.     Elastos specifically and openly targeted investors in the United States to participate in its ICO.  To do so, in November 2017, Elastos first established a prominent presence in San Francisco, California and shifted its promotional efforts from Chinese based social media to U.S. based and English language social media.  Defendants then embarked on an aggressive in-person marketing effort to promote Elastos throughout the United States and solicit investors, which included sending Elastos representatives to blockchain and cryptocurrency conferences and expos, and organizing informational "meetups" designed to educate potential investors about Elastos.

27.     In terms of its social media efforts, Elastos's official Facebook account began promoting Elastos at least as early as November 17, 2017 and its official Twitter account, @Elastos_org, began promoting Elastos at least as early as November 29, 2017.  Defendant Han began promoting Elastos's efforts in the United States on Twitter at least as early as November 28, 2017 and CMO Li began promoting Elastos on Twitter at least as early as December 8, 2017.

28.      Many of the tweets published by Defendants and CMO Li included "$ELA"
which is the "cashtag" used on Twitter to refer to the ELA Tokens.  In 2012, Twitter announced
its cashtag feature to allow users to "click on ticker symbols … to search results about stocks and
companies."   The use of the $ELA cashtag by Defendants and Li in their tweets signified to
Twitter users that the tweet related to the ELA Tokens and allowed users seeking information
about ELA Tokens to easily find their tweets by simply searching Twitter for the $ELA cashtag.

29.      On or about November 28, 2017, Elastos held its first in-person marketing event,
an Elastos "meetup" in Silicon Valley.  On that day, Defendant Han tweeted "The first Elastos
meetup in Silicon Valley" and attached a picture of himself with a group of two dozen people.

30.      On November 29, 2017, Defendants Chen and Han attended Blockchain Expo
North America in Santa Clarita, California.  During the Expo, Chen and Han touted the Elastos
platform to Expo attendees and Chen spoke about Elastos in a speech titled "A New Internet
Operating System."

31.      On November 30, 2017, Elastos held its "San Francisco launch meetup."
Defendants Han and Chen attended the Meetup and explained the Elastos platform to the
attendees.  More than 900 people registered for the meetup.

32.      On December 9, 2017, Defendant Han tweeted "Having a meetup in Deloitte US
Headquarters" and attached two pictures from the meetup.  Deloitte's US headquarters is located
in New York City.

33.      On December 24, 2017, Elastos admitted that it was targeting U.S. investors with
an ICO when it posted responses to "Frequently Asked Questions" from interested investors on
Steemit.com, a New York City based and Virginia headquartered blockchain-based blogging and
social media website.  One of the questions asked, "Can US citizens buy Elastos tokens? How

can I do that?"  The response said, "After Elastos completes all of the legal and regulatory procedures, you can register for the whitelist on our official site to buy our tokens. ***This applies not only for US citizens***, but for all except Chinese citizens."  A "whitelist" is a registration process whereby potential investors in an ICO sign up for the opportunity to purchase coins.

34.     On December 26, 2017, Elastos published its first post, titled "An Introduction to Elastos" on Medium.com, a popular San Francisco based online publishing platform.  The post provided a technical description of Elastos and described CMO Li as "Silicon Valley based" and listed her as a contact.

35.     Also on December 26, 2017, Elastos posted the transcript of a November 2017 interview of Rong Chen on Medium.com, in which Chen discussed the history of the Elastos platform and provided details about how the platform works.  He also stated, "we are in the last stages of preparing for an Initial Coin Offering of our ELA token."

36.     On December 27, 2017, Elastos again admitted that it was targeting U.S. investors when it posted a substantially similar version of the "Frequently Asked Questions" on its website and on Medium.com.  In response to the same question, "Can US citizens buy Elastos tokens? How can I do that?" Elastos answered, "Elastos Foundation adheres to [the] highest standards in many regulating nations across the world. ***We have gone through due diligence analysis from leading law firms in California, US and we will be opening our token sale to US residents through a whitelist process.***"

37.     Also on December 27, 2017, Elastos posted an announcement introducing the Company on Bitcointalk.org, an internet forum created by Satoshi Nakamoto, the pseudonymous inventor of Bitcoin.  The forum is dedicated to discussing blockchain technology and cryptocurrency.  In response to the introductory post, Bitcointalk.org users were able to ask

Elastos questions and otherwise post comments about the Company.  Many users focused on

when the Company would hold an ICO.  For example, one user asked "When [does the] ico

start?"  Elastos responded, "The first token sale [will start on] January 1, 2018 and then on

Huobi.pro on Feb 1, 2018."  In the forum, Li also specifically addressed the Company's move

away from China stating, "Basically, we just started the overseas market not even 1 month ago

(by launching an Elastos & NEO & stellar joint meetup in San Francisco), we are trying our best

and are definitely fully engaged.  Our original plan was to go on Huobi on Feb 1, 2018 without

having a community outside of China, but we believe it's very important to build up international

communities and to have people believe in our technologies outside of China as well, that's why

we are here and would love to see your support."

38.     Also on December 28, 2017, Elastos published a press release titled, "Elastos ICO

Offers a Cross-Platform Operating System and Public Blockchain Designed for a Smart

Economy" on Accesswire, a North Carolina based news agency.  The press release announced

that the ICO would "launch in the first week of January 2018" and noted that "six million ELA

tokens have been sold in China, raising nearly 4,000 bitcoins."  The press release also explained

the Elastos platform and provided background information on Defendant Chen.  Elastos included

six contacts where potential investors could get "more information," including the Elastos

Investor Relations email address, the Elastos webpage, the Elastos Twitter feed, the Elastos

Facebook page, and the Elastos Reddit page.  *Yahoo! Finance*, among other outlets, picked up

and posted the press release.  Elastos's official Facebook page also posted a link to the press

release on December 29, 2017.

39.     In or around late December 2017, Elastos posted its first English language White Paper (the "ICO White Paper") to its website.  The ICO White Paper contained a technical description of the Elastos platform as well as an explanation of the ELA Token distribution plan.

40.     Around the same time, Elastos launched the web page tokensale.elastos.org.  This page contained a variety of information useful for potential investors, such as a countdown clock to the opening of the whitelist registration; links to Elastos's social media pages, including Twitter, Facebook, Reddit, and Telegram; a link to the ICO White Paper; a written "Introduction to Elastos"; a video explaining the Elastos platform; answers to "Token sale FAQ"; a "Roadmap" of key operational milestones; and a link to register for the whitelist.

41.     During an interview with "The NEO News Today Podcast" conducted sometime prior to January 1, 2018 and made available to the public on January 2, 2018, Defendant Chen discussed the ICO.  When asked how potential investors could get involved in the ICO, Chen directed potential investors to the Elastos website where there is "a countdown clock" to the ICO to get more information.  Additionally, when asked "Is it true that U.S. citizens are going to be able to participate" in the ICO, Chen affirmed that they could participate and asserted that Elastos discussed the ICO with U.S. based lawyers.

42.     Before and during the ICO, Defendants repeatedly promoted the ICO through social media outlets and platforms such as Twitter, Facebook, Reddit, and Telegram.

43.     For example, between January 2, 2018 and January 30, 2018, Elastos repeatedly posted links to the ICO White Paper, provided instructions on how to participate in the ICO, reminded its followers of dates and deadlines for the ICO, repeatedly urged them to sign up for the whitelist registration before it was too late, posted positive articles about Elastos, and promoted Defendants Chen's and Han's speaking engagements and interviews.  On Twitter

12

alone, during the ICO the official Elastos Twitter account tweeted at least 43 times about Elastos and the ICO.  Defendant Han and CMO Li also used their Twitter accounts to promote the Elastos ICO.  During the month of January 2018, Li posted repeated reminders and instructions concerning the whitelist registration and the ICO.

44.     On or around January 1, 2018, Elastos opened its whitelist registration, allowing potential investors to sign-up for the chance to participate in the ICO.  The registration period was set to last until January 15, 2018, or until 10,000 investors registered.  Elastos indicated that the price for the ICO would be 1 Bitcoin for 800 ELA (investors could also pay with NEO cryptocurrency), though limits were set on the amount that could be purchased.

45.     On January 1, 2018, Li tweeted a picture of a countdown clock hosted on the Elastos website counting down the days, hours, minutes and seconds until the end of the whitelist registration process.  In the tweet, Li stated "we noticed that too many people have clicked the site on the same second! Thanks for your support! However, please be noted [sic] this is a WHITELIST REGISTRATION (not yet a token sale yet [sic]), so no rush guys. TAKE YOUR TIME. Thank you again for your support!"

46.     On January 3, 2018, Li created a sense of urgency by tweeting, "It's the LAST chance and we only have 2 million ELAs to release, we have 9209 submissions & will be closing when it hits 10k (NOT 12 DAYS). Register here: elastos.org If you believe in our over 10 million lines of code and 18 years of hard work."

47.      Due to high investor interest, Li announced that the registration closed on or around January 4, 2018.  Li tweeted, "Got 11915 submissions, thanks for everyone's support. Unfortunately, we had to bring it down much earlier, apologies for those who wanted to join but missed it."

48.     On January 7, 2018, Elastos posted "Whitelist Amendments" to Medium.com. The post informed participants in the ICO that the Company "identified that many [ICO registrants] did not upload their identification successfully" and warned that "All Whitelist edits must be completed before 11AM *P[acific] T[ime]"* on January 9, 2018.  Li also tweeted a link to this post on January 7, 2018.

49.     Relatedly, also on January 7, 2018 Li tweeted, "I need to apologise for claiming that we couldn't accept all 11915 applicants, WHY NOT!? We'll embrace every single person from the whitelist that has passed the KYC.  And also, whoever failed to submit the ID will have a second chance to submit tomorrow."  KYC stands for "know your customer" and is a process by which companies vet and verify the identities of potential investors.

50.     On January 9, 2018, Li tweeted "Please come meet Rong [Chen] at #elastos Developers' party if you have technical questions.  Snacks and drinks will be provided.  Location San Francisco, specific location TBD."  According to a link included in the tweet, the party was an "Elastos Founder's Beer Meetup" and was scheduled for January 21, 2018.

51.     Also on January 9, 2018, Li tweeted, "12 HOURS LEFT for the whitelist amendments. #elastos $ELA."

52.     Between January 9 and January 11, 2020, while the sign-up process for the whitelist registration was still open to potential investors, Li posted links on Twitter to four articles on *Huffington Post*, *Digital Journal*, *Yahoo! Finance*, and *Morningstar* that discussed and explained the purported benefits of the Elastos platform.

53.     On January 12, 2018, after the whitelist registration closed, but before investors could purchase ELA Tokens, Li tweeted a link to a Medium.com article that listed the "11 Blockchain startups to Watch in 2018" and listed Elastos as number one.  In her tweet, Li stated,

"#elastos is listed Number 1 again!"  The linked article focused on the potential future value of blockchain companies and noted that "the blockchain industry is expected to grow to $20 billion by 2024," and "the total market cap of cryptocurrencies … recently crossed $700 billion."  The article referred to cryptocurrencies as "an asset class."

54.     On January 14, 2018, Defendant Han tweeted a link to a video hosted on YouTube titled "Elastos (ELA) SmartWeb | Best ICO January 2018."  The more than 90-minute video featured interviews with Defendants Chen and Han.

55.     On January 16, 2018, Elastos posted "Token Sale—Reminders" on Medium.com. The post provided instructions to potential investors on how to participate in the ICO and set a deadline of "4PM *Pacific Time*, January 22, 2018" for potential investors to transfer their Bitcoin or NEO to make their purchases.

56.     Also on January 16, 2018, Li tweeted, "Emails will be sent to those who have passed the KYC within 24 hours. Get your BTC/NEO ready."  Then, on January 18, 2018, Li tweeted, "Token sale emails were sent, we appreciate your patience!  We did not mention a time as we didn't want scammers to send emails at the same time, hope you understand our thought! Our email should be arriving [in] your mailbox between 10-10:30pm *Pacific Time*."

57.     On January 18, 2018, an Elastos supporter tweeted, and Li retweeted, "Once again … Elastos is showing how to run a professional ICO" and another Elastos supporter tweeted, and Li retweeted, "Couldn't be happier with the @Elastos_org ICO, approval process and fair distribution."

58.     On or around January 18, 2018, Elastos selected 5,702 individuals and 75 entities to participate in the first round of the token sale.  At this time, investors were instructed to transfer either Bitcoins or NEO to a designated "contribution address" on the internet.  Elastos

also told investors "Please transfer your BTC/NEO before 4PM *Pacific Time*, January 22, 2018.

Elastos then conducted two additional rounds of sales for investors who made the largest

allowable investments in the previous rounds.  The deadline to participate in round two was "9

PM *Pacific Time*, January 23, 2018," and the deadline to participate in the third and final round

was "9 PM *Pacific Time*, January 24, 2018.  The transactions were not completed until January

31, 2018 when Elastos delivered the ELA Tokens to investors.

### D.  Defendants Offered, and Solicited Purchases of, ELA Tokens on the Secondary Market

59.    Defendants offered, and actively solicited purchases of, ELA Tokens after the

ICO through a sustained and intensive marketing campaign which included more than 15 events

and speaking engagements in at least eight cities across the United States.  Defendants were

motivated by their own financial interests and/or that of the Company.  Defendants offered, and

solicited purchases of, ELA Tokens on the secondary market in hopes of increasing the number

of investors and ultimately driving up the market price of ELA Tokens.  An increase in the price

of ELA Tokens benefitted Elastos by increasing its market capitalization, thus strengthening its

financial position, and providing opportunities to raise additional funds in the future by

conducting additional offerings.  Defendants Chen and Han were also motivated by their own

financial interests because, as founders, they participated in the Angel Investor sale and own

large quantities of ELA Tokens.

60.    On January 31, 2018, the Elastos official Twitter account tweeted, and Li

retweeted, an announcement that ELA would begin trading on the Huobi Exchange.

Specifically, the tweet announced, "#elastos Airdrop & Trading Campaign. World Premier of

#ELA at 12:00, Jan 30th (GMT+8). View Details on #HuobiPro…"  In a separate tweet on

January 31, 2018, Elastos tweeted a link to the ICO Whitepaper.  In another January 31, 2018

tweet, Elastos posted an article from Benzinga.com, the U.S. based financial media outlet, and included the following quote from the article: "The #elastos foundation recently launched what is so far the most expensive token #crowdsale in history."

61. Also on January 31, 2018, Li tweeted a picture of an Elastos advertisement on the NASDAQ digital screen located in Times Square in New York City.

62. On or about February 1, 2018, ELA was listed on the secondary market on the Huobi Exchange and went live for trading. Immediately, Defendants ramped up their promotion and solicitation of purchases of ELA Tokens.

63. On February 4, 2018, while in New York City, Defendant Han tweeted that "[j]ust before the [E]lastos launch time, the price value surpass [sic] more than 250000 Bitcoin."

64. Also on February 4, 2018, an Elastos supporter tweeted, and Li retweeted, "I am so excited about $ELA. Everyone this is the game-changer blockchain. Get aboard this bullet train before it's too late." A different Elastos supporter tweeted, and Li retweeted, "Elastos and $ELA showing how to run a platform. Top 10 Market Cap Project incoming. Still a great buy right now, but rising fast."

65. On the same day, another Elastos supporter tweeted, and Defendant Han retweeted, "Elastos is a sleeping dragon that's about to light the crypto world on fire. $ela $btc $ltc $eth $xrp."

66. On February 6, 2018, Li tweeted, and Han and Elastos retweeted, a picture of the Elastos advertisement on the NASDAQ digital screen located in Times Square in New York City and included the cashtag $ELA.

67. On February 7, 2018, Defendant Han tweeted the picture of the Elastos advertisement on the NASDAQ digital screen and connected it to the listing of Elastos on the

Huobi Exchange, stating, "The order is: the list day (1st Feb), the elastos advertisements must be Sun shining 24 hours all around the world [sic]."

68.     Also on February 7, 2018, Li tweeted, and Defendant Han and the official Elastos Twitter account retweeted, a picture of the Elastos advertisement on the NASDAQ digital screen. On the same day, Li tweeted, and the Elastos official Twitter account retweeted, a short video of the Elastos advertisement.

69.     On February 9, 2018, an Elastos supporter tweeted, and Li retweeted, "I don't expect the price of $ELA to remain affordable much longer for the average investor."

70.     On or about February 13, 2018, Elastos entered into an agreement with the Chicago, Illinois based business advisory firm ChinaWise to help Elastos promote and offer ELA Tokens to potential investors.  ChinaWise purports to "help North American and Chinese enterprises conduct business with each other."

71.     On February 13, 2018, Elastos, through ChinaWise, published a press release on Business Wire that was distributed throughout the United States, promoting Defendant Han's attendance and speech at CryptoCon 2018 on February 15, 2018, in Chicago, Illinois.  The press release described Han as a "visiting scholar at Columbia University."  According to the press release, the conference topics included "ICOs, bitcoin mining, the socio-political aspects of cryptocurrency, futures trading, and cryptocurrency exchanges, as well as the legal, regulatory and taxation issues surrounding cryptocurrency."  The press release also noted that ELA Tokens (1) are "used for trading, investing in digital assets, paying processing fees, etc."; (2) were listed on the Huobi Exchange; and (3) had a total market value of more than $1.7 billion.

72.     On February 14, 2018, Defendant Han spoke about Elastos at Purdue University in Lafayette, Indiana.  Han tweeted two pictures of the event which indicate that he represented to the audience that he was a "Writing Scholar and Research Associate at Columbia University."

73.     On February 15, 2018, Elastos, again through ChinaWise, published a press release on Business Wire, distributed throughout the United States, promoting Defendant Han's appearance at CryptoCon 2018 in Chicago.  The press release discussed the content of Defendant Han's speech, including that, "Dr. Han believes that data can and will become a wealth-generating asset, reinforcing that Elastos's mission is 'we will change data into wealth.'" Defendant Han tweeted a link to the press release the same day.

74.     Also on February 15, 2018, Defendant Han tweeted "Having speech [sic] in Cryptocurrency Conference in Chicago" and posted three pictures of himself at the conference, including one in which he was speaking to the conference attendees.

75.     On February 16, 2018, an Elastos supporter tweeted, and Li retweeted, "Volume on @Elastos_org keeps rising every day. 70M+ and it is only on ONE exchange, @Huobi_Pro, also the **_market cap_** is still unknown on @CoinMarketCap, this is still flying under the radar. Some very smart people are accumulating."

76.     On February 23, 2018, Defendant Han tweeted a screenshot of a line chart depicting the price of ELA Tokens increasing in value and tweeted, "When we have a meetup in NY. [T]he ela is rising up" accompanied by a photo of Han speaking at the meetup and a photo of the attendees.

77.     On February 27, 2018, Defendant Han tweeted a picture of himself with Jeffrey Wernick—a well-known cryptocurrency investor who gained prominence after investing heavily in Bitcoin in 2009—and stated, "I was happy to have lunch with such a thoughtful person and

look forward to more discussion at dinner." On March 1, 2018, Han tweeted that he "met Jeffrey Wernick" in New York and "held an academic dialogue with him."

78.     On March 8, 2018, Defendant Han tweeted that "Elastos has decided to open a base in Silicon Valley starting on March 15."

79.     On March 13, 2018, Defendant Han tweeted, "Having a lecture about Blockchain and elastos at Harvard" which included a picture of himself speaking to a large group.

80.     On March 17, 2018, Defendant Han tweeted a picture of himself speaking at the Block Invest Summit 2018 in Cambridge, Massachusetts. The tagline for the summit was "The Ultimate Investment Outlook of Blockchain, and Token Sale." Han's tweet stated, "We talk[ed] about Elastos which [is] the first decentralized operation system powered by blockchain."

81.     On March 28, 2018, the Elastos official Twitter account tweeted, and Defendant Han retweeted, "Discussed blockchain opportunities for Wall Street today with JP Morgan chief economist Jim Glassman. #Elastos $ELA" and included a picture of Han with Glassman.

82.     On April 2, 2018, Elastos posted the transcript of a March 19, 2018 discussion Defendant Chen had with a representative of an entity known as Huoxing Financial on the Company's Medium.com page. During the discussion, Chen stated that "Elastos is not exactly Security currency, *which allowed us to do an ICO in the United States* around January 2nd. It was very successful. ***This was the first coin to pass the United States' Howey Test, a public offering [sic] based on the legal and regulatory requirements of the United States***."

83.     On April 4, 2018, Defendant Han tweeted a picture of himself during a speech at a New York University event "about Blockchain and [E]lastos at NYU." Defendant Han promoted ELA at this event and attempted to gain additional investors.

84.     On April 7, 2018, Defendant Han tweeted a picture of himself speaking on a panel at Johns Hopkins University in Baltimore, Maryland and stated, "Talking about Blockchain and Elastos with World Bank Chief security architect [] Zhijun Zhang in The Johns Hopkins University [sic]."

85.     On April 8, 2017, Defendant Han tweeted a picture of himself speaking at George Washington University in Washington D.C. and stated, "Having a speech in [sic] George Washington University."

86.     On April 15, 2018, the Elastos official Twitter account tweeted, and Defendant Han retweeted, "Discussed the issue solved by Elastos for the future blockchain industry at Harvard's AI and Blockchain Forum: providing a trusted operating environment for real-world applications. #Elastos $ELA…"  The tweet included a picture of Han speaking on a panel in front of a large audience.

87.     On April 17, 2018, the Elastos ***"San Francisco Team"*** published on Medium.com the "Elastos Communication Plan by SF Team."  The plan included new efforts to market and promote Elastos to the public including improving branding for the Company and developing informational content about the Elastos platform.

88.     On April 24, 2018, Defendant Han spoke about Elastos at the 2nd Annual FinTech Conference at Fordham University in New York City.

89.     On April 26, 2018, Defendant Han spoke in Boston, Massachusetts at an event titled "Future of Blockchain: A Talk with Elastos and Nebulas."  The Elastos official Twitter account and Defendant Han tweeted about this event multiple times.

90.     From May 4 through May 6, 2018, Elastos sponsored and participated in the 5th Annual "Omaha Summit."  The Omaha Summit is organized, in part, by ChinaWise and purports

to bring Chinese and American business leaders together to discuss investment strategies and U.S.-China relations.  The summit is affiliated with investment guru Warren Buffett and his company Berkshire Hathaway, which has its headquarters in Omaha, Nebraska.  Summit participants attend Berkshire Hathaway's annual shareholders meeting and Warren Buffett often participates in the summit.  Defendants Chen and Han both attended the 2018 Omaha Summit and spoke to the attendees about Elastos during a VIP dinner.

91.     On May 3, 2018, the official Elastos Twitter account tweeted, and Defendant Han retweeted, "Professor Huang hosted a private Elastos seminar at MIT.  Elastos OS was discussed on its application to MIT food safety inspection, big data, and management along with P2P network.  A consensus was reached for future collaborations of an Elastos dev community at MIT #Elastos $ELA."

92.     On May 4, 2018, the Elastos official Twitter account tweeted, and Defendant Han retweeted, "At MIT Professor David Clark, one of the founders of the Internet, discussed the prospect of Elastos as the next generation of P2P Internet to protect users' data rights and security #Elastos $ELA."  The tweet included a picture of Defendant Han and others speaking with Professor Clark.

93.     On May 8, 2018, Elastos held a Developer Meetup in San Francisco.  The event was live streamed on the internet and included an AMA [ask me anything] for participants and viewers.  The Elastos official Twitter account and Defendant Han tweeted about this event multiple times between May 6, 2018 and May 8, 2018.

94.     On May 10, 2018, a supporter of Elastos tweeted, and Defendant Han retweeted, an article discussing the end of Net Neutrality.  The body of the tweet stated, "Another reason $ELA can be a great *investment*.  @Elastos_org is a SmartWeb Powered by Blockchain."

95.     On May 12, 2018, Defendant Han spoke during a "meetup" at Fordham University in New York City.  Elastos, Han, and Li all tweeted about this event on May 12, 2018.  Defendant Han promoted ELA at this event and attempted to gain additional investors.

96.     On May 14, 2018, an Elastos supporter tweeted, and Defendant Han retweeted, a picture of an individual approaching a luxury sports car with the words "ASK ME ABOUT ELASTOS" superimposed on his back.

97.     On May 21, 2018, Li tweeted, and Defendant Han retweeted, "Discussing with the Silicon Valley Congressman Ro Khanna about building The United States National Blockchain and Cryptocurrency Council at United States Capitol and Cannon House Building. #elastos $ela."  The tweet included a picture of Han, Li, and Congressman Khanna. Congressman Khanna posted on his own Facebook page "It was a pleasure to meet with one of my constituents, Fay [Li], as well has her friend Feng, Visiting Scholar and Research Associate at Columbia University, to learn more about the potential for blockchain technology."

98.     On May 24, 2018, Defendant Han met with former Federal Reserve Chairman Alan Greenspan in Washington D.C. and discussed "the gold standard, bitcoin and scarcity." Elastos and Han tweeted pictures of the meeting.

99.     On June 6, 2018, a supporter of Elastos tweeted, and Defendant Han retweeted, "The Internet of Wealth is coming.  Wall Street knows it. Governments know it. Digital assets are the future, and blockchain enables #Elastos to complete their long-running vision.  We are blessed to be involved so early."

100.    On June 18, 2018, a supporter of Elastos tweeted, and Defendant Han retweeted, "It's crazy cheap now – most of my friends bought between [$]50 – [$]80 – so I wouldn't expect

it to go much lower.  I never trust the market though, so I just load up when I think something is good value.  $ELA @ [$]28 is incredibly cheap in my opinion."

101.    On June 19, 2018, Elastos tweeted and Defendant Han retweeted, "@SunnyFengHan met with Dr. Paul Sheard, the Standard & Poor's Executive VP, in New York.  Naturally they discussed the huge impact of blockchain and cryptocurrency on [the] future economy of both China and Japan, as well as how Elastos transforms digital assets into wealth #Elastos $ELA."  The tweet included pictures of Han and Sheard, and a picture of Han in front of the New York Stock Exchange.

102.    On July 13, 2018, Li retweeted a link to an episode of the CNBC Africa television program *Crypto Trader*, which included an interview with Defendant Chen.  *Crypto Trader* bills itself as "the World's only televised Crypto show."

103.    On July 16, Elastos tweeted, and Li retweeted, a link to the segment of the *Crypto Trader* episode containing Defendant Chen's interview.  At the start of the segment, a graphic was displayed showing the July 13, 2018 price of ELA Tokens in U.S. dollars, the trading volume of ELA Tokens on that day, the "Low" and "High" price of ELA Tokens for the day, and the percentage increase in the ELA Token price for the day.  In the interview, Chen touted the ELA platform.

104.    On July 18, 2018, Elastos was listed on the cryptocurrency exchange KuCoin.  On that day KuCoin tweeted, and Li and Defendant Han retweeted, the news of the listing.  The tweet stated, "Elastos (ELA) is now on KuCoin, you can deposit now.  Trading pairs include ELA/BTC and ELA/ETH.  Buying starts July 18, 2018 at 17:30 (UTC +8), selling starts July 18, 2018 (UTC +8), and withdrawal opens July 20, 2018 (UTC +8)."

24

105.     On July 20, 2018, Li retweeted a tweet by Visionz Capital with a link to an 86-page research and analysis report on Elastos published by Visionz Capital.  Visionz Capital describes itself as "an investment and research firm focused exclusively on cryptoasset and blockchain technology."

106.     On August 1, 2018, Li tweeted a link to a July 31, 2018 interview with Defendant Chen on *Crypto 101*, a popular podcast that bills itself as "the average consumer's guide to cryptocurrency."  Defendant Chen discussed his background and the Elastos platform on the podcast.

107.     On August 24, 2018, Elastos posted a 22-minute promotional video on YouTube commemorating Elastos's one-year anniversary and explaining the Elastos platform.  On the same day, Elastos tweeted "Welcome to Elastos! #Elastos $ELA #ElastosVideo #ElastosOneYear" with a link to the YouTube video.

108.     On September 23, 2018, an Elastos supporter tweeted, and Defendant Han retweeted, "[ELA is] [t]he most undervalued and misunderstood project."

109.     On September 28, 2018, based on Defendants' offers and solicitations set forth above, Plaintiff Owen purchased ELA Tokens on the secondary market.

110.     On October 16, 2018, a supporter of Elastos tweeted and Defendant Han retweeted, "Elastos slow steady climb while everything is sideways. … Looking like it's catching on.  Has me thinking how I should have went all in at the $5-7 mark, not surprised. $ELA is the best project in crypto!"

111.     On November 6, 2018, an Elastos supporter tweeted, and Defendant Han retweeted, "I honestly feel @Elastos_org has now cleared out the moonboys, Riff Raff and

people wanting a quick buck… Now we are left with a very strong community and support bade [sic] to bounce off… Real believers are left…"

112.    On November 10, 2018, Defendant Han retweeted a tweet by BBOD Research that included a link to a post on the BBOD Research Blog titled "Fundamental Pick: Elastos (ELA)."  BBOD Research purports to "produce comprehensive, unbiased, evidence-based research and reports on crypto-coins and blockchain technology."  The post included BBOD's rating for ELA Tokens, information about the availability of ELA Tokens on the secondary market including the total supply of ELA Tokens, a partial list of exchanges on which ELA Tokens could be purchased, and information about the Elastos platform.  BBOD rated ELA Tokens as a "SPEC BUY," which it defined as, "A speculative opportunity for investors with a higher risk tolerance."

113.    On November 21, 2018, a supporter of Elastos tweeted, and Defendant Han retweeted, "Best website in crypto no doubt. … And it's going for $3? Feel like a kid holding out the bag for trick or treating."

### E.  ELA Tokens Are Securities

114.    ELA Tokens are securities under U.S. law, legal precedent, and SEC guidelines.

115.    Under 15 U.S.C. § 77b, the definition of a "security" includes an "investment contract."

116.    The seminal Supreme Court case *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946) established a four-part test for determining the existence of an investment contract. The four-part test requires:

(1) An investment of money;

(2) In a common enterprise;

(3) With the expectation of profits;

(4) Solely from the efforts of others.

*Id*. at 298-99.

117.    The SEC has endorsed and utilized the *Howey* test to determine whether certain cryptocurrencies are securities in recent enforcement actions and in recent investor bulletins disseminated to the public.

118.    The Elastos Tokens satisfy the *Howey* test and are investment contracts for the reasons stated below.

### 1)      The Class Invested Money

119.    Lead Plaintiff and all members of the Class paid either Bitcoin or NEO cryptocurrency to purchase their ELA Tokens from Defendants during the ICO.  On the secondary market, investors paid for ELA Tokens with at least Bitcoin, Ethereum, or cash.  Such investments are the type of contribution of value that creates an investment contract.  The investment of "money" need not take the form of cash.

### 2)      In a Common Enterprise

120.    Defendants have acknowledged that investors who purchased ELA Tokens were participating in a common enterprise, as all funds raised would be pooled under the control of the Defendants.  According to the January 1, 2018 ICO White Paper, "The investor community is the backbone of Elastos, and it will support and facilitate Elastos development.  ***All the raised cryptocurrency will belong to the Elastos Foundation, and it will be used to develop the Elastos platform***."

121.    Additionally, the fortune of each investor was, and continues to be, tied to Defendants' ability to use the funds raised from investors to successfully develop and launch the Elastos platform.  Indeed, the value of ELA Tokens are expected to rise upon the successful development and launch of the Elastos platform.  Relatedly, the value of ELA Tokens is also dependent upon, and is expected to rise with, the adoption of the platform by consumers, entrepreneurs, and the business community.  The failure by Defendants to successfully develop or launch the Elastos platform, or an inability to attract users to the platform, would ultimately render the ELA Tokens worthless.

### 3)    Investors Had an Expectation of Profit

122.    Through their words and actions, Defendants led potential investors in the Elastos ICO to expect a profit from the purchase of ELA Tokens.  Defendants repeatedly referred to purchasers of ELA Tokens as "investors."   Elastos also made it clear that it would "issue a scarce amount of tokens," a total of 33 million, and led potential investors to believe that ELA Tokens would be the exclusive form of currency on the Elastos platform, where users would be able to "generate wealth" by buying and selling digital assets.  Therefore, it is logical that potential investors believed that the development and growth of the Elastos platform would create additional demand for ELA Tokens and increase their value.

123.    In fact, in the December 27, 2017 "Frequently Asked Questions" post, Elastos pegged the Elastos ICO pricing to heavy demand for ELA Tokens.  Responding to the comment, "This is the most expensive token sale price I have ever heard," Elastos told potential investors, "[W]e feel this is a responsible valuation based on current market demand for our upcoming token sale."  "Sale price," "valuation," "market," and "demand" are all functional hallmarks of securities.

124.    Defendant Chen has explained the direct relationship between the successful development of the Elastos platform and the market price of the ELA Token.  On April 2, 2018, Elastos posted a March 19, 2018, "Q&A" involving Defendant Chen on the Company's Medium.com page.  Defendant Chen addressed the market price of ELA Tokens and implied that their value would increase as more progress was made on the platform – which is equivalent to companies publicly promoting their future growth and concomitant rise in share value. Specifically, he stated:

> The recent decline in the currency price was actually due in large part to its rapid rise.  Everyone knows that there are more than a thousand kinds of Tokens, but those with real technology or high traffic are few and far between…. As for the currency price of Elastos, I basically do not look at it. I do not look at other coin prices either.  Out of sight out of mind.  Our progress in the project has been relatively smooth, so I think we can get through the winter.  Winter has come and many ICOs have returned to normal.

125.    Defendants also encouraged investors to focus on the profit potential of ELA Tokens by seeking to have ELA Tokens listed on cryptocurrency exchanges in order to reach more investors in the United States and make their efforts and successes known to potential investors.

126.    Finally, Defendants developed a token lock-in program (similar to lock-ups in initial public offerings) in which investors could earn additional ELA Tokens by simply agreeing not to sell a committed portion of their tokens for a predetermined period of time.  On or around February 14, 2018, Elastos ICO investors were given the opportunity to "lock-in" their ELA Tokens for up to three years in exchange for additional ELA Tokens at a rate of 4% of their total locked in tokens for the first year, 5% for the second year, and 6% for the third year.  Investors that locked in tokens had additional expectations of profit in the form of the ELA Tokens they would earn through the lock-in.

127.     On October 24, 2018, Elastos announced the end of its lock-in program.  In a

letter by Chen to the Elastos "Community," titled "Modification to Token Lock-in and Return

Program," he said, "[b]eginning today, lock-in ELA holders will receive an official

communication from the Elastos Foundation regarding the coin return mechanism.  As further

described in that communication, all locked up coins, ***including a 4% bonus***, will be returned to

lock-in ELA holders on November 5th, 4am UTC. ELA coins will also be returned to angel

investors on November 20th, 4am UTC" (the "Lock-In Sale").

128.     The "Lock-In Sale" constituted an offer and sale of unregistered securities.

129.     Chen also added in the letter the following:

As a matter of openness, honesty and transparency, I would like to explain how we
reached this decision. First, it is our understanding that in order to be fully
compliant for expansion into Western markets, it is critical that these coins be
unlocked. If Elastos is to succeed as an international project, compliance with
Western laws is paramount. When we launched this lock up program, it was not
clear to us that these types of programs could be seen as out of sync with
compliance. Now that we have been informed that the continuation of this program
may cause compliance risk, we feel strongly that this modification is in the best
interest of Elastos' long term success.

**4)     Investors' Realization of Profit is Dependent on the Efforts of the
Defendants**

130.      ELA investors' profits, if any, will derive from Defendants' managerial efforts.

Defendants have sole control over the money that they raised through the ICO and the

management of those funds in connection with the Elastos platform.  Lead Plaintiff and members

of the Class have had no input into how the funds raised in the ICO would be allocated or how

they actually were, and are, being spent.

131.     When Lead Plaintiff and members of the Class invested in ELA Tokens, the

Elastos platform had not launched for public use.  In fact, it still has not launched.  As a result,

the ELA Tokens have never had any functionality or utility.  Lead Plaintiff and members of the

Class had no power to bring about the implementation of the Elastos platform.  Indeed, they relied, and still rely, on Defendants' managerial and entrepreneurial efforts to make Elastos fully available to the public, as promised.

132.    Lead Plaintiff and members of the Class also relied, and still rely, on Defendants to: (a) market the Elastos ICO and generate publicity by posting on social media and other outlets; (b) attract additional investors and Elastos users; and (c) continue to raise the necessary funding to finance the Elastos project.

133.    Investors are also forced to rely on Defendants to maintain the ELA token listing on the various cryptocurrency exchanges that allow for active trading.

## F.   The SEC Has Cracked Down on Unregistered ICOs

134.    Beginning in mid-2017, the SEC has proceeded to methodically bring enforcement actions against companies that conduct unregistered ICOs.  On July 25, 2017, the SEC published a 21A investigative report into The DAO, an organization that issued and sold cryptocurrency (the "DAO Report").[3]  According to the DAO Report:

> The DAO was created … with the objective of operating as a for-profit entity that would create and hold a corpus of assets through the sale of DAO Tokens to investors, which assets would then be used to fund "projects." The holders of DAO Tokens stood to share in the anticipated earnings from these projects as a return on their investment in DAO Tokens. In addition, DAO Token holders could monetize their investments in DAO Tokens by re-selling DAO Tokens on a number of web-based platforms ("Platforms") that supported secondary trading in the DAO Tokens.

135.    The DAO ICO raised approximately $150 million in Ethereum-based cryptocurrency.  After the ICO, investors were allowed to sell their tokens freely on

---

[3] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, Exchange Act Release No. 81207, 2017 WL 7184670, (July 25, 2017), https://www.sec.gov/litigation/investreport/34-81207.pdf.

cryptocurrency exchanges.  Subsequent to the ICO, The DAO was hacked and approximately one-third of its funds were stolen.

136.    The SEC's investigation and its final report addressed the question of whether the DAO tokens should be classified as securities.  The SEC applied the *Howey* test and determined the tokens were investment contracts, and therefore were securities that should have been registered under the Securities Act.

137.    In the DAO Report, the SEC stated, "the U.S. federal securities law may apply to various activities, including distributed ledger technology, depending on the particular facts and circumstances, without regard to the form of the organization or technology used to effectuate a particular offer or sale."

138.    On September 25, 2017, the SEC announced a new Cyber Unit in its Enforcement Division with a mandate to "address cyber-based threats and protect retail investors."  Among the items the new Cyber Unit was to focus on was, "[v]iolations involving distributed ledger technology and initial coin offerings."

139.    The Cyber Unit has brought actions against companies for failing to register ICOs.  For example, in December 2017, the SEC charged the California-based company Munchee Inc. with selling unregistered tokens in an ICO relating to purported blockchain-based food review service.  In its press release announcing the action, the SEC stated, "[w]e will continue to scrutinize the market vigilantly for improper offerings that seek to sell securities to the general public without the required registration or exemption."  Munchee immediately halted its ICO and returned all proceeds before issuing any tokens.

140.    On December 11, 2017, SEC Chairman Jay Clayton issued a Public Statement titled *Statement on Cryptocurrencies and Initial Coin Offerings*[4] that addressed the application of U.S. securities laws to ICOs and attempts by companies to skirt the securities laws:

> Following the issuance of the [DAO Report], certain market professionals have attempted to highlight utility characteristics of their proposed initial coin offerings in an effort to claim that their proposed tokens or coins are not securities. Many of these assertions appear to elevate form over substance. Merely calling a token a "utility" token or structuring it to provide some utility does not prevent the token from being a security. Tokens and offerings that incorporate features and marketing efforts that emphasize the potential for profits based on the entrepreneurial or managerial efforts of others continue to contain the hall marks of a security under U.S. Law.

## V.    CLASS ACTION ALLEGATIONS

141.    Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and 23(b)(1) and(b)(3) of the Federal Rules of Civil Procedure, on behalf of the following proposed class: All persons or entities who purchased or acquired Elastos Tokens in domestic transactions in the Elastos ICO, the Lock-In Sale, or the secondary market.

142.    Excluded from the Class are Defendants and their immediate family members, subsidiaries, affiliates, employees, officers, agents, and directors. Also excluded from the Class are any and all exchanges that traded or currently trade the ELA Tokens including, but not limited to, Huobi Exchange, KuCoin, LBank, Hadax, Bit-Z, and Netcoins, and any subsidiaries, affiliates or U.S. counterparts thereof.

143.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims. The Class is so numerous that joinder of all members is impracticable.  On information and belief, there are

---

[4] Statement on Cryptocurrencies and Initial Coin Offerings, SEC Chairman Jay Clayton, (Dec. 11, 2017), https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11.

at least thousands of Class members.  The precise number or identification of members of the

Class is presently unknown to Lead Plaintiff, but may be ascertained from Defendants' books

and records.  Class members may be notified of the pendency of this action by mail, email,

internet postings, and/or publication.

144.    Common questions of law and fact exist as to all members of the Class, which

predominate over any questions affecting only individual members of the Class.  These common

questions of law or fact include, but are not limited to, the following:

a)  whether Defendants offered and sold unregistered securities, in violation of federal
securities laws, to Lead Plaintiff and the Class in the Elastos ICO, the Lock-In Sale and
on the secondary market;

b)  whether the Elastos Tokens are securities;

c)  whether the Class is entitled to compensatory and/or rescissory relief as a result of
Defendants' wrongful conduct as alleged herein.

145.    Defendants engaged in a common course of conduct giving rise to the legal rights

sought to be enforced by Lead Plaintiff, on behalf of itself and the other members of the Class.

Similar or identical statutory law violations and injuries are involved.  Individual questions, if

any, pale by comparison, in both quality and quantity, to the numerous common questions that

dominate this action.

146.    Lead Plaintiff's claims are typical of the claims of the other members of the Class

because, among other things, all such claims arise out of the same wrongful course of conduct

engaged in by Defendants in violation of the federal securities laws as complained of herein.

Further, the damages of each member of the Class were caused directly by Defendants' wrongful

conduct in violation of the federal securities laws as alleged herein.

147.    Mark Owen and James Wandling are adequate Class representatives because they

are members of the Class and their interests do not conflict with the interests of the other

members of the Class they seek to represent.  Lead Plaintiff has also retained counsel competent

and experienced in complex class action litigation.  Lead Plaintiff and its counsel intend to

prosecute this action vigorously for the benefit of all members of the Class.  Accordingly, the

interests of the members of the Class will be fairly and adequately protected by Lead Plaintiff

and its counsel.

148.    A class action is superior to any other available means for the fair and efficient

adjudication of this controversy, and no unusual difficulties are likely to be encountered in the

management of this class action.  The damages and other financial detriment suffered by Lead

Plaintiff and the members of the Class are relatively small compared to the burden and expense

that would be required to individually litigate their claims against Defendants.  As such, it would

be impracticable for members of the Class to individually seek redress for Defendants' wrongful

conduct.  Even if Class members could afford individual litigation, that would pose an undue

burden on the courts. And individualized litigation creates a potential for inconsistent or

contradictory judgments and increases the delay and expense to all parties and the courts.  By

contrast, the class action device presents far fewer management difficulties, and provides

benefits of single adjudication, economy of scale, and comprehensive supervision by a single

court.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### Violations of §§ 5 and 12(a)(1) of the Securities Act
### Against All Defendants

149.    Lead Plaintiff repeats and re-alleges each and every allegation above as if set

forth herein.

150.     Section 5(a) of the Securities Act prohibits the direct or indirect use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of any prospectuses or otherwise; or to carry or cause to be carried through the mails or in interstate commerce, by any means or instrument of transportation, any security for the purpose of sale or for delivery after sale, unless a registration statement is in effect as to such security.

151.     Section 5(c) of the Securities Act makes it unlawful for any person to directly or indirectly make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or buy through the use or medium of any prospectus or otherwise any security, unless a registration has been filed as to such security.

152.     Section 12(a)(1) of the Securities Act grants Lead Plaintiff and the Class a private right of action against any person who offers or sells a security in violation of § 5, and states that such person:

> Shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77l(a)(2).

153.     In connection with the sale of unregistered ELA Tokens through the Elastos ICO, the Lock-In Sale, and the secondary market, Defendants unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails for the purpose of offering, selling, or delivering unregistered securities in direct violation of §§ 5(a), 5(c), and 12(a)(1) of the Securities Act.

154.    Defendants are "sellers" and "offerors" within the meaning of the Securities Act because Defendants sold ELA Tokens in the Elastos ICO and Lock-In Sale to Lead Plaintiff and the Class, and offered and solicited Lead Plaintiff and the Class to invest in ELA Tokens in the Elastos ICO, Lock-In Sale, and in the secondary market.

155.    The sales of ELA Tokens constituted sales of unregistered securities under controlling federal law.  ELA Tokens exhibit the following hallmarks of a security under the test articulated in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946): (a) in order to receive any ELA Tokens, an investment of money in the form of a cryptocurrency was required; (b) the investment of money was made into the common enterprise that is ELA and the potential future ELA platform; c) there was an expectation of returns on the investment; and d) the potential returns depended  on  Defendants' ability to launch and grow the Elastos platform.

156.    The Elastos platform is both a horizontal common enterprise because ELA investments were pooled and under the control of Defendants, and a vertical common enterprise because any profits investors may receive from the investments are dependent on Defendants' efforts.

157.    To purchase ELA Tokens, Elastos ICO investors paid either Bitcoins or NEO cryptocurrency into Defendants' online account – a common pool of funds that commingled each investor's investment.  Investors who purchased ELA Tokens on the secondary market paid Bitcoins, Ethereum, or cash to cryptocurrency exchanges.

158.    Defendants told Elastos ICO investors that their assets would be pooled together and all of the funds initially raised would be invested in the company and the development of the Elastos platform.  The ICO Whitepaper states that "All the raised cryptocurrency will belong to the Elastos Foundation, and it will be used to develop the Elastos platform.  The Bitcoin

proceeds will go to the Elastos Foundation."  Defendants had, and continue to have, sole and exclusive control over the allocation and use of the funds raised in the Elastos ICO.

159.    Profits among the investors are also expected to be divided proportionately.  The number of ELA Tokens purchased by investors was dependent upon the size of an investment and the price paid.  An investor's return on an Elastos ICO investment – potential profits stemming from the future valuation of ELA Tokens – is directly proportional to the amount of an investor's financial stake and the number of ELA Tokens owned.

160.    Defendants offered or sold the ELA Tokens to the Lead Plaintiff and the Class. Plaintiff Wandling purchased ELA Tokens from Defendants pursuant to the ICO and the Lock-In-Sale, and Plaintiff Owen purchased ELA Tokens based on Defendants offers and solicitations to buy.

161.    No registration statements have been filed with the SEC or have been in effect with respect to the sale of ELA Tokens alleged herein. The sale of ELA Tokens was not a transaction exempt from the registration requirements of the Securities Act. By reason of the foregoing, Defendants have violated §§ 5(a), 5(c), and 12(a)(1) of the Securities Act.

162.    As a direct and proximate result of Defendants' unregistered sale of securities in violation of the Securities Act, Lead Plaintiff and Class members have suffered damages in connection with their purchases or acquisitions of ELA Tokens in the Elastos ICO, Lock-In Sale, and on the secondary market.

163.    Defendants are liable to Lead Plaintiff and the Class pursuant to the Securities Act for compensatory and equitable relief, including rescission, together with pre- and post-judgment interest, reasonable attorneys' and experts' fees and costs of suit.

**COUNT II**
**Violations of § 15 of the Securities Act**
**Against Defendants Chen and Han**

164.    Lead Plaintiff repeats and re-alleges each and every allegation above as if set

forth herein.

165.    Section 15 of the Securities Act provides for joint and several liability for

"controlling persons" who had sufficient power or influence over an entity that violated federal

securities laws:

> Every person who, by or through stock ownership, agency, or otherwise, or who,
> pursuant to or in connection with an agreement or understanding with one or more
> other persons by or through stock ownership, agency, or otherwise, controls any
> person liable under section 77k or 77l of this title, shall also be liable jointly and
> severally with and to the same extent as such controlled person to any person to
> whom such controlled person is liable, unless the controlling person had no
> knowledge of or reasonable ground to believe in the existence of the facts by reason
> of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o.

166.    Defendant Chen is subject to liability by virtue of his top-level executive position

with Elastos and his significant influence and supervisory authority over Elastos.  Chen is a Co-

Founder and Executive Chairman of Elastos, which provided him the power to control or

influence the company's actions.   Chen developed the Elastos technology and was responsible

for its continued technical development.  At all relevant times, Chen has given numerous

interviews and made public statements promoting the Elastos ICO and the Elastos platform.  As

a controlling person of Elastos, Chen knew of and actively participated in the Elastos ICO and

the sale of unregistered securities in direct violation of the Securities Act.

167.    Defendant Chen had the power to influence and control, and did influence and

control, directly or indirectly, Defendant Elastos's conduct in offering the Elastos Tokens for

sale in the Elastos ICO, resulting in the violation of the federal securities laws.  Chen is a

culpable participant in the Elastos ICO alleged herein and caused Elastos to engage in the acts which give rise to liability under §§ 5 and 12(a)(1) of the Securities Act.  Accordingly, Chen is a "controlling person" of Elastos within the meaning of § 15 of the Securities Act.

168.     Similarly, Defendant Han is subject to liability by virtue of his top-level executive position with Elastos and his significant influence and supervisory authority over Elastos.  Han is a Co-Founder of Elastos, the Chief Executive Officer, and a Board Member, which provided him the power to control or influence Elastos's actions.  He is responsible for Elastos's operations and business management, including its interactions with Lead Plaintiff and Class members.  At all relevant times, Han has given numerous interviews and made public statements promoting the Elastos ICO and the Elastos platform.  As a controlling person of Elastos, Han knew of and actively participated in the Elastos ICO and the sale of unregistered securities in direct violation of the Securities Act.

169.     Defendant Han had the power to influence and control, and did influence and control, directly or indirectly Defendant Elastos's conduct offering the ELA Tokens for sale in the Elastos ICO, resulting in violation of the federal securities laws.  Han is a culpable participant in the Elastos ICO alleged herein and caused Elastos to engage in the acts which give rise to liability under §§ 5 and 12(a)(1) of the Securities Act.  Accordingly, Han is a "controlling person" of Elastos within the meaning of § 15 of the Securities Act.

170.     Lead Plaintiff and Class members have suffered damages as a result of Defendants Chen and Han's individual roles as a "controlling person" in Elastos's violations of §§ 5 and 12(a)(1) of the Securities Act.

## VII.    PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff, individually and on behalf of other members of the

Class, respectfully requests that the Court enter judgment and relief as follows:

      **A.**  Declaring this action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying the Class as requested herein, designating Lead Plaintiff as Class Representative, and appointing the undersigned counsel as Class Counsel for the Class;

      **B.**  Declaring the ELA Tokens a security under the federal securities laws;

      **C.**  Declaring that Defendants offered and sold unregistered securities in violation of the federal securities laws;

      **D.**  Declaring that Defendants are liable to Lead Plaintiff and the Class under §§ 5, 12(a)(1) and 15 of the Securities Act;

      **E.**  Awarding Lead Plaintiff and the Class damages, including interest or, in the alternative, ordering rescission of the investments made by Lead Plaintiff and the Class in ELA Tokens;

      **F.**  Awarding Lead Plaintiff the costs of this action, including reasonable allowance for attorneys' fees and litigation costs and expenses;

      **G.**  Leave to amend this Complaint to conform to the evidence presented at trial; and

      **H.**  Ordering such other and further relief as may be just and proper.

## VIII.   JURY DEMAND

Lead Plaintiff respectfully request a trial by jury of all issues so triable.

Dated: July 28, 2020                          Respectfully submitted,


                                              **BLEICHMAR FONTI & AULD LLP**

                                              */s/ Javier Bleichmar*
                                              Javier Bleichmar
                                              Ross Shikowitz
                                              7 Times Square, 27th Floor
                                              New York, New York 10036
                                              Telephone: (212) 789-1340
                                              Facsimile:  (212) 205-3960
                                              jbleichmar@bfalaw.com
                                              rshikowitz@bfalaw.com

                                              *Counsel for Lead Plaintiff and Lead Counsel*
                                              *for the Class*

                                              **RAITI, PLLC**
                                              Warren Raiti
                                              1345 Avenue of the Americas, 33rd Floor
                                              New York, New York 10105
                                              Telephone: (212) 590-2328
                                              wraiti@raitipllc.com

                                              *Additional Counsel for Lead Plaintiff*