UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/9/21____
```

---------------------------------------------------------------X

MARK OWEN and JAMES WANDLING,
Individually and On Behalf of All Others Similarly
Situated,

                Plaintiffs,

           -against-

ELASTOS FOUNDATION, FENG HAN, and
RONG CHEN,

                Defendants.

:        1:19-cv-5462-GHW

:     MEMORANDUM OPINION &
:           ORDER

---------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

      Plaintiffs Mark Owen and James Wandling ("Plaintiffs") bring this putative class action

alleging that Defendants Elastos Foundation ("Elastos"), Feng Han, and Rong Chen (together with

Han, the "Individual Defendants," and, together with Elastos, the "Defendants") violated Sections

5, 12(a)(1), and 15 of the Securities Act of 1933 (the "Securities Act") by selling—and soliciting the

sale of—unregistered securities in the form of cryptocurrency tokens.  Defendants moved to dismiss

the Amended Complaint under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), principally

arguing that Owen lacks standing under Section 12(a)(1), that the Court lacks personal jurisdiction

over the Individual Defendants, that Wandling's claims are time-barred, and that the Individual

Defendants are not "sellers" of securities under Section 12(a)(1).  Because the Court finds that

Plaintiffs have adequately pleaded timely violations of Section 12(a)(1) for sales of unregistered

securities as part of both the Elastos ICO and during sales on the secondary market, Defendants'

motion is DENIED.

## I.     BACKGROUND

### A. The Defendants

Defendant Rong Chen is a co-founder and Executive Chairman of Elastos.  Amended Compl. ("AC"), Dkt. No. 68, ¶ 16.  At the time of the events forming the basis for this action, Chen resided and worked near Redmond, Washington.  *Id.*

Defendant Feng Han is the CEO of Elastos, which he co-founded.  *Id.* ¶ 17.  He is also a member of the company's board.  *Id.*  From at least February 2018, until September 2018, Han was a "Writing Scholar and Research Associate at Columbia University" in New York, New York.  *Id.*  Han resided in Cambridge, Massachusetts from September 2018 until at least the inception of this action.  *Id.*  Han received service of the summons in this action at his residence in Cambridge, Massachusetts.  *Id.*

Defendant Elastos is registered in Singapore and has its primary offices in Shanghai and Beijing, China.  *Id.* ¶ 15.  By December 2017, Elastos maintained a significant presence in San Francisco, California.  *Id.*  By March 2018, Elastos maintained an official "base in Silicon Valley."  *Id.*

### B. Founding of Elastos and Early Token Sales

The Individual Defendants founded Elastos in 2017.  *Id.* ¶ 22.  Through Elastos, the Individual Defendants sought to "create a new kind of internet, powered by blockchain technology." *Id.* ¶ 18.  Defendants' goal was to develop a platform of decentralized applications—connected to each other but not connected to the rest of the internet—to facilitate the ownership, purchase, and sale of digital assets without third-party companies like Amazon and Apple.  *Id.* ¶¶ 18–19.  As part of this effort, Defendants developed a cryptocurrency—ELA Tokens—to use as the exclusive currency on the Elastos platform.  *Id.* ¶ 20.

Defendants conducted their initial efforts to drive investment in Elastos exclusively in China. In the summer of 2017, Elastos issued a "white paper" (written in Chinese) explaining the Elastos

platform. *Id.* ¶ 23.  Between August 10 and August 20, 2017, Elastos held a private investment sale in China.  *Id.* ¶ 24.  This sale—which Plaintiffs term an "Angel Investment" sale to "founders and key partners" of Elastos—raised approximately 4,300 Bitcoins and released approximately six million ELA Tokens.  *Id.*

Following its private sale, Elastos planned to conduct an Initial Coin Offering—or ICO—in China.  *Id.*  After the ICO, Elastos planned to allow global investors to purchase ELA Tokens on secondary exchanges.  *Id.*  Those plans, however, hit a major roadblock when China banned ICOs on September 5, 2017.  *Id.* ¶ 25.

C. <u>January 2018 Token Sale</u>

Following the ICO ban in China, Defendants decided to open the ICO to anyone except Chinese citizens.  *Id.*  In November 2017, Defendants began actively promoting the Elastos platform in the United States.  *Id.*  To facilitate that effort, Elastos established a physical presence in San Francisco.  *Id.* ¶ 26.  Elastos also shifted its promotional efforts from China-based social media to U.S.-based and English language social media.  *Id.*

As early as November 29, 2017, Defendants promoted Elastos through the company's official Twitter account—@Elastos_org.  *Id.* ¶ 27.  At the same time, Han and Elastos' CMO, Fay Li, began promoting Elastos through their personal Twitter accounts.  *Id.*  Many of the tweets published by Defendants and Li contained the "cashtag"[1] $ELA.  *Id.* ¶ 28.  Use of the cashtag in a tweet indicated to those who read it that the tweet related—in part—to ELA Tokens.  *Id.*  The cashtag also allowed Twitter users seeking additional information about ELA Tokens to easily find Defendants' tweets by simply searching for the cashtag.  *Id.*

---

[1] A cashtag is a Twitter feature that allows users to "click on ticker symbols . . . to search results about stocks and companies."  AC ¶ 28.

In addition to the tweets, Defendants participated in in-person marketing efforts throughout the United States. *Id.* ¶ 26. These efforts included sending Elastos representatives to blockchain and cryptocurrency conferences and expos, as well as organizing informational "meetups" designed to educate potential investors about Elastos. *Id.* Those meetings and presentations took place from November 2017 through December 2017 in Silicon Valley; Santa Clarita, California; San Francisco, California; and New York, New York. *Id.* ¶¶ 29–32.

On December 24, 2017, Elastos posted responses to "Frequently Asked Questions" from investors interested in ELA Tokens on a New York City-based and Virginia-headquartered blockchain blogging and social media website—Steemit.com. *Id.* ¶ 33. In response to the question "Can US citizens buy Elastos tokens? How can I do that?," Elastos wrote: "After Elastos completes all of the legal and regulatory procedures, you can register for the whitelist[2] on our official site to buy our tokens. This applies not only for US citizens, but for all except Chinese citizens." *Id.*

On December 26, 2017, Elastos posted an article on the San Francisco-based online publishing platform Medium.com titled "An Introduction to Elastos." *Id.* ¶ 34. That same day, Elastos posted a transcript from a November 2017 interview of Chen. *Id.* ¶ 35. In the interview, Chen stated that "we are in the last stages of preparing for an Initial Coin Offering of our ELA token." *Id.* On December 27, 2017, Elastos again posted a response to a "Frequently Asked Question" on Medium.com. *Id.* ¶ 36. In response to the question "Can US citizens buy Elastos tokens? How can I do that?," Elastos wrote: "Elastos Foundation adheres to [the] highest standards in many regulating nations across the world. We have gone through due diligence analysis from leading law firms in California, US and we will be opening our token sale to US residents through a whitelist process." *Id.* That same day, Elastos posted messages on blockchain and cryptocurrency

---

[2] A "whitelist" is a process whereby potential investors in an ICO sign up for the opportunity to purchase tokens. AC ¶ 33.

forum Bitcointalk.org.  *Id.* ¶ 37.  A Bitcointalk.org user responded to one of the posts, asking when the Elastos ICO would begin.  *Id.*  Elastos wrote that "[t]he first token sale [will start on] January 1, 2018" and then stated that trading on a secondary market platform—Huobi.pro—would begin on February 1, 2018.  *Id.*

On December 28, 2017, Elastos issued a press release through North Carolina-based news agency Accesswire.  *Id.* ¶ 38.  The press release—titled "Elastos ICO Offers a Cross-Platform Operating System and Public Blockchain Designed for a Smart Economy"—stated that the Elastos ICO would launch in the first week of January 2018.  *Id.*  The press release also included six contacts for potential investors to access more information, including the Elastos Investor Relations email address, the Elastos webpage, the Elastos Twitter feed, the Elastos Facebook page, and the Elastos Reddit page.  *Id.*

Along with the posts and press release, in late December 2017, Elastos published an English-language White Paper (the "ICO White Paper") to its website.  *Id.* ¶ 39.  The ICO White Paper stated, in relevant part:  "The investor community is the backbone of Elastos, and it will support and facilitate Elastos development.  All the raised cryptocurrency will belong to the Elastos Foundation, and it will be used to develop the Elastos platform."  *Id.* ¶ 120.  The ICO White Paper included a description of the Elastos platform, as well as an explanation of the ELA Token distribution system.  *Id.*

Contemporaneous with the publication of the ICO White Paper, Elastos launched the website "tokensale.elastos.org."  *Id.* ¶ 40.  This website contained information for potential investors in ELA Tokens, including a link to the ICO White Paper, answers to "Token sale FAQ[s]," and a link to register for the whitelist.  *Id.*

Whitelist registration opened on January 1, 2018.  *Id.* ¶ 44.  Potential investors could register on the whitelist from January 1, 2018 until January 15, 2018, or until 10,000 investors registered.  *Id.*

Elastos stated that the ICO price would be 1 Bitcoin for 800 ELA Tokens.  *Id.*  Investors could also

pay with NEO—another cryptocurrency—at a rate not specified in the Amended Complaint.  *Id.*

On January 4, 2018, Elastos closed its whitelist registration after receiving 11,915 submissions from

interested investors.  *Id.* ¶ 47.

 Between January 2, 2018, and January 30, 2018, Elastos posted links to the ICO White

Paper, provided instructions on how to participate in the ICO, reminded its followers on social

media platforms of the dates and deadlines for the ICO, urged its social media followers to

participate in the ICO, and posted links to articles describing the Elastos ICO and the Elastos

platform.  *Id.* ¶ 43.

 On January 2, 2018, "The NEO News Today" podcast published an interview with Chen in

which he discussed the ICO.  *Id.* ¶ 41.  Chen directed potential investors to the Elastos website for

more information about the ICO and confirmed that U.S. citizens could participate.  *Id.*

 On January 16, 2018, Elastos posted an ELA Token sale reminder on Medium.com.  *Id.* ¶

55.  The post provided instructions to potential investors on how to participate in the ICO and set a

deadline of January 22, 2018 for potential investors to transfer their Bitcoin or NEO to purchase the

ELA Tokens.  *Id.*  On January 18, 2018, Elastos selected 5,702 individuals and 75 entities to

participate in the first round of the ELA Token sale.  *Id.* ¶ 58.  Investors were instructed to transfer

either Bitcoins or NEO to a designated contribution address.  *Id.*  Wandling purchased ELA Tokens

from Elastos in the ICO.  *Id.* ¶ 13.  Elastos conducted two additional rounds of sales on January 23,

2018 and January 24, 2018.  *Id.* ¶ 58.  Elastos delivered the ELA Tokens to investors, including

Wandling, on January 31, 2018.  *Id.* ¶¶ 13, 58.

 D. <u>Secondary Market Sales</u>

 On January 31, 2018, Elastos announced that it would begin trading in the secondary market

on the Huobi Exchange.  *Id.* ¶ 60.  That same day, Li tweeted a picture of an Elastos advertisement

on the NASDAQ digital screen in Times Square in New York City. *Id.* ¶ 61. On February 1, 2018, Elastos was listed on the secondary market on the Huobi Exchange. *Id.* ¶ 62. Following the listing on the secondary market, Defendants engaged in a marketing campaign that included more than fifteen events and speaking engagements across the United States. *Id.* ¶ 59. Defendants embarked on this campaign in an attempt to increase the value of the ELA Tokens—thereby increasing Elastos' market cap—as well as the number of investors in ELA Tokens on the secondary market. *Id.*

Starting in February 2018, Defendants—and Li, acting as an agent of Elastos—retweeted several tweets regarding the ELA Token's value. *Id.* ¶ 69. For example, on February 4, 2018, while in New York City, Han tweeted "[j]ust before the [E]lastos launch time, the price value surpass [sic] more than 250000 Bitcoin." *Id.* ¶ 63. On February 6 and 7, 2018, Han, Li, and Elastos, tweeted or retweeted pictures and videos of Elastos advertisements on the NASDAQ digital screen in Times Square. *Id.* ¶¶ 66–68. Additionally, on February 9, 2018, a Twitter user tweeted, and Li retweeted, "I don't expect the price of $ELA to remain affordable much longer for the average investor." *Id.*

On February 13, 2018, Elastos retained Illinois-based business advisory firm China Wise to assist in the promotion of ELA Tokens. *Id.* ¶ 70. That same day, Elastos, through China Wise, issued a press release stating that ELA Tokens (1) are "used for trading, investing in digital assets, paying processing fees, etc.;" (2) were listed on the Huobi Exchange; and (3) had a token market value of more than $1.7 billion. *Id.* ¶ 71.

Around the same time, Defendants developed a lock-in program for the ELA Tokens. *Id.* ¶ 126. Investors who participated in this program received additional ELA Tokens by agreeing not to sell a committed portion of their ELA Tokens for a predetermined length of time. *Id.* ¶ 126. Elastos offered its investors this program starting on February 14, 2018. *Id.* Lock-ins were available

for up to three years and offered payouts of additional ELA Tokens at a rate of 4% of the investor's total locked-in ELA Tokens for the first year, 5% for the second year, and 6% for the third year.  *Id.*

Shortly after Defendants announced the lock-in program, Wandling elected to participate. *Id.* ¶ 14.  Wandling agreed not to sell his ELA Tokens for three years.  *Id.*  On November 5, 2018, Elastos delivered ELA Tokens to Wandling for payment of accrued interest.

Following the announcement of the lock-in program, Defendants continued to appear at events across the United States to promote Elastos as both a platform and an investment.  On February 23, 2018, Han tweeted a screenshot of a line chart showing the increasing price of ELA Tokens accompanied by a photo of Han speaking to a group of people.  *Id.* ¶ 76.  The text accompanying the photos read "[w]hen we have a meetup in NY.  [T]he ela is rising up."  *Id.* Additionally, on March 17, 2018, Han spoke at the Block Invest Summit 2018 in Cambridge, Massachusetts.  *Id.* ¶ 80.  The summit described itself as "[T]he Ultimate Investment Outlook of Blockchain, and Token Sale."  *Id.*  In a tweet describing his speech at the summit, Han wrote:  "We talk[ed] about Elastos which [is] the first decentralized operation system powered by blockchain."  *Id*

On April 2, 2018, Elastos posted a transcript of a March 19, 2018 discussion between Chen and a representative from Huoxing Financial.  *Id.* ¶ 82.  During this conversation, Chen stated:

> Elastos is not exactly Security currency, which allowed us to do an ICO in the United States around January 2nd.  It was very successful.  This was the first coin to pass the United States' *Howey* test, a public offering [sic] based on the legal and regulatory requirements of the United States.

*Id.* ¶ 82.  On April 22, 2018, Han again promoted Elastos to potential investors, this time in a speech at New York University.  *Id.* ¶ 83.  These types of speeches and meetups continued throughout April and May of 2018.  *Id.* ¶¶ 84–98.

As the ELA Tokens traded in the secondary market, Defendants continued to tweet and retweet messages encouraging investment in ELA Tokens.  On May 10, 2018, Han retweeted an article regarding net neutrality and a tweet reading:  "Another reason $ELA can be a great

investment." *Id.* ¶ 94.  On June 18, 2018, Han retweeted a tweet stating:  "It's crazy cheap now—most of my friends bought between [$]50–[$]80—so I wouldn't expect it to go much lower.  I never trust the market though, so I just load up when I think something is good value.  $ELA @ [$]28 is incredibly cheap in my opinion." *Id.* ¶ 100.  On July 16, 2018, Elastos tweeted, and Li retweeted, a link to a segment on the CNBC Africa television program *Crypto Trader* displaying a graphic detailing the volume of ELA Tokens traded on that day, the "Low" and "High" price of ELA Tokens for that day, and the percentage increase in the ELA Token price for that day.  *Id.* ¶ 103.  On July 18, 2018, Elastos was listed on the cryptocurrency exchange KuCoin.  *Id.* ¶ 104.  That same day, KuCoin tweeted, and Li and Han retweeted:  "Elastos (ELA) is now on KuCoin, you can deposit now.  Trading pairs include ELA/BTC and ELA/ETH.  Buying starts July 18, 2018 at 17:30 (UTC +8), selling starts July 18, 2018 (UTC +8), and withdrawal opens July 20, 2018 (UTC +8)." *Id.*  On July 20, 2018, Visionz Capital published a research and analysis report on Elastos.  *Id.* ¶ 105.  Visionz Capital tweeted a link to their report which Li retweeted.  *Id.*

On September 28, 2018, allegedly based on Defendants' statements and retweets, Owen purchased ELA Tokens on the secondary market.  *Id.* ¶ 109.

Despite having promised a three-year program, Elastos announced a premature end to its lock-in program on October 24, 2018.  *Id.* ¶ 127.  Chen issued a letter addressing the termination. *Id.* ¶ 129.  It stated:

> As a matter of openness, honesty and transparency, I would like to explain how we reached this decision.  First, it is our understanding that in order to be fully compliant for expansion into Western markets, it is critical that these coins be unlocked.  If Elastos is to succeed as an international project, compliance with Western law is paramount.  When we launched this lock up program, it was not clear to us that these types of programs could be seen as out of sync with compliance.  Now that we have been informed that the continuation of this program may cause compliance risk, we feel strongly that this modification is in the best interest of Elastos' long term success.

*Id.*

E. Procedural History

On January 31, 2019, Owen filed a summons with notice in the Supreme Court of the State of New York—alleging that Defendants had failed to register the ELA Tokens he purchased on the secondary market. Dkt. No. 1-1. On May 28, 2019, Owen and Wandling filed their initial complaint on behalf of themselves and the putative class. Dkt. No. 1-3. Defendants removed this action to federal court on June 11, 2019. Dkt. No. 1. And, on July 29, 2020, Plaintiffs filed the Amended Complaint. Dkt. No. 68.

## II.    LEGAL STANDARD

A. Rule 12(b)(2)

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). "Where, as here, a court relies on pleadings and affidavits, rather than conducting a 'full-blown evidentiary hearing,' the plaintiff need only make a prima facie showing that the court possesses personal jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)). Thus, a plaintiff "must plead facts which, if true, are sufficient in themselves to establish jurisdiction as to each defendant." *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 251 (S.D.N.Y. 2013) (quotation marks omitted). To make this showing, a plaintiff may use—and a court may consider—affidavits and supporting materials outside the pleadings that, if credited, would suffice to establish jurisdiction over the defendant. *Whitaker v. Am. Telecasting Inc.*, 261 F.3d 196, 208 (2d Cir. 2001); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 630 (S.D.N.Y. 2017). "If the parties present conflicting affidavits, however, 'all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *In re Banco*, 277 F. Supp. 3d at 630 (quoting *Seetransport Wiking Trader*

*Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993), *as amended* (May 25, 1993)).

      B. Rule 12(b)(6)

      To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), Plaintiffs must allege in their complaint facts that, if accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this plausibility standard, Plaintiffs must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged. *Id.* Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8 "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

      When considering a motion to dismiss under Rule 12(b)(6), "a court must accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor." *Levy v. Southbrook Int'l Investments, Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001), *cert. denied*, 535 U.S. 1054 (2002) (citations omitted). However, the Court need not accept legal conclusions as true. *Iqbal*, 556 U.S. at 678. And "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted).

## III.   DISCUSSION

A. Personal Jurisdiction

As an initial matter, Defendants argue that this Court lacks personal jurisdiction over the

Defendants.  Defs.' Br. at 7.  District courts "resolving issues of personal jurisdiction must . . .

engage in a two-part analysis."  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779,

784 (2d Cir. 1999).  "First, they must determine whether there is jurisdiction over the defendant

under the relevant forum state's laws . . . .  Second, they must determine whether an exercise of

jurisdiction under these laws is consistent with federal due process requirements."  *Id.*  Once a

statutory basis for personal jurisdiction is established, "due process requires a plaintiff to allege (1)

that a defendant has 'certain minimum contacts' with the relevant forum, and (2) that the exercise of

jurisdiction is reasonable in the circumstances."  *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659,

673 (2d Cir. 2013) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

> To determine whether a defendant has the necessary "minimum contacts," a
> distinction is made between "specific" and "general" personal jurisdiction.  "Specific
> [personal] jurisdiction exists when 'a [forum] exercises personal jurisdiction over a
> defendant in a suit arising out of or related to the defendant's contracts with the
> forum'; a court's general jurisdiction, on the other hand, is based on the defendant's
> general business contacts with the forum . . . and permits a court to exercise its power
> in a case where the subject matter of the suit is unrelated to those contacts."  The
> existence of either specific personal jurisdiction or general personal jurisdiction
> satisfies the "minimum" contacts requirement of the Due Process Clause.

*Id.* at 673–74 (citations omitted).

"For the purpose of establishing specific personal jurisdiction, the necessary 'fair warning'

requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the

forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities."

*Id.* at 674 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985) (quoting *Keeton v.

Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984), and *Helicopteros Nacionales de Colombia, S.A. v. Hall*,

466 U.S. 480, 414 (1984))).

"Unlike specific personal jurisdiction, general jurisdiction is not related to the events giving rise to the suit." *Id.* To establish general jurisdiction, a plaintiff must "demonstrate the defendant's 'continuous and systematic general business contacts' with the forum at the time the initial complaint was filed." *Id.* (quoting *Helicopteros Nacionales de Colombia, S.A.*, 466 U.S. at 414–16 & n.9). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 922 (2011).

i. 15 U.S.C. § 77v(a)

The Amended Complaint alleges that the Court has personal jurisdiction over Defendants pursuant to 15 U.S.C. § 77v(a), which authorizes nationwide service in cases arising under the Securities Act. AC ¶ 10. While Defendants urge the Court to find that minimum contacts under such a statue should be assessed based on the state in which the court sits rather than the United States as a whole, the Court finds that the relevant contacts for determining personal jurisdiction are contacts with the United States as a whole. And under this analysis, Plaintiffs have pleaded the sufficient minimum contacts by each Defendant for the Court to exercise personal jurisdiction.

Although the Second Circuit "has not yet decided" what contacts are relevant to determining whether defendants possess sufficient minimum contacts under a statute permitting nationwide service of process, other circuits hold that "when a civil case arises under federal law and a federal statute authorizes nationwide service of process, the relevant contacts for determining personal jurisdiction are contacts with the United States as a whole." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014) (collecting cases). This Court agrees. "The rationale underlying this national contacts approach is that when the national sovereign is applying national law, the relevant contacts are the contacts between the defendant and the sovereign's nation." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6243526, at *23 (S.D.N.Y. Oct. 20, 2015), *on reargument in part sub*

*nom. In re: LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 1301175 (S.D.N.Y. Mar. 31, 2016) (internal quotation marks omitted). And this approach comports with that adopted by other courts in this district. *See, e.g., Straub*, 921 F. Supp. 2d at 253 ("When the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process, however, the Fifth Amendment applies, and the Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state.") (internal quotation marks and citations omitted); *Estate of Ungar v. Palestinian Auth.*, 400 F. Supp. 2d 541, 548 (S.D.N.Y. 2005), *aff'd*, 332 Fed.Appx. 643 (2d Cir. 2009) ("If a federal statute provides for nationwide service of process, the jurisdictional reach of an enforcing court is at its fullest—its analysis is limited only by the requirements of due process, and it may consider a party's contacts with the United States as a whole, rather than with the forum state."); *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *44–46 (S.D.N.Y. Mar. 28, 2017), *on reconsideration*, 449 F. Supp. 3d 290 (S.D.N.Y. 2020) (analyzing contacts with the entire United States); *Balestra v. ATBCOIN LLC*, 380 F.Supp.3d 340, 349–50 (S.D.N.Y. 2019) (same).

Regarding Defendant Elastos, Defendants concede that, as pleaded, Elastos has sufficient minimum contacts with the United States to give the court personal jurisdiction over it. *See* Defs.' Br. at 12 (arguing only Han and Chen lack sufficient minimum contracts under a "nationwide contacts" approach). This was a wise choice, as the Amended Complaint is replete with allegations regarding Elastos and/or its agents and employees promoting the purchase of ELA Tokens in the United States. *See, e.g.*, AC ¶¶ 26–27; 33–36; 43; 60–61; 64; 66; 68; 71.

Regarding Han, Plaintiffs have pleaded sufficient facts to vest the Court with both general and specific personal jurisdiction over him. At the time of the events in question, Han resided in the United States—meaning that the Court has general personal jurisdiction over him. And even if the Court lacked general personal jurisdiction over Han, his alleged repeated contacts with the United

States related to the promotion of Elastos and the ELA Tokens is sufficient to plead specific personal jurisdiction.

The "paradigm forum for general jurisdiction over an individual is the individual's domicile, his home." *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 225 (2d Cir. 2014). Defendants argue that Han is not subject to general jurisdiction here because he "reside[s] and work[s] in the People's Republic of China," and he does not maintain a residence in [the United States], nor do[es] [he] frequently travel there." Defs.' Br. at 16 (citing Decl. of Feng Han in Supp. of Defs.' Mot. to Dismiss Pls.' Am. Compl. ("Han Decl."), Dkt. No. 76 , ¶4). While Han may now reside in China, as pleaded, Han maintained a residence in Cambridge, Massachusetts as of the date this action was filed and received service of process at that residence. AC ¶ 17. Such allegations are sufficient to plead general personal jurisdiction at this stage. *See Porina v. Marward Shipping Co.*, 521 F.3d 122, 128 (2d Cir. 2008) ("In general jurisdiction cases, we examine a defendant's contacts with the forum state over a period that is reasonable under the circumstances—up to and including the date the suit was filed." (quotation marks omitted)).

But even if this Court lacked general personal jurisdiction over Han, his repeated contacts with the United States related to the allegations in the Amended Complaint suffice to establish specific personal jurisdiction. As alleged, Han repeatedly and continuously promoted Elastos and the ELA Tokens in the United States. *See, e.g.*, AC ¶¶ 29–32; 63; 67–68; 71; 73–74; 76. While Defendants attempt to recast these contacts as mere discussions of Elastos "as a business," (Defs.' Br. at 14), the Amended Complaint adequately alleges that Defendants were promoting Elastos' merits as a business in order to increase the value of the ELA Tokens and drive further investment in ELA Tokens. AC ¶¶ 26; 59. Indeed, Elastos' decentralized platform for exchanging digital assets—*i.e.*, its business—was not operational at the time of Han's alleged conduct. Defendants' argument then, is that Han was promoting a product that did not exist rather than promoting

investment in that product in order to generate investment in the product that would drive development.  As the Court must construe all reasonable inferences in favor of Plaintiffs at this stage, Plaintiffs have plausibly alleged that Defendants' actions were directed to promote Elastos as an investment.

Next, Defendants concede that, as pleaded, the Court has general personal jurisdiction over Chen.  *See* Defs.' Br. at 16 (declining to challenge general jurisdiction over Chen).  Such a concession is only appropriate where, as here, the defendant resided in the United States during the period of his conduct alleged in the complaint.  AC ¶ 16.  As the Court requires only either general or specific personal jurisdiction—not both—the Amended Complaint adequately pleads personal jurisdiction over Chen and the inquiry may end here.  *See In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 674 ("The existence of either specific personal jurisdiction or general personal jurisdiction satisfies the "minimum" contacts requirement of the Due Process Clause.").  However, even if the Court lacked general personal jurisdiction over Chen, the Amended Complaint adequately pleads specific personal over him as well.  The Amended Complaint contains numerous allegations related to Chen's promotion of Elastos and ELA Tokens in the United States.  For example, Chen, while in the United States, confirmed that U.S. citizens could participate in the ICO.  *Id.* ¶ 41.  Chen also attended expos and meetups in the United States to promote Elastos.  *Id.* ¶¶ 30–31, 50.

In a final attempt to thwart jurisdiction over the Individual Defendants, Defendants argue that exercising personal jurisdiction over Chen and Han would be unfair and unreasonable.  Defs.' Br. at 17.  "This prong of the inquiry rarely defeats jurisdiction where a defendant has sufficient forum contacts, and is largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process."  *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d at 645 (quotation omitted).  So too here, where all of the relevant factors weigh in favor of the exercise

of jurisdiction and the only significant burden is one of Defendants' own making—Han's decision to leave his residence in the United States.

"While the exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts at the first stage of the inquiry, it may be defeated where the defendant presents 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Metropolitan Life Ins.*, 84 F.3d at 568 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477–78 (1985)). In determining whether the exercise of personal jurisdiction over a particular defendant would be reasonable, the court must evaluate "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Id.* at 568 (citing *Asahi Metal Indus. Co. v. Super. Ct.*, 480 U.S. 102, 113–14 (1987)).

Here, exercising personal jurisdiction over the Individual Defendants is not unreasonable. Regarding the first factor, Chen lives in Redmond, Washington and "the realities of modern transportation and communication, as well as the nature of civil litigation . . . serve to reduce the burdens of litigating in a distant forum." *S.E.C. v. Softpoint, Inc.*, 2001 WL 43611, at *6 (S.D.N.Y. Jan. 18, 2001). And while Han now lives in China, he availed himself of this Court's jurisdiction while living in the United States. This is a burden of Han's own making. The Court fails to see, and Defendants fail to establish, that exercising jurisdiction over a defendant after that defendant intentionally departs from the forum is unreasonable. Regarding the second factor, because this is a case brought under U.S. federal law, the judicial system has a strong interest in resolving it here. *See Straub*, 921 F. Supp. 2d at 259. Finally, Plaintiff's interest in obtaining a convenient and efficient

resolution of this dispute is self-evidently strong.[3]  Accordingly, Plaintiffs have adequately pleaded personal jurisdiction over each defendant.

ii. NYCLPR

Defendants also challenge the Court's jurisdiction under New York Law.  Defs.' Br. at 7. However, because the Court concludes that Plaintiffs have adequately pleaded personal jurisdiction under 15 U.S.C. § 77v(a), it need not reach the question of whether personal jurisdiction is proper under New York law.  *See Platinum*, 449 F. Supp. 3d 290, 319 n.23.

B. Violations Section 12(a)(1) of the Securities Act

Section 12(a)(1) of the Securities Act creates a private right of action to enforce violations of Section 5 of the Securities Act, which "prohibits the offer, sale, or delivery after sale of any security without an effective or filed registration statement."  *S.E.C. v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 364 (S.D.N.Y. 2020) (citing 15 U.S.C. § 77e(a), (c)).  "[A] prima facie case of a section 5 violation requires [a showing]:  (1) that no registration statement was in effect or filed; (2) defendant offered or sold a security; and (3) the offer or sale took place in interstate commerce."  *Id.* (citing *S.E.C. v. Cavanagh*, 1 F. Supp. 2d 337, 361 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2d Cir. 1998)).  Here, Plaintiffs have adequately pleaded Section 12(a)(1) claims as to the ELA Tokens offered in the ICO, the ELA Tokens sold in the secondary market, and the ELA Tokens distributed as part of the lock-in program.  In each instance, Plaintiffs have pleaded that Defendants sold, or solicited the sale of, ELA Tokens in interstate commerce, that the ELA Tokens were securities, and that no registration statement was in place at the time of the sales.  While Defendants raised a bevy of arguments as to why Plaintiffs' claims are insufficient as to each set of sales, none of these issues—at least at the pleading stage—are sufficient to defeat Plaintiffs' well-pleaded complaint.

---

[3] The fourth and fifth factors are not relevant here.

i. ICO Purchases

As pleaded, the Amended Complaint states a *prima facie* violation of Section 12(a)(1) as to the ELA Tokens purchased in the ICO (the "ICO Purchases").  Defendants do not contest on this motion that, as pleaded, no registration statement was in effect during the ICO, that the ELA Tokens constituted securities, that the Defendants sold Wandling the ELA Tokens in the ICO, or that the sales took place in interstate commerce.  Instead, Defendants argue that the claims related to the ICO Purchases are untimely because Owen—who purchased ELA Tokens only in the secondary market—lacks standing to bring claims related to the ICO Purchases while Wandling— who purchased ELA Tokens in the ICO—did not join this action until after the expiration of the one-year statute of limitations.  In the end, because Owen filed a notice of summons within one year of the end of the ICO, Plaintiffs' claims related to the ICO Purchases are timely.  While Owen lacks standing to bring the ICO claims individually, Plaintiffs have adequately pleaded that Owen has class standing—meaning that he may bring claims related to the ICO Purchases on behalf of the class. Separately, even if Owen did not have class standing, his filing of the notice of summons in this action tolled the applicable statute of limitations under the Supreme Court's holding in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 554 (1974), meaning that Wandling timely joined the action. Accordingly, Plaintiffs have adequately pleaded timely claims related to the ICO claims.

Claims brought under Section 12(a)(1) and Section 5 of the Securities Act of 1933 are governed by a one-year statute of limitations.  15 U.S.C. §77m ("No action shall be maintained to . . . enforce a liability created under section 77l(a)(1) of this title, unless brought within one year after the violation upon which it is based.").  "The 'lapse of a limitations period is an affirmative defense that a defendant must plead and prove,' and dismissing claims on statute of limitations grounds at the complaint stage 'is appropriate only if a complaint clearly shows the claim is out of time.'"  *S.E.C. v. Gabelli*, 653 F.3d 49, 60 (2d Cir. 2011) (citations omitted), *rev'd on other grounds*, 568

U.S. 442 (2013).[4]  Each of the acts prohibited by Section 5—the offer, sale, and after-sale delivery of an unregistered security—are distinct violations for statute of limitations purposes. *Eriksson v. Galvin*, 484 F. Supp. 1108, 1119 (S.D.N.Y. 1980).

---

[4] Federal Rule of Civil Procedure 8(c) lists "statute of limitations" as an affirmative defense. F.R.C.P. 8(c).  As a general rule, the "lapse of a limitations period is an affirmative defense that a defendant must plead and prove." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 426 (2d Cir. 2008).  Therefore, the court should not grant a motion to dismiss on the basis of a statute of limitations defense unless "the defense appears on the face of the complaint." *Id.* Defendants argue that in the context of a Section 12 claim, Plaintiffs bear the burden to "affirmatively plead that the claim is not barred under the statute of limitations." Defs.' Br. at 18–19.  Defendants' argument relies on several district court decisions from this district. *Id.* (quoting *Mori v. Saito*, 2013 WL 1736527, at *3 (S.D.N.Y. Apr. 19, 2013) and citing *Beres v. Thomson McKinnon Sec., Inc.*, 1987 WL 16977, at *11 (S.D.N.Y. Sept. 10, 1987)).  Those cases, in turn, rely on a rule, adopted by the First and Ninth Circuits for Section 12 claims, that "when the very statute which creates the cause of action also contains a limitation period, the statute of limitations not only bars the remedy but also destroys the liability, and therefore the plaintiff must plead and prove facts showing that he is within the statute." *Cook v. Avien, Inc.*, 573 F.2d 685, 695 (1st Cir. 1978) (quoting 3 Louis Loss, Securities Regulation 1742 (2d ed. 1961)); *see Toombs v. Leone*, 777 F.2d 465 (9th Cir. 1985).  But this rule appears to be in direct conflict with Federal Rule of Civil Procedure 8(c)'s description of statute of limitations as an affirmative defense.  Indeed, even the Ninth Circuit has since described the rule established in the *Toombs* decision as "archaic," and that criticism of it was "justified."  The Ninth Circuit's analysis of the question is worthy of quotation at length.

> The defendants contend that the statute of limitations is an element of Section 10(b) . . . .  But in those cases the Court simply refers to the statute of limitations as a general dimension of Section 10(b), not an essential element of the claim . . . .  Nor do we believe that the statute of limitations becomes transformed as an element of such a claim pursuant to the archaic rule "'that, when the very statute which creates the cause of action also contains a limitation period, the statute of limitations not only bars the remedy but also destroys the liability, and therefore the plaintiff must plead and prove facts showing that he is within the statute.'" *Cook v. Avien, Inc.*, 573 F.2d 685, 695 (1st Cir. 1978) (quoting 3 Louis Loss, Securities Regulation 1742 (2d ed.1961)).  We followed such general rule in *Toombs v. Leone*, 777 F.2d 465 (9th Cir. 1985), holding that "the plaintiff must affirmatively plead sufficient facts in his complaint to demonstrate conformity with the statute of limitations" if he is to make out a violation of Section 12 of the Securities Act of 1933. *Id.* at 468.

> This rule has incurred forceful, and we think justified, criticism. In *Tregenza v. Great American Communications Co.*, 12 F.3d 717 (7th Cir. 1993), the Seventh Circuit stated that "[t]o the extent that the rule has persisted, it has done so by blind inertia" and that "[i]t is time that it was discarded." *Id.* at 719.  Pursuant to Fed. R. Civ. P. 8(c), the statute of limitations is an affirmative defense.  We recognize, however, that the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4, may require a plaintiff to plead certain facts with particularity, which may establish that the action is time-barred. But the Supreme Court recently explained in *Jones v. Bock*, 549 U.S. 199, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), that even though "the complaint is subject to dismissal for failure to state a claim" because the "allegations ... show that relief is barred by the applicable statute of limitations, . . . that does not make the statute of limitations any less an affirmative defense." *Id.* at 920.

> Notwithstanding that such a disapproved pleading rule may survive in this circuit with respect to Section 12, we are convinced that it is inapplicable to Section 10(b) because, at least in this case, that statute creates no express period of limitations.  *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (creating a uniform statute of limitations for an implied cause of action under Section 10(b) because that statute failed to provide an express period of limitations), superseded in part by statute, 28 U.S.C. § 1658(b); *see also Tregenza*, 12 F.3d at 719 (rejecting the argument that a statutorily mandated statute of limitations "is an element of the claim itself" because such argument is "a conclusion rather than an explanation, and an especially dubious one where as in

Owen filed a notice of summons on January 31, 2019, one year after Elastos last delivered the ELA Tokens as part of its ICO.  While Owen indisputably does not have Article III standing to bring claims regarding the ICO purchases, he does have Article III standing to bring claims related to the secondary market purchases.  And, as discussed below, he has statutory standing to bring the same.  The issue here then is whether Owen has standing to bring claims *on behalf of* putative class members whose claims he could not pursue individually—that is to say, the question is whether Owen has class standing.

In the Second Circuit, "a plaintiff [in a putative class action] has class standing if he plausibly alleges (1) that he 'personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant,' and (2) that such conduct implicates 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants."  *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012).  A plaintiff need not have Article III standing stemming from the exact same conduct as the other members of the putative class.  *Id.* at 158 ("But whether NECA has 'class standing' . . . does not turn on whether NECA would have statutory or Article III standing to seek recovery for misleading statements in [separate offering documents].").  As the Court has already determined

---

this case the statute of limitations isn't even found in the statute that creates the substantive right").  In any event, we remain unpersuaded that the statute of limitations is an element of Section 10(b).

*Johnson v. Aljian*, 490 F.3d 778, 782 n.13 (9th Cir. 2007).  As a result of the "justified" critiques of the rule adopted in *Toombs*, the Ninth Circuit cabined the case's holding to claims arising under Section 12, and did not extend it beyond that context.  But despite its recognition of the issues with its precedent, the Ninth Circuit was constrained by its holding in *Toombs*.  This Court, however, is not bound by *Cook* or *Toombs*.  And the Court is also not bound by the prior district court decisions which adopted without analysis the Ninth Circuit's ruling in *Toombs*.  *See Camreta v. Greene*, 563 U.S. 692, 709 n. 7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.") (quoting 18 J. Moore et al., Moore's Federal Practice § 134.02[1] [d], p. 134–26 (3d ed. 2011)).  The Court is unaware of any Second Circuit precedent that establishes that satisfaction of the statute of limitations must be affirmatively pleaded as an element of a claim under Section 12.  As a result, the Court follows Federal Rule of Civil Procedure 8(c) and considers the statute of limitations in the context of a claim under Section 12 as an affirmative defense, rather than as an element of the claim.  This conclusion has no ultimate impact on the result of the Court's analysis here:  Defendants would not be entitled to dismissal of Plaintiffs claims on the basis of the statute of limitations even if satisfaction of the statute of limitations was treated as an element of the claim.

that Plaintiffs have adequately pleaded Article III and statutory standing as to Owen's secondary market purchases, it need only address the second step of the class standing analysis—whether the alleged conduct forming the basis of the secondary market purchase claims "implicates 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *Id.* at 162.

Here, the ICO purchase claims and the secondary market purchase claims are sufficiently similar to plead class standing.  Both claims will require proving that the ELA Tokens were securities and that Defendants sold (or solicited the sale of) those securities to members of the putative class in the absence of an effective registration statement.  While Defendants certainly may challenge the definition of putative class or the adequacy of Owen as a class representative at the class certification phase, the allegations in the complaint are sufficient to plead class standing.  Accordingly, because Plaintiffs have adequately pleaded that Owen has standing to bring claims on behalf of the ICO purchasers, and because Owen filed the notice of summons in this action within the one-year statute of limitations period, Plaintiffs claims are timely.

Separately, even if Owen lacked class standing to bring claims on behalf of the ICO purchasers, the statute of limitations for those claims would be tolled under *American Pipe*.  There, the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Am. Pipe*, 414 U.S. at 554.  In *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 354 (1983), the Supreme Court expanded on this doctrine and held that "[o]nce the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied.  At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action."  The Second Circuit has since clarified that

> Because members of the asserted class are treated for limitations purposes as having instituted their own actions, at least so long as they continue to be members of the

class, the limitations period does not run against them during that time. Once they cease to be members of the class—for instance, when they opt out or when the certification decision excludes them—the limitation period begins to run again on their claims.

*In re WorldCom Sec. Litig.*, 496 F.3d 245, 255 (2d Cir. 2007); *see also Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 393 (2d Cir. 2021) (holding that *American Pipe* tolling allows for the addition of new class representatives following expiration of the statute of limitations period "whether because they would be better representatives, because class definitions are modified, because subclasses are needed, or for any other case-management reason" (quoting *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 615 (7th Cir. 2020))).

Applying *Worldcom*, *American Pipe* tolling applies here. *Id.* And "[i]t would not undermine the purposes of statutes of limitations to give the benefit of tolling to all those who are asserted to be members of the class for as long as the class action purports to assert their claims." *WorldCom*, 496 F.3d at 255. Accordingly, even if Owen lacked class standing, his filing of the notice of summons tolled the statute of limitations as to the ICO purchases. And because the subsequent addition of Wandling to this action was timely, Plaintiffs have timely pleaded violations of section 12(a)(1) stemming from the ICO purchases.

ii. Secondary Market Purchases

As pleaded, the Amended Complaint states a *prima facie* violation of Section 12(a)(1) as to the ELA Tokens purchased on the secondary market (the "Secondary Market Purchases"). Defendants do not contest in this motion that, as pleaded, no registration statement was in effect during the Secondary Market Purchases, that the ELA Tokens constituted securities, or that the sales took place in interstate commerce. Rather, Defendants raise a threshold issue—whether Section 12(a)(1) allows a plaintiff to bring a cause of action for secondary market transactions at all. And they also argue that they do not qualify as "sellers" of the ELA Tokens on the secondary market under the Supreme Court's holding in *Pinter v. Dahl*, 486 U.S. 622 (1988). But violations of Section 5—and by

extension Section 12(a)(1)—may result from initial or secondary sales of securities.  And the facts pleaded in the complaint sufficiently establish that Defendants solicited the Secondary Market Purchases for their own financial gain.

> Section 12(a)(1) of the Securities Act states the following:

> Any person who (1) offers or sells a security in violation of [section 5 of the Securities Act] . . . shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77*l*(a)(1).  Under Section 5 of the Securities Act, "[u]nless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to . . . sell such security through the use or medium of any prospectus *or otherwise* . . . ."  15 U.S.C. § 77e (emphasis added).  "When a registration statement is filed, it is that specific offering of securities that is registered; the securities themselves are not considered registered for all times and all purposes." *S.E.C. v. Caledonian Bank Ltd.*, 145 F. Supp. 3d 290, 306 (S.D.N.Y. 2015) (citing *S.E.C. v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998) (registration statement covering issuance to management did not cover reoffering of shares to other persons)).  If a later sale occurs, such as a transaction on the secondary market, "the securities sold in that offering will either be 'registered, exempt, or illegal.'" *Id.* (quoting 1 Law Sec. Reg. § 4:2).  "If the relevant instruments are securities and a prima facie case of a section 5 violation is then established, 'the burden shifts to the defendant to show that the securities were exempt from the registration requirement.'"  *Telegram Grp.*, 448 F. Supp. 3d at 365–66 (quoting *Cavanagh*, 155 F.3d at 133 (citing *S.E.C. v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953)))).

Exemptions to Section 5, and by extension Section 12(a)(1), are listed in Section 4 of the Securities Act.  *See* 15 U.S.C. § 77d(a).  Such exemptions include, by way of example:  "transactions by any person other than an issuer, underwriter, or dealer;" "transactions by an issuer not involving

any public offering;" "transactions by a dealer" (with certain exceptions); and "brokers' transactions executed upon customers' orders on any exchange or in the over-the-counter market but not the solicitation of such orders."  *Id.*

Here, Defendants claim no such exemption.  Instead, Defendants argue that, under *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995), in order to state a claim under Section 12(a)(1), Plaintiffs must have purchased securities in a "new 'public offering' and not in the aftermarket."  Defs.' Br. at 27.  But the Court in *Gustafson* announced no such rule for Section 12(a)(1) claims.  In *Gustafson*, the Supreme Court analyzed a claim under Section 12(a)(2) of the Securities Act, under which "buyers have an express cause of action for rescission against sellers who make material misstatements or omissions 'by means of a prospectus.'"  *Gustafson*, 513 U.S. at 564.  At issue was "whether th[e] right of rescission extends to a private, secondary transaction, on the theory that recitations in the purchase agreement are part of a 'prospectus.'"  *Id.*  Ultimately, the Court concluded that a prospectus "is confined to documents related to public offerings by an issuer or its controlling shareholders."  *Id.* at 569.  In so holding, the Court said nothing about limiting claims under Section 12(a)(1) to initial offerings of securities.  Indeed, the Court only made one reference to Section 12(a)(1), noting that

> We are reluctant to conclude that § [12(a)(2)] creates vast additional liabilities that are quite independent of the new substantive obligations the Act imposes.  It is more reasonable to interpret the liability provisions of the 1933 Act as designed for the primary purpose of providing remedies for violations of the obligations it had created.  Indeed, §§ 11 and [12(a)(1)]—the statutory neighbors of § [12(a)(2)]—afford remedies for violations of those obligations.  *See* § 11, 15 U.S.C. § 77k (remedy for untrue statements in registration statements); § 12(1), 15 U.S.C. § 77l (1) (remedy for sales in violation of § 5, which prohibits the sale of unregistered securities).

*Id.* at 569, 572.

Consequently, nothing in *Gustafson* limits claims under Section 12(a)(1) to the initial offerings of a security.  Nor does the text of the statute support grafting the holding of *Gustafson* onto Section 12(a)(1).  Section 12(a)(1) is meant to remedy violations of Section 5.  And violations of Section 5 do

not exclusively require use of a prospectus.  *See* 15 U.S.C. § 77e(a)(1) ("Unless a registration

statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) . . . to sell such security through the use or medium of any prospectus *or otherwise*." (emphasis

added)).  As Judge Hamilton reasoned in *Zakinov v. Ripple Labs, Inc.*,

> Unlike [Section 12(a)(2)], which applies to certain sale of securities "by means of
> prospectus or oral communication," [Section 12(a)(1)] prohibits the sale of an
> unregistered security "through the use or medium of any prospectus **or otherwise**."
> Because subsection (a)(1) provides a broader basis for assigning liability than its
> subsection (a)(2) counterpart, the court . . . concludes that it may consider a [Section
> 12(a)(1)] claim premised upon a purchase outside the initial distribution context.

2020 WL 922815, at *12 (N.D. Cal. Feb. 26, 2020) (citation omitted).

Instead, by its terms, the reach of Section 12(a)(1) extends to any and all violations of

Section 5.  As the Supreme Court wrote in *Gustafson*, "§§ 11 and 12[a](1)—the statutory neighbors of

§ 12[a](2)—afford remedies for violations of [obligations created under the 1933 Act]. *See* § 11, 15

U.S.C. § 77k (remedy for untrue statements in registration statements); § 12[a](1), 15 U.S.C. § 77l (1)

(remedy for sales in violation of § 5, which prohibits the sale of unregistered securities)."  *Gustafson*,

513 U.S. at572.  Violations of Section 5 may occur as a result of initial or secondary sales of

securities.  *See, e.g.*, *Caledonian Bank*, 145 F. Supp. 3d at 306 ("[I]t is of no moment whether the initial

offering was covered by a valid registration statement because the SEC has plausibly alleged that

Verdmont later *resold* the securities for its clients in offerings bereft of separate registration

statements."); *S.E.C. v. Boock*, 2011 WL 3792819, at *15 (S.D.N.Y. Aug. 25, 2011) (applying Section

5 to secondary sales); *Ellison v. Am. Image Motor Co.*, 36 F. Supp. 2d 628, 644 (S.D.N.Y. 1999)

(analyzing Section 12(a)(1) claims related to scheme involving "open market purchasers"); *In re Laser

Arms Corp. Sec. Litig.*, 794 F. Supp. 475, 483 (S.D.N.Y. 1989), *aff'd*, 969 F.2d 15 (2d Cir. 1992)

(analyzing 12(a)(1) claims stemming from purchases on the secondary market); *Fukuda v. Nethercott*,

2016 WL 3920176, at *2–3 (D. Utah July 15, 2016) (rejecting defendants' argument that "[i]n order

to have standing to assert a Section 12(a)(1) claim, a plaintiff must show that he purchased the

securities at issue directly in a public offering and not in the aftermarket."); *In re Biozoom, Inc. Sec. Litig.*, at *3 (N.D. Ohio Aug. 20, 2015), *judgment entered*, 2015 WL 5023106 (N.D. Ohio Aug. 20, 2015) (analyzing 12(a)(1) claims against brokerage firms who acted as market makers on the Over-the-Counter Bulletin Board).  Accordingly, if Defendants wish to limit Plaintiffs' claims based on the Secondary Market Purchases, they should look to Section 4, not *Gustafson*.[5]

Finally, Defendants argue that they are not "sellers" of the ELA Tokens within the meaning of Section 12(a)(1) as to the secondary market transactions.  Defs.' Br. at 24.  Because the Amended Complaint adequately pleads that Defendants actively solicited the secondary market sales for their own gain, however, they qualify as sellers under Section 12(a)(1).  Section 12(a)(1) "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from brining actions against remote sellers.  Thus, a buyer cannot recover against his seller's seller."  *Pinter* 486 U.S. at 644 n.21.  But Section 12(a)(1) also extends liability to those who actively solicit the sale of securities with a motivation to serve his or her own financial interest or those of the securities owner.  *Id.* at 647.

In *Pinter*, the Supreme Court held that "the range of persons potentially liable under § [12(a)(1)] is not limited to persons who pass title.  The inclusion of the phrase 'solicitation of an offer to buy' within the definition of 'offer' brings an individual who engages in solicitation, an activity not inherently confined to the actual owner, within the scope of § 12."  486 U.S. at 643.  However, "[t]he second clause of [§ 12(a)(1)], which provides that only a defendant 'from' whom the plaintiff 'purchased' securities may be liable, narrows the field of potential sellers."  *Id.*  In determining the scope of potential sellers, the Court noted that sellers include "at least some persons who urged the buyer to purchase.  For example, a securities vendor's agent who solicited the

---

[5] The Court acknowledges that Section 4 in effect will exempt most secondary sales of securities.  But most is not all.  And the caselaw is clear that it is incumbent upon defendants to establish an exemption for the unregistered sales of securities.  *Cavanagh*, 155 F.3d at 133 ("Once the SEC has made a prima facie case [for a violation of Section 5], the burden shifts to the defendant to show that the securities were exempt from the registration requirement.").

purchase would commonly be said, and would be thought by the buyer, to be among those 'from' whom the buyer 'purchased,' even though the agent himself did not pass title." *Id.* at 644.  Thus, "[i]t long has been "quite clear," that when a broker acting as agent of one of the principals to the transaction successfully solicits a purchase, he is a person from whom the buyer purchases within the meaning of § 12 and is therefore liable as a statutory seller." *Id.* at 645.

That said, the Court concluded that "Congress did not intend to impose rescission based on strict liability on a person who urges the purchase but whose motivation is solely to benefit the buyer." *Id.* at 647.

> [A] person who gratuitously urges another to make a particular investment decision is not, in any meaningful sense, requesting value in exchange for his suggestion or seeking the value the titleholder will obtain in exchange for the ultimate sale.  The language and purpose of § [12(a)(1)] suggest that liability extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.

*Id.*  In so holding, the Court rejected the "substantial factor" test used at the time by the Fifth Circuit.  *Id.* at 648.  "Under that approach . . . a nontransferor [§ 12(a)(1)] seller is defined as one whose participation in the buy-sell transaction is a substantial factor in causes the transaction to take place."  *Id.* at 648–49 (quotation marks omitted).  The Court found that such a test "divorces the analysis of seller status from any reference to the applicable statutory language and from any examination of § 12 in the context of the total statutory scheme."  *Id.* at 651.[6]

Here, the Amended Complaint is replete with allegations describing the Individual Defendants' efforts to solicit purchases of ELA Tokens on the secondary market.  *See, e.g.*, AC ¶ 59 (alleging that defendants solicited secondary purchase of ELA Tokens through a "sustained and

---

[6] Plaintiffs urge the Court to return to the substantial factor test, arguing that in *ATBCOIN LLC*, the court held that "any person who engaged in steps necessary to the distribution of the unregistered security is liable."  Opp'n at 26 (quoting *ATBCOIN LLC*, 380 F. Supp. 3d at 357–58).  But this is not the law.  Instead, Plaintiffs must plead that defendants solicited their purchases, "motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner."  *Pinter*, 468 U.S. at 651. It appears that the Court in *ATBCOIN* took this rule in error from the case *S.E.C. v. Tecumseh Holdings Corp.*, 2009 WL 4975263, at *3 (S.D.N.Y. Dec. 22, 2009)), which in turn quoted and followed pre-*Pinter* caselaw.  *See S.E.C. v. Chinese Consol. Benevolent Ass'n*, 120 F.2d 738, 741 (2d Cir. 1941).

intensive marketing campaign which included more than 15 events and speaking engagements in at least eight cities across the United States"); ¶ 63 (alleging that Han tweeted positive statements of the value of ELA Tokens in order to solicit purchases); ¶ 76 (alleging that, "[o]n February 23, 2018, Defendant Han tweeted a screenshot of a line chart depicting the price of ELA Tokens increasing in value and tweeted, "When we have a meetup in NY. [T]he ela is rising up" accompanied by a photo of Han speaking at the meetup and a photo of the attendees"); ¶ 80 (alleging that Han spoke about Elastos at a conference regarding the investment outlook of blockchain); ¶ 94 (alleging that Han retweeted a tweet with the text "Another reason $ELA can be a great investment); ¶¶ 102–103 (alleging that Chen participated in an interview on the CNBC Africa television program Crypto Trader in order to promote investment in the ELA platform); ¶ 106 (alleging that Chen promoted investment in Elastos in an interview on a podcast which describes itself as "the average consumer's guide to cryptocurrency").

Defendants argue that their actions are too far removed from the secondary market transactions to be considered to have sold or solicited the sale of the ELA Tokens. However, even indirect solicitation efforts are sufficient to state a claim under Section 12. *See Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988) ("indirect solicitation can suffice to state a claim under Section 12(a)(2)" and "the language of sections 12(1) and 12(2) is identical in meaning"); *see also In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 186 (S.D.N.Y. 2003) (finding adequate allegations that CEO was a statutory seller where he "regularly appeared before investors and financial news agencies to tour the financial vitality of [the company] and thereby encourage investors to purchase [the company's] securities"); *In re WorldCom, Inc. Secs. Litig.*, 294 F. Supp. 2d 392, 423 (S.D.N.Y. 2003) (finding sufficient allegations that an underwriter was a statutory seller where the underwriter "participat[ed] in 'road show' meetings"); *Ripple Labs*, 2020 WL 922815, at *12 (finding that defendants qualify as "sellers" were plaintiff alleged that "defendants 'have earned over $1.1 billion through the sale of

XRP'" and "that defendants published various tweets, interviews, and articles pushing the adoption of XRP" (a blockchain platform similar to Elastos)).

The Amended Complaint also adequately pleads that the Individual Defendants[7] solicited Owen's Secondary Market purchases of ELA Tokens for personal financial gain. The Individual Defendants were motivated by personal financial interest as officers/directors of Elastos and as owners of large quantities of ELA tokens. Am. Compl. ¶ 59. As the Defendants stood to gain from Elastos's success—as well as from the increase in value of their own ELA Tokens—when the Defendants solicited investment in the ELA Tokens, the Amended Complaint adequately pleads that they did so for their personal financial gain. Likewise, Plaintiffs adequately allege that Owen relied on Defendants' solicitations in purchasing ELA Tokens. *Id.* ¶ 109. While these allegations of reliance are rather sparse, at this stage at least, they are sufficient.

### iii. Lock-In Program Sales

Finally, even if Owen lacked standing and Wandling's claims based on his ICO purchases were untimely, Plaintiffs also alleged that Elastos sold Wandling unregistered securities when it paid out ELA Tokens in exchange for Wandling's and other investors' participation in the lock-in program (the "Lock-in Sales"). Elastos delivered ELA Tokens to Wandling, pursuant to the lock-in program, on November 5, 2018. Because Wandling was added to this case less than a year later—when he and Own filed the initial class action complaint on May 28, 2019—Wandling's claims regarding ELA Tokens distributed pursuant to the lock-in program would be timely. While Defendants argue that this was not a sale of securities, the program—as pleaded—involved an exchange of consideration (the lock-in) for payment (the ELA Tokens) from Elastos. Thus, as pleaded, the Lock-In Sales are a separate sale and delivery of securities for which Defendants may be held liable. This alleged sale took place in interstate commerce and with no registration statement in

---

[7] Defendants do not argue that Elastos is not a statutory seller.

effect.  Accordingly, Plaintiffs have adequately pleaded a Section 12(a)(1) claim based on the Lock-In Sales.

        C. <u>Section 15 Claims</u>

Defendants do not contest—at present—that Plaintiffs have adequately alleged that the Individual Defendants are control persons under Section 15.  *See* Defs' Br. at 32.  Therefore, because the Amended Complaint adequately pleads claims for primary violations of Sections 5 and 12(a)(1), Plaintiffs have adequately plead a violation of Section 15.

## IV.  CONCLUSION

For the reasons stated above, Defendants' motion to dismiss the Amended Complaint is denied.  The Clerk of Court is directed to terminate the motion pending at Dkt. No. 73.

SO ORDERED.

Dated:  December 9, 2021
New York, New York

                          _____
                                GREGORY H. WOODS
                             United States District Judge