# Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARK OWEN and JAMES WANDLING, Individually and On Behalf of All Others Similarly Situated,<br><br>     Plaintiffs,<br><br>        v.<br><br>ELASTOS FOUNDATION, FENG HAN, and RONG CHEN,<br><br>     Defendants. | No. 1:19-cv-5462-GHW |

## PLAINTIFFS' FIRST REQUESTS FOR DOCUMENTS

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiffs (as defined below) hereby request that Defendants Elastos, Han, and Chen (as defined below) each produce for inspection and copying the documents described herein which are in the possession, custody or control of said Defendants (as defined below), by 5:00 PM Eastern Time on **February 25, 2022**, at the offices of Bleichmar Fonti & Auld LLP, 7 Times Square, 27th Floor, New York, New York 10036.

## DOCUMENTS REQUESTED[1]

### DOCUMENT REQUEST NO. 1

All Documents and Communications (without any time limitation) concerning Your development and marketing of the Elastos Blockchain.

### DOCUMENT REQUEST NO. 2

All Documents and Communications (without any time limitation) concerning Your development, marketing, and/or sale of ELA Tokens.

---

[1] Definitions and instructions follow the requests.

i

**DOCUMENT REQUEST NO. 3**

All Documents and Communications concerning any interaction with any regulatory authority, including without limitation any self-regulatory organizations, governmental entities, and/or digital asset exchanges, regarding Elastos, the Elastos Blockchain, ELA Tokens, the ICO, the Lock-In Program, and/or the listing of ELA Tokens on a secondary market.

**DOCUMENT REQUEST NO. 4**

All Documents and Communications concerning whether ELA Tokens pass the "Howey Test," including, without limitation, as referenced in Paragraph 82 of the Complaint and/or as described in the Defendants' Answer (*see, e.g.*, ECF No. 95 p.2 ¶1).

**DOCUMENT REQUEST NO. 5**

All marketing or promotional materials concerning Elastos and/or ELA Tokens, including, but not limited to, advertisements, social media posts, white papers, prospectuses, and offering materials.

**DOCUMENT REQUEST NO. 6**

All Documents and Communications concerning the English language White Paper published by Elastos as referenced in Paragraph 39 of the Complaint.

**DOCUMENT REQUEST NO. 7**

All Documents and Communications concerning Defendants' publications or statements in connection with Elastos, the Elastos Blockchain, ELA Tokens, the ICO, the Lock-In Program, and/or the listing of the ELA Tokens on a secondary market, including, but not limited to, all Documents and Communications concerning:

   a.  The Elastos "meetup" in Silicon Valley on or about November 28, 2017 (¶29);[2]

   b.  The Blockchain Expo North America in Santa Clarita, California on November 29, 2017 (¶30);

   c.  The "San Francisco launch meetup" held by Elastos on November 30, 2017 (¶31);

   d.  The "meetup" at the offices of Deloitte on or about December 9, 2017 (¶32);

   e.  The responses by Elastos to questions on Steemit.com on December 24, 2017 (¶33);

   f.  The post titled "An Introduction to Elastos" posted by Elastos on Medium.com on or around December 26, 2017 (¶34);

---

[2] References to "¶__" refer to paragraphs in the Complaint (as defined below).

g.  The November 2017 interview of Rong Chen (¶35);

h.  The publication regarding "Frequently Asked Questions" on Medium.com on or about December 27, 2017 (¶36);

i.  The publication on Bitcointalk.org in or around December 27, 2017 (¶37);

j.  The press release published by Elastos titled, "Elastos ICO Offers a Cross-Platform Operating System and Public Blockchain Designed for a Smart Economy" in December 2017 (¶38);

k.  "The NEO News Today Podcast" in which Chen discussed Elastos and has a listed date of January 1, 2018 (¶41);

l.  The "Elastos Founder's Beer Meetup" scheduled for January 21, 2018 (¶50);

m.  The video titled "Elastos (ELA) SmartWeb | Best ICO January 2018" featuring interviews with Defendants Chen and Han (¶54);

n.  The publication concerning "Token Sale—Reminders" on Medium.com on or around January 16, 2018 (¶55);

o.  Han's attendance and speech at CryptoCon 2018 on February 15, 2018 in Chicago, Illinois (¶¶71, 73, 74);

p.  Han's lecture about Blockchain and Elastos at Harvard on March 13, 2018 (¶79);

q.  Han's speech at the Block Invest Summit 2018 in Cambridge, Massachusetts on March 17, 2018 (¶80);

r.  Chen's discussion with Huoxing Financial on March 19, 2018, the transcript of which was posted to Medium.com on April 2, 2018 (¶82);

s.  Han's visit to New York University on or around April 4, 2018 (¶83);

t.  Han's visit to Johns Hopkins University on or around April 7, 2018 (¶84);

u.  Han's visit to George Washington University on or around April 8, 2017 (¶85);

v.  Han's appearance at Harvard's AI and Blockchain Forum on April 15, 2018 (¶86);

w.  The post titled "Elastos Communication Plan by SF Team" posted on Medium.com on or around April 17, 2018 (¶87);

x.  Han's appearance and speech at the 2nd annual fintech conference at Fordham University on or around April 24, 2018 (¶88);

y.  Han's appearance and speech in Boston at the "Future of Blockchain: A Talk with Elastos and Nebulas" on or around April 26, 2018 (¶89);

z.   The 5th Annual "Omaha Summit" from on or around May 4, 2018 through May 6, 2018 (¶90);

aa.  Han's appearance and discussions at MIT on or around May 3, 2018 and May 4, 2018 (¶¶91, 92);

bb.  Elastos' Developer Meeting in San Francisco on May 8, 2018 (¶93);

cc.  Han's appearance and speech at a "meetup" at Fordham University on May 12, 2018 (¶95);

dd.  Meetings or correspondence between Defendants and Congressman Ro Khanna, including on or about May 21, 2018 (¶97);

ee.  Meetings or correspondence between Han and former Federal Reserve Chairman Alan Greenspan, including on or about May 24, 2018 (¶98);

ff.  Meetings or correspondence between and Dr. Paul Sheard, Standard & Poor Executive Vice President, including on or about June 19, 2018 (¶101);

gg.  Chen's appearance and/or interview on the show "Crypto Trader" on or about July 13, 2018 (¶102);

hh. Chen's appearance and/or interview on the podcast "Crypto 101" (¶106); and

ii.  The "Q&A" posted on Medium.com in or around April 2, 2018 (¶124).

## DOCUMENT REQUEST NO. 8

All Documents and Communications concerning Defendants' activities on social media platforms regarding Elastos, the Elastos Blockchain, ELA Tokens, the ICO, the Lock-In Program, and/or the listing of ELA Tokens on a secondary market, including, but not limited to, Reddit, Facebook, Twitter, Telegram, Snapchat, TikTok, YouTube, Instagram, WeChat, and Sina Weibo.

## DOCUMENT REQUEST NO. 9

All Documents and Communications concerning the ICO, including, but not limited to, offering materials, communications with actual or potential ELA Token purchasers, financial results, transaction records, internal reporting or analyses, registration lists, purchase lists, and agreements with purchasers.

## DOCUMENT REQUEST NO. 10

All Documents and Communications concerning the Lock-In Program, including, but not limited to, offering materials, communications with actual or potential ELA Token purchasers, financial results, transaction records, internal reporting or analyses, registration lists, purchase lists, and agreements with purchasers.

**DOCUMENT REQUEST NO. 11**

All Documents and Communications concerning the actual or potential listing of ELA Tokens on any digital asset exchange, including, but not limited to, KuCoin, Houbi Global, Bittrex Global, CoinEx, StealthEX, SimpleSwap, Tokswap, and Uniswap.

**DOCUMENT REQUEST NO. 12**

All Documents and Communications concerning ChinaWise.

**DOCUMENT REQUEST NO. 13**

All Documents and Communications concerning the "Cyber Republic" community, as described in the Defendants' Answer (*see, e.g.,* ECF No. 95 ¶6), including, but not limited to, white papers, promotional materials, membership records, governing documents, policies and procedures, internal reporting and analyses, and/or transaction records.

**DOCUMENT REQUEST NO. 14**

All Documents and Communications concerning the "Elastos Ecosystem," as described in the Defendants' Answer (*see, e.g.,* ECF No. 95 ¶6), including, but not limited to, white papers, promotional materials, membership records, governing documents, policies and procedures, internal reporting and analyses, and/or transaction records.

**DOCUMENT REQUEST NO. 15**

All Text Messages concerning Elastos, the Elastos Blockchain, ELA Tokens, the ICO, the Lock-In Program, and/or the listing of ELA Tokens on a secondary market.

**DOCUMENT REQUEST NO. 16**

All Documents and Communications concerning the actual or potential taxation and/or tax implications regarding the purchase or sale of ELA Tokens.

**DOCUMENT REQUEST NO. 17**

All Documents and Communications, including without limitation the books and records of Elastos, concerning Your actual or forecasted financial results.  These Documents and Communications shall include, but are not limited to, those reflecting Your actual and forecasted revenues, profits, margins, sales, or losses generated by ELA Tokens, the ICO, and the Lock-In Program, respectively.

**DOCUMENT REQUEST NO. 18**

All Documents and Communications concerning Your Document and ESI retention or destruction policies, including, but not limited to, any actions taken or procedure for storage, transmission, retention, archiving, retrieval, maintenance, and back-up of all ESI.

**DOCUMENT REQUEST NO. 19**

All Documents and Communications concerning any compensation, consideration, or other benefits actually or possibly paid or owed by You to Chen, Han, Li, or any other employees responsible for the sale or marketing of ELA Tokens.  These Documents and Communications shall include, but not be limited to, those concerning any actual or potential compensation related to the ICO or the development, marketing, pricing, sales, revenues, or profits related to ELA Tokens.

**DOCUMENT REQUEST NO. 20**

All Documents and Communications concerning any actual or potential financial interest in Elastos and/or ELA Tokens by Chen, Han, and/or Li, any members of their immediate families, friends, or any entity over which any of them (or any Elastos officer or director) had or has control or had or has any interest. These Documents shall include, but not be limited to those sufficient to reflect the extent of any such interest and to show all such purchases, sales, holdings, gains and/or losses.

**DOCUMENT REQUEST NO. 21**

Documents and Communications, including organizational charts and personnel directories, sufficient to show Your organizational structure, including:

a)      the identity of Your parent companies, subsidiaries, affiliates, and joint ventures;

b)      the organization of any division, department, unit, or subdivision of Your company that has any role or responsibilities concerning the development, marketing, pricing, sales, revenues and/or profits related to ELA Tokens;

c)      the identity and reporting relationships of any officers, directors, employees, committees, subcommittees, or working groups that have any role or responsibilities concerning the development, marketing, pricing, sales, revenues and/or profits of ELA Tokens;

d)      the identity and reporting relationships of any officers, directors, employees, committees, subcommittees, or working groups that have any role or responsibilities for communications and negotiations with third parties concerning ELA Tokens;

e)      the identity and reporting relationships of any officers, directors, employees, committees, subcommittees, or working groups that have any role or responsibilities for communications and negotiations with any digital asset exchange;

f)      the identity and reporting relationships of any officers, directors, employees, committees, subcommittees, or working groups that have any role or responsibilities for regulatory and/or legal compliance regarding ELA Tokens, the ICO, the Lock-In Program, and/or the listing of ELA Tokens on a secondary market;

g)      the identity and reporting relationships of Your information technology or information services departments or divisions, including their members' names, Your outsourced information technology services (including with respect to data storage for Your ELA Token data), and any temporary consultants for information technology services.

**DOCUMENT REQUEST NO. 22**

For each of Your employees with any responsibility for development, marketing, pricing, sales, revenues and/or profits of Elastos and/or ELA Token:

a)      all calendars, appointment books, and appointment notes;

b)      all trip and travel logs;

c)      all time sheets or records;

d)      all expense vouchers or expense reports and supporting documents;

e)      all telephone number logs, directories, contact management systems, notebooks, and Rolodex-type contact files;

f)      all paper or electronic journals or notebooks used to memorialize work activities, including but not limited to, meetings and conference calls;

g)      all bills, statements, records, databases, and logs concerning the employee's office, home, cellular, or other mobile or landline telephone(s), including logs of all calls and text messages sent or received; and

h)      documents sufficient to identify all email addresses, social or industrial/business web-based media accounts (*e.g.*, Facebook®, Twitter®, LinkedIn® Instagram®, Snapchat®, Cluster), cellular phone numbers, office phone, and facsimile numbers, or other telephone numbers assigned by You to each such employee or used by the employee in connection with his or her employment by You.

**DOCUMENT REQUEST NO. 23**

All Documents and Communications concerning what, if any, actions You took in connection with the retention and preservation of Your ESI in connection with this Action. These Documents and Communications shall include, but not be limited to, those concerning (i) any litigation hold or preservation notices or (ii) any Documents or ESI that have been lost or destroyed.

**DOCUMENT REQUEST NO. 24**

Documents and Communications sufficient to show Your policies and procedures concerning the use of instant messaging services or applications, social media, and mobile devices, including phones, PDAs, and tablets by Your personnel, including any "bring your own device" or "bring your own technology" policies.

**DOCUMENT REQUEST NO. 25**

All Documents and Communications that You or Your counsel intend to rely upon, seek to introduce into evidence, or otherwise refer to in connection with class certification submissions or proceedings in this Action, or to establish a defense.

**DOCUMENT REQUEST NO. 26**

All Documents and Communications concerning the information contained or referred to in any Defendants' Initial Disclosures provided pursuant to Federal Rule of Civil Procedure 26(a)(1).

**DOCUMENT REQUEST NO. 27**

All Documents and Communications concerning any policies of insurance issued to You or to any other Person that may be used to satisfy all or part of any judgment in this Action rendered against You personally, or to indemnify or reimburse any payments made to satisfy any judgment rendered against You personally, including, but not limited to, Documents sufficient to establish whether the carriers of any such insurance policies have agreed to provide coverage.

**DOCUMENT REQUEST NO. 28**

To the extent not requested above, all Documents and Communications (without any time limitation) supporting, substantiating, undermining contradicting, or concerning any of the Affirmative Defenses set forth in Your Answer.

**DOCUMENT REQUEST NO. 29**

All Documents obtained by the Defendants from any non-party concerning the subject matter of this Action, including, but not limited to, Documents obtained pursuant to subpoenas, voluntary productions, or any other process or procedure.

**DOCUMENT REQUEST NO. 30**

To the extent not requested above, all Documents and Communications of which you are aware that are relevant to the claims or defenses in this Action.  This Request seeks all documents without time limitation.

## DEFINITIONS[3]

1.      "Action" means the above-titled consolidated action, captioned *Owen v. Elastos Foundation, et al.*, No. 1:19-cv-05462, before the Honorable Gregory H. Woods, United States District Court for the Southern District of New York.

2.      "Answer" means any answer served by any Defendant to any Complaint in this Action.  (*See* ECF Nos. 94, 95, 96.)

3.      "Chen" means Defendant Rong Chen, as well as his counsel, partners, or affiliates or persons acting or purporting to act on his behalf.

4.      "ChinaWise" means the business consulting firm "ChinaWise," and includes, but is not limited to, any owner, director, officer, employee, agent, custodian, parent, subsidiary, affiliate, predecessor, successor, attorney, accountant, consultant, or representative of ChinaWise, or any other Person purporting to act on ChinaWise's behalf.

5.      "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) and includes, but is not limited to, Correspondence.

6.      "Complaint" means the Amended Complaint For Violations of the Federal Securities Laws filed in the Action on July 29, 2020 (ECF No. 68), including any amendments thereto.

7.      The term "concerning" or "relate to" means, directly or indirectly pertaining in any way to, relating to, referring to, describing, evidencing, recording, constituting, supporting, contravening, touching upon, or being in any way legally, logically or factually connected, in whole or in part, with the subject or matter described.

---

[3] Each definition herein is to be interpreted as consistent with and incorporating the broadest interpretation of the definitions relating to document requests provided in Federal Rule of Civil Procedure 34 and Local Rule of Civil Procedure 26.3.

8. "Correspondence" means any letter, memorandum, note, electronic communication, including, but not limited to, e-mail, facsimile, text message, instant message, including, but not limited to, Bloomberg Chat, Slack, Google Talk, WhatsApp, Skype, Jabber, Hipchat, Yahoo! Messenger, AOL Instant Messenger, Blackberry Messenger, ICQ, Pidgin, Line, Audium, Signal, Telegram, Trillian, Facebook Messenger, LinkedIn messages, Instagram messages, or any proprietary instant messaging system, internet message board posting, iMessage or any message transmitted through another personal digital device, or any other writing containing a communication from one Person to another.

9. "Cyber Republic" means the community formed around Elastos, ELA Token holders, and encompasses the meaning of the term as used in Defendants' Answer (*see, e.g.*, ECF No. 95 ¶6).

10. "Defendant" means any person named as a defendant in the Action, individually and/or collectively, at any time and, where applicable, any owner, director, officer, employee, agent, custodian, parent, subsidiary, affiliate, predecessor, successor, attorney, accountant, consultant, or representative of Defendant, or any other Person purporting to act on a Defendant's behalf.

11. "Document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Federal Rule of Civil Procedure 34(a)(1)(A) and referenced in Local Rule 26, and includes (among other things) "data" and "data compilations" that are "stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form." Fed. R. Civ. P. 34(a)(1)(A).  A draft or non-identical copy is a separate document within the meaning of this term.

12.     "ELA Tokens" means the digital assets developed for use on the Elastos Blockchain and/or any other Elastos platform and/or offered and sold in the ICO, the Lock-In Program, or secondary market.  This definition includes, but is not limited to, the meaning of "The ELA Token" set forth in Defendants' Answer (*see, e.g.*, ECF No. 95 ¶5).

13.     "Elastos" means Defendant Elastos Foundation and includes, but is not limited to, any owner, director, officer, employee, agent, custodian, parent, subsidiary, affiliate, predecessor, successor, attorney, accountant, consultant, or representative of Elastos (including Cyber Republic and the "Elastos Ecosystem," as described in the Defendants' Answer (*see, e.g.,* ECF No. 95 ¶6)), or any other Person purporting to act on Elastos' behalf.

14.     "Elastos Blockchain" means the technological infrastructure developed by Elastos. This definition includes, but is not limited to, the meaning of "The ELA Blockchain" set forth in Defendants' Answer (*see, e.g.*, ECF No. 95 ¶4).

15.     "Email Threading" means a process of identifying the email in an email correspondence that includes the initiating email and all subsequent replies and forwards pertaining to that original email.

16.     "ESI" or "Electronically-Stored Information" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Federal Rule of Civil Procedure 34(a)(1)(A) and referenced in Local Rule 26.

17.     "Extracted Text" means text extracted from a Native Format file and includes at least all headers, footers, document body information, and any hidden text, if available.  The extracted text must not include text of characters that were not part of the text of the original Native Format file, including but limited to, Bates Numbers and Endorsements (except in the cases of redactions).

18.    "Han" means Defendant Rong Chen, as well as his counsel, partners, or affiliates or persons acting or purporting to act on his behalf.

19.    "ICO" means the initial coin offering in January 2018 pursuant to which Defendants offered and sold ELA Tokens.

20.    "Individual Defendant" means Chen and/or Han, individually and/or collectively.

21.    "Load File" means an electronic file that is used to import all required production information into a document database, including, if available, document images, Extracted Text or OCR text, Native Format files, and Metadata, as well as information indicating document breaks, document relationships (such as those between an e-mail message and its attachments), and information related to embedded content.

22.    "Li" means Fay Li, who served as Elastos Chief Marketing Officer (CMO), as well as their counsel, partners, or affiliates or persons acting or purporting to act on their behalf.

23.    "Lock-In Program" means the program whereby certain purchasers and/or holders of ELA Tokens agreed not to sell their tokens for a pre-specified amount of time in exchange for accruing interest in the form of additional ELA Tokens.

24.    "Metadata" means structured information about ESI that is created by the file system or application, embedded in the Document or email, and sometimes modified through ordinary business use.   Metadata of the ESI describes, *inter alia*, the characteristics, origins, usage, and validity of the collected ESI.

25.    "Native Format" means the format of ESI in the application in which such ESI was originally created.

26.      "OCR" means the optical character recognition technology used to read paper Documents or electronic images of Documents and output such Documents to a searchable text format.  The latter text is also referred to as the "OCR text" or simply "OCR."

27.      "Person" means any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

28.      "Plaintiffs" means Mark Owen and James Wandling.

29.      "Responsive Document" means any Document that is responsive to any discovery request, subject to the limitations set forth in the Federal Rules of Civil Procedure, and/or Court order.

30.      "Text Messages" includes iMessages, MMS, SMS, WeChat, WhatsApp, Facebook Messenger, Twitter, LinkedIn messages, and any text, chat, instant messaging, social media messaging, mobile device messaging, or other Correspondence that could be recoverable from a mobile device.

31.      "You" or "Your" means the Defendants, individually and/or collectively, as defined herein.

## RELEVANT TIME PERIOD

The relevant time period (the "Relevant Period"), unless otherwise indicated, shall be from January 1, 2016 through the present and shall include all Documents and Communications that relate to such period, even if such Documents and Communications were prepared, published, or occurred outside the Relevant Period.

## INSTRUCTIONS

1.      In responding to these Requests, all Documents shall be produced in accordance with the Federal Rules of Civil Procedure 26 and 34 and the Local Civil Rules.

2.      These Requests are organized in a uniform manner and directed at Defendants to avoid unnecessary duplication.  The uniform organization of these Requests is not intended to limit the scope of these Requests, and each Request shall be construed as though directed at each Defendant.  Thus, each Defendant is required to produce Documents or things in its, his, or her possession, custody, or control, regardless of whether such Documents or materials are possessed directly by You or by Your owner, director, officer, employee, agent, custodian, parent, subsidiary, affiliate, predecessor, successor, attorney, accountant, consultant, or representative, or any other Person purporting to act on Your behalf.  A Document shall be deemed to be within Your possession, custody, or control if You have the right or ability to secure the Document or a copy of the Document from another Person having possession or custody of the Document.

3.      Pursuant to Federal Rule of Civil Procedure 34(b), Documents shall be produced as they are kept in the usual course of business so that Plaintiffs can ascertain the files in which they were located, their relative order in such files, and how such files were maintained.

4.      All Documents must be produced in their entirety, including all attachments and enclosures, and in their original folder, binder, or other cover or container, regardless of whether You consider the entire Document to be relevant or responsive to the Request.  Whenever a Document or group of Documents is removed from a file folder, binder, file drawer, file box, notebook, or other cover or container, a copy of the label of such cover or other container must be attached to the Document or group of Documents.

5.      All File types containing any user-generated text, such as email stores and individual messages, word processing documents, spreadsheets, hypertext documents and data saved in Portable Document Format ("PDF") will be processed and their text shall be extracted

prior to searching.  Image files and PDFs containing images of potentially relevant text shall be submitted to Optical Character Recognition ("OCR") processing before search terms are applied.

6.      With respect to the production of Documents and ESI, all Documents and ESI must be produced in accordance with the production formatting instructions appended hereto as Exhibit A.

6.1    <u>Format Guideline:</u> Documents shall be produced in 300 DPI Group IV Black & White Tagged Image File Format (.TIFF or .TIF) files ("TIFF files"). TIFF files shall be produced in single-page format along with corresponding image load files (.OPT file).  For electronically stored information ("ESI"), the TIFF files shall be, where possible, created directly from the original native documents.  The party producing documents or ESI (the "Producing Party") may not create TIFF files of electronic documents by printing out paper copies of the electronic documents and scanning those paper copies.  For documents that only exist on paper, the TIFF files shall be created by scanning either the original paper documents or first-generation photocopies of the original paper documents, running OCR and properly unitizing documents before production.  Each embedded file shall be produced as a child to the parent document to which it is embedded.  In-line images and OLE objects such as signature blocks from emails shall not be extracted as stand-alone documents.

Notwithstanding the foregoing, all electronically stored spreadsheets and multimedia files shall also be produced in native electronic format with embedded data and metadata intact and a TIFF placeholder. Any documents that cannot be converted to TIFF format shall be represented in the production with a

placeholder TIFF image which bears the legend "This document cannot be converted to TIFF" and a native version of the file shall be provided. The parties agree to meet and confer regarding such documents if requested by the party receiving the production (the "Receiving Party") and to take reasonable actions to remedy such conversion problems.

6.2     Previously Produced Documents.  To the extent that documents have been produced by a Producing Party in another proceeding, action or investigation in a format otherwise prohibited by this Request for Documents, the parties will meet and confer on whether such documents may be produced in the format used in the other proceeding, action or investigation.

6.3     De-Duplication:  The Producing Party is only required to produce a single copy of a responsive Document. Exact duplicate Documents (*i.e.*, identical copies of the same Document) may be removed, including but not limited to email, to reduce the unnecessary cost of reviewing and producing exact duplicate Documents. If the Producing Party chooses to remove exact duplicate documents, it shall make reasonable efforts to remove exact duplicate ESI according to the MD5/SHA-1 hashing method and shall identify all custodians of de-duplicated Documents in the Custodian field delimited by semicolons or in a MasterCustodian field delimited by semicolons (as set forth in Exhibit A). Moreover, (a) de-duplication shall be performed only at the Document family level[4] so that

---

[4] Unless otherwise agreed upon by the Parties, a family can only be removed through de-duplication if each and every member of the de-duplication candidate family has identical MD5/SHA-1 hashcodes to the corresponding members of another family.  For example, if there is a two-member family with a parent and an attachment, the MD5 hashcodes of the parent must

attachments are not de-duplicated against identical stand-alone versions of such Documents and vice versa, although each family member shall be hashed separately for purposes of populating the HashValue field in Exhibit A; (b) attachments to emails, instant messages or other Documents shall not be disassociated from the parent email, instant message or Document even if they are exact duplicates of another Document in the production, and (c) paper Documents shall not be eliminated as duplicates of responsive ESI. ESI that is not an exact duplicate according to the method specified in Exhibit A may not be removed. If there is any handwriting or other alteration to a document, it shall not be considered a duplicate pursuant to this Paragraph.  If the Producing Party becomes aware of any file that was incorrectly filtered during the de-duplication process, the Producing Party shall promptly notify the Requesting Party and produce the file pursuant to the terms of this Request for Documents.

6.4     Extracted Text.  For all documents, the Producing Party shall provide full extracted text.  Where extracted text is unavailable, such as image files and non-searchable PDFs, OCR text shall be provided.  Such text files shall be produced as document-level text files and be named consistently with their corresponding TIFF files.

6.5     Documents to Be Produced Natively:   Microsoft Excel and other spreadsheet files, including comma or tab delimited text files, Microsoft Access

---

be identical and the MD5 hashcodes of the attachments must also be identical.  If a Party de-duplicates globally, the Party shall identify the de-duplication priority order at the request of any other Party.  To the extent any Party wishes to de-duplicate emails in such a way as to eliminate earlier or incomplete chains of email, the Parties shall confer in good faith about that request.

and other database files, video files, audio files, animation files, Bloomberg chats and other instant messages, and Power Point and other presentation files shall be produced in Native Format.  If a document to be produced in Native Format contains privileged information, the document will be produced by producing the document in TIFF format with redactions and OCR text to remove the privileged material from the searchable text.  Each electronic file produced in Native Format shall be assigned a unique Document Number, as set forth in Section 6.1, and the database record for that file shall include a single page TIFF image branded with this unique Document Number in the lower right corner of the image as a Bates Number, with the phrase "PRODUCED IN NATIVE FORMAT" (or similar language) branded in the center of the page.  To protect the confidentiality of files produced in Native Format, any confidentiality designations must appear on the associated TIFF placeholder in no less than 10-point font.  Files produced in Native Format shall be given file names identical to the Document Number, followed by the file extension and include the confidentiality designation after the file number, *e.g.*, BATES00000000_CONF.xlsx.  For each file produced in Native Format, the Producing Party shall also indicate its native status in the Native File Metadata field described in Exhibit A.

6.6     Embedded Files:  Embedded files to responsive documents shall not be produced as separate documents.  Examples of Embedded files include, but are not limited to, logo graphics in email signature lines (usually *.PNG or another image file format) and images, tables, or graphics in presentation software like Microsoft PowerPoint.  Upon request by the Receiving Party, the Parties shall meet and confer

in good faith regarding whether certain substantive records containing embedded files should be produced in native format.

6.7     <u>Databases</u>:     Non-privileged raw data and records kept in enterprise databases (such as Oracle or SQL databases) that are maintained in the normal course of business will be produced in an electronic format.  To the extent such databases exist, raw data from those types of databases will be produced in database or delimited text file format, as database reports, or, where necessary, the parties will discuss appropriate procedures and method of production.

6.8     <u>Attachments</u>:  If any part of an email or its attachments is responsive, the entire email and all attachments will be produced, except as to any email or attachment that the Producing Party contends is entirely privileged or protected from disclosure.

6.9     <u>Encryption</u>:  The Producing Party will make reasonable efforts to ensure that all encrypted or password-protected Documents are successfully processed for review and production under the requirements herein, and if produced in Native Format, the decrypted Document is produced.   To the extent encrypted or password-protected Documents are successfully processed according to the requirements herein, the Producing Party shall have no duty to identify the prior encrypted status of such Documents but will produce such processed Documents in accordance with the specifications herein.  If documents are not successfully processed despite use of reasonable efforts, a placeholder TIFF image will be produced stating the file is password protected.  Upon request from either Party, the Parties shall meet and confer in good faith regarding reasonable efforts or

mechanisms to remove such security protection or the production of available Metadata.

6.10    Unitization:  In scanning paper Documents, each page of paper should be output to a single page TIFF file.  Distinct, logical document breaks should be defined as such in a standard load file as described in Exhibit A.  In the case of an organized compilation of separate Documents (*e.g.*, a binder containing several separate Documents behind numbered tabs) the Document behind each tab should be scanned separately, but any document or family relationship among the scanned Documents in the compilation should be reflected in the data load file at the appropriate standard fields.  Pages containing post-it notes or other detachable notes that obscure the underlying Document should be scanned once with the detachable note intact, and then again without it, and made part of the same Document.  The Parties shall make reasonable efforts to unitize the Documents correctly.

6.11    Document Numbering:  Each page of a Document produced in TIFF file format shall have a legible, unique fixed-length numeric identifier ("Document Number") containing at least eight (8) digits electronically "burned" onto the image in no less than 10-point font.  Unless it would obscure, conceal, or interfere with any information originally appearing on the Document, the Document Number shall be burned on the lower right-hand corner of the Document. The Document Number for each Document shall be created so as to identify the Producing Party and the Document Number (*e.g.*, "BATES0000000000").

6.12    Claims of Confidentiality.  All documents shall be produced subject to a Stipulation for the Production and Use of Confidential Information agreed to by the

parties and ordered by the Court in the Action (the "Confidentiality Stipulation"). For documents that the Producing Party produces in TIFF format, if the Producing Party is producing documents subject to a claim that it is protected from disclosure under the Confidentiality Stipulation, the Producing Party shall electronically "burn" the appropriate confidentiality designation onto each page of the document and provide the designation in the metadata load file.  Unless it would obscure, conceal, or interfere with any information originally appearing on the Document, any confidentiality designation will appear on the lower left-hand side of each page of a Document produced, in no less than 10-point font.  If there is a conflict between the provisions of this Request for Documents and a Confidentiality Stipulation, the Confidentiality Stipulation shall control.

6.13    Metadata Fields and Processing: Each of the Metadata and coding fields set forth in Exhibit A that can be extracted or generated from a Document shall be produced for that Document. The Producing Party is not obligated to populate any of the fields in Exhibit A manually if such fields cannot be extracted or generated from a Document and its context in the source data, with the exception of the following fields, if available: (a) BegBates; (b) EndBates; (c) BegAttach; (d) EndAttach; (e) Custodian; (f) Redacted (Y/N); (g) Confidentiality; and (h) HashValue[5]. Metadata shall be provided in a Concordance-format delimited file with a .DAT file extension and ASCII 020 and 254 delimiters for column break and text qualifier. The first line shall be the header with field names, and each subsequent line shall contain the fielded data for each Document. For documents

---

[5] In the case of Documents that were scanned from paper, the HashValue field is not required.

produced natively, the metadata load file shall contain a link to natively produced documents via data values called "Native Link." The Native Link values should contain the full directory path and file name of the documents as contained in the produced media. The Native Link field should be included in the .DAT file. The Producing Party shall not be required to create or produce Metadata that does not exist, cannot be generated by ESI processing software, or is not reasonably or technically accessible.

6.14   <u>Production Media</u>:   The Producing Party will endeavor to produce documents electronically by way of a secure FTP.  To the extent a production by a secure FTP is not possible or impractical, the Producing Party shall produce documents on readily accessible computer or electronic media, including without limitation CD-ROM, DVD, external hard drive (with standard PC-compatible interface), or such other media as the parties may agree on ("Production Media"). The Producing Party shall affix a unique identifying label to each piece of Production Media, which shall identify the date of the production and the numbered sequence of the material in that production.  The Producing Party shall properly package all Production Media to ensure safe shipping and handling.  The Producing Party shall encrypt all Production Media prior to shipping.

6.15   <u>Email Threading</u>: Where Email Threading is available as a review tool, email threading may be employed in the review process but not to remove lesser included emails in an email thread from productions since this destroys the ability to search the To/From/CC/SentDate/SentTime/

Subject Metadata Fields of the individual lesser-included emails.

6.16    <u>Predictive Coding or Technology Assisted Review ("TAR")</u>: If TAR will be employed to prioritize Documents for review and production, the Parties will meet and confer in good faith regarding the adoption of a separate agreement, a Technology Assisted Review Protocol, to define and agree upon the process, benchmarks, and reporting obligations for the use of TAR.

7.    If any otherwise requested Document was, but is no longer, in existence or in Your possession, custody, or control, identify the type of information contained in the Document, its current or last known custodian, the location/address of such Document, the identity of all persons having knowledge or who had knowledge of the Document, and describe in full the circumstances surrounding its disposition from Your possession, custody, or control.

8.    Documents shall be produced in such fashion as to identify the department, branch, or office in whose possession they were located and, where applicable, the natural Person in whose possession they were found.

9.    A copy of a Document that varies in any way whatsoever from the original or from any other copy of the Document, including, without limitation, by reason of Metadata that differs in any respect, or by reason of any handwritten or other notation or any omission, constitutes a separate Document and must be produced, whether or not the original of such Document is within Your possession, custody, or control.   Accordingly, all prior versions and all drafts of all Documents must be produced.

10.    The terms "all," "any," and "each" shall each be construed as encompassing any and all.

11.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of its scope.

12.    The use of the singular form of any word includes the plural and vice versa.

13.    If no Documents or materials exist that are responsive to a particular Request, so state in writing.

14.    If any responsive Documents are withheld under a claim of attorney-client privilege, attorney work product doctrine, or any other privilege or immunity from discovery, provide a privilege log as required by Federal Rule of Civil Procedure 26(b)(5) and Local Rule of Civil Procedure 26(e) by the time when any Document production of any such withheld Document is due.  If a portion of any responsive Document is withheld under a claim of privilege or other immunity from discovery pursuant to the preceding instruction, each such Document must be produced with the portion claimed to be privileged or otherwise immunized from discovery redacted.

15.    All Requests shall be deemed continuing Requests, and You are required to supplement Your answers with any new or newly discovered materials responsive to these Requests up to and including the time of the trial of this Action, in accordance with Federal Rule of Civil Procedure 26(e).

16.    The specificity of any Request herein shall not be construed to limit the generality or reach of any other Request herein.

**DATED: January 26, 2022**

> **BLEICHMAR FONTI & AULD LLP**
>
> */s/ Javier Bleichmar*
> Javier Bleichmar

George N. Bauer
Benjamin F. Burry
7 Times Square, 27th Floor
New York, New York 10036
Telephone: (212) 789-1340
Facsimile:  (212) 205-3960
jbleichmar@bfalaw.com
gbauer@bfalaw.com
bburry@bfalaw.com

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

**RAITI, PLLC**
Warren Raiti
1345 Avenue of the Americas, 33rd Floor
New York, New York 10105
Telephone: (212) 590-2328
wraiti@raitipllc.com

*Additional Counsel for Lead Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 26, 2022, a copy of the foregoing was served on

Defendants' counsel by email.


                                       */s/    George Bauer*
                                             George Bauer

## EXHIBIT A

1.   **PRODUCTION LOAD FILES**
     There will be two Load/Unitization files accompanying all productions of ESI:
- The first will be a Metadata import file, in Concordance-format delimited file with a .DAT file extension that contains the agreed-upon Metadata fields. For all DAT files: if no foreign language is contained in the production, then UTF-8 text encoding is acceptable; however, if there will be foreign language documents, the text encoding must be in Unicode.
- The second will be a cross-reference file that contains the corresponding image information [IDX] identifying document breaks. The acceptable formats for the cross-reference files are .log and .opt.

2.   **IMAGES**
- Produce documents in Single Page Group IV TIFF black and white files.
- Image Resolution of at least 300 DPI.
- If either Party deems the quality of the document produced in TIFF format to be insufficient, the Parties will meet and confer in good faith to determine whether the Producing Party must produce the document as a JPEG file.
- File Naming Convention:  Match Bates Number of the page.
- Insert placeholder image for files produced in Native Format (see Paragraph 6.1).
- Original document orientation or corrected orientation shall be retained.

3.   **SPECIAL FILE TYPE INSTRUCTIONS**
- Certain file types shall be produced in Native Format, as specified in Paragraphs 6.5 and 6.9.
- If redactions are required, see production requirements specified in Paragraph 6.5.

4.   **FULL TEXT EXTRACTION/OCR**
- Where available, produce full extracted text for all file types (Redacted text will not be produced). Redacted documents should be re-OCRed and the redacted text should be produced.
- Produce OCR text output for any paper document.
- Produce OCR text output for any ESI where the source format was an image file (such as JPG, JPEG, GIF, BMP, PCX, PNG, TIF, TIFF etc.) where extracted text cannot be provided, using industry standard OCR technology (Redacted text will not be produced).
- *Production format*: Single text file for each document, not one text file per page.
- *File Naming Convention*: Match Beg Bates Number.

5.   **ESI (AND PAPER TO THE EXTENT APPLICABLE) PRODUCTION METADATA FIELDS**
- <u>BegBates</u>:  Beginning Bates Number.
- <u>EndBates</u>:  Ending Bates Number.
- <u>BegAttach</u>:  Beginning Bates number of the first document in a document family range. Documents that are part of document families, *i.e.*, containing parents and attachments should receive a value.
- <u>EndAttach</u>:  Ending Bates number of the last document in attachment range in a document family range.  Documents that are part of document families, *i.e.*, containing parents or attachments, should receive a value.

- Custodian:  Name of the Custodian of the Document Produced.
- Duplicate Custodians:  Names of all custodians who had a copy of a document that was removed through the de-duplication process, if applicable.
- FileName:  Filename of the original source ESI as stored by the custodian.
- NativeLink:  Path and filename to produced Native Format file (see Paragraph 6.13).
- EmailSubject:  Subject line extracted from an email message.
- Title:  Title field extracted from the metadata of a non-email document.
- Author:  Author field extracted from the metadata of a non-email document.
- From:  From field extracted from an email message, including both the display name and the SMTP address.
- To:  To or Recipient field extracted from an email message, including both the display name and the SMTP address.
- Cc:  CC or Carbon Copy field extracted from an email message, including both the display name and the SMTP address.
- BCC:  BCC or Blind Carbon Copy field extracted from an email message, including both the display name and the SMTP address.
- DateSent:  Sent date and time of an email message (mm/dd/yyyy  format).
- TimeSent: Sent time of an email message or instant message. (hh:mm:ss format)
- TimeZoneProcessed: The originating time zone of the document.
- DateCreated: The origination date of the document. (mm/dd/yyyy format)
- TimeCreated: The origination time of the document (hh:mm:ss format)
- DateLastModified:  Last modification date (mm/dd/yyyy format).
- TimeLastModified:  Last modification time (hh:mm:ss format)
- Location: The folder structure for the original native file as it existed at the time of collection.
- PageCount: The number of pages of the document, excluding the pages of documents in the same family.
- [MD5/SHA1]HashValue:  MD5 or SHA-1 hash value, but please specify using field name.
- File Extension:  File extension of document (.msg, .doc, .xls, etc.).
- ExtractedText:  File path to Extracted Text/OCR File.
- Confidentiality: "Confidential," if a document has been so designated under the Confidentiality Stipulation; otherwise, blank.
- Attach Count:  Number of attached files.
- Message-ID: The Outlook Message ID assigned by the Outlook mail server, if applicable.
- Reference Chain: The Outlook message "Reference Chain," if applicable.
- Redacted (Y/N): Whether the document contains redactions.
- Embedded Source: The Document Number of the source file from which the embedded file was extracted (if applicable).

6.    **DE-DUPLICATION**
- De-duplication method: Parties may make reasonable efforts to de-duplicate stand-alone documents or entire document families globally using MD5 or SHA-1 Hash value matching.
- Common system files defined by the NIST library (http://www.nsrl.nist.gov/) need not be produced.