UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



MARK OWEN and JAMES WANDLING,
*Individually and On Behalf of All Others
Similarly Situated*,

                    Plaintiffs,

            -against-

ELASTOS FOUNDATION, et al.,

                    Defendants.

19-CV-5462 (GHW) (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Now before the Court is plaintiffs' motion (Dkt. 112), made pursuant to Fed. R. Civ. P. 37(b), to compel defendants Elastos Foundation (Elastos), Feng Han (Han), and Rong Chen (Chen) to produce documents that they have withheld in reliance on the Personal Information Protection Law of the People's Republic of China (PIPL). Although defendants initially agreed to collect, search, review, and produce documents from 19 custodians (including Han and Chen), they now assert that, to the extent either the custodian or the data is in the People's Republic of China (China or PRC), PIPL forbids them from doing any of those things without the custodian's express written consent. *See* Def. Mem. (Dkt. 128) at 1, 8-12. Defendants report that although they received full consents from ten custodians (including Han and Chen), the other nine either failed to provide any consent or consented to the search of some, but not all, of their data sources. *Id.* at 6-7. As to those custodians and sources, defendants say, they cannot comply with their discovery obligations under United States law without risking "significant penalties" under PIPL. *Id.* at 11.

Plaintiffs argue that Chinese law does not block the discovery they seek because, among other things, (i) the business communications at issue do not constitute "personal information," and Elastos is not acting as a "personal information processor," as those terms are used in PIPL; (ii) PIPL does not apply to any documents "outside of China," such as documents on the Google

servers that Elastos has used to host its email and store its data since early 2018; and (iii) even where PIPL applies, it does not bar the collection and production of documents "necessary for the performance of statutory duties or obligations," such as defendants' obligations under the Federal Rules of Civil Procedure. *See* Pl. Mem. (Dkt. 113) at 8-13. The parties also disagree as to whether (in the event the Court identifies a true conflict between U.S. and Chinese law) defendants should be permitted, as a matter of comity, to withhold otherwise discoverable documents in deference to PIPL, or be ordered to produce all responsive documents within their possession, custody, and control, with or without custodian consent. *See* Pl. Mem. at 13-24; Def. Mem at 12-21.

For the reasons that follow, plaintiffs' motion will be granted.

## I.      BACKGROUND

Plaintiff Mark Owen, later joined by plaintiff James Wandling, commenced this putative class action in state court on January 31, 2019. After removal (Dkt. 1), plaintiffs filed an Amended Complaint alleging that the "ELA Tokens" (a form of cryptocurrency) that Elastos created and sold to investors in the United States are securities, but that defendants failed to register them with the Securities and Exchange Commission, in violation of §§ 5, 12(a)(1), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77e, 77l(a)(1), and 77o(a). Am. Compl. (Dkt. 68) ¶ 1.

The ELA Tokens were sold in an "initial coin offering" (ICO) in January 2018, which raised "more than $200 million in digital cryptocurrencies" from U.S. investors, who were told that the tokens were "'intrinsic' to accessing and participating in the 'new internet of wealth' that Elastos was purportedly developing," were "limited in supply," and would "increase in value." Am. Compl. ¶¶ 1-2. Elastos also developed a "token lock-in program" wherein "investors agreed not to sell their tokens for a pre-specified amount of time in exchange for accruing interest in the form of additional ELA Tokens." *Id.* ¶ 14. After the ICO, defendants continued to solicit U.S.

investors to purchase ELA Tokens "on the secondary market." *Id.* ¶¶ 1, 4. The tokens are listed on the Huobi Exchange. *Id.* ¶ 3.

Elastos is registered in Singapore and "has its primary offices in Shanghai and Beijing, China." Am. Compl. ¶ 15. However, "on or about September 5, 2017, China banned all ICOs." *Id.* ¶ 25. This caused Elastos to adjust its strategy and open its ICO to "anyone except Chinese citizens," targeting U.S. investors in particular. *Id.* ¶¶ 25-26. By December 2017, Elastos had a "significant presence in San Francisco," *id.* ¶ 15, and defendants "embarked on an aggressive in-person marketing effort to promote Elastos and its tokens throughout the United States," at "blockchain and cryptocurrency conferences and expos," as well as through its websites, on its Twitter feed and Facebook page, on Reddit, and through its officers' personal accounts across these platforms. *Id.* ¶¶ 26-27, 38, 40. According to plaintiffs, defendants Chen and Han, the Founder and Co-Founder of Elastos, both lived, worked, and promoted the sale of ELA Tokens in the United States during this period. *Id.* ¶¶ 16-17.[1] The Elastos Board of Directors consists of Chen, Han, and Ben Lee (also known as Ben Li and Heng Li), who is Elastos's "Operation Lead" and resides in China. *See Welcome to Elastos: Elastos Foundation (EF)*, Elastos Foundation, https://www.elastos.org/en/ (last visited Jan. 11, 2023); Declaration of Benjamin F. Burry (Burry Decl.) (Dkt. 137) Ex. 1, at 1.[2]

---

[1] Defendant Chen, a former Microsoft engineer, *see* Am. Compl. ¶ 21, agrees that he resides and works in the U.S., "near Redmond, Washington." Declaration of Rong Chen (Dkt. 64) ¶ 6. Defendant Han attests that he resides and works in China. Declaration of Feng Han (Dkt. 63) ¶ 4. However, plaintiffs served Han with process in Cambridge, Massachusetts, *see* Am. Compl. ¶ 17, and Elastos admits that "from approximately September 2018 to October 2019," Han lived in Massachusetts. Elastos Ans. ¶ 17.

[2] Exhibit 1 to the Burry Declaration is a chart (Pl. Chart) (Dkt. 137-1) listing – by custodian – the categories of documents that plaintiffs believe to have been wrongfully withheld. As discussed in more detail below, plaintiffs contend that, even as to the custodians who furnished unqualified consent, defendants failed to search one or more of their personal accounts or devices. The only custodian who does *not* appear on the chart is defendant Han.

Elastos describes itself as a "fully decentralized organization" employing blockchain technology, Elastos Ans. (Dkt. 95) at ¶ 2, and a "platform for dApps [decentralized applications] that run on a peer-to-peer network without centralized control." *Id.* ¶ 3. According to defendants, the ELA Token is a "digital asset with a fully functional ecosystem and utility that powers the Elastos blockchain and supports development by its users and dApp developers." *Id.* ¶ 5. The token is "used for processing peer-to-peer payments, storing information on the decentralized chain, and executing smart contracts. It is also used for the exchange of digital goods throughout the entire ecosystem," *id.*, which is composed of Elastos, Cyber Republic (the "consensus-based community governance mechanism for Elastos"), "various independent teams," and Elastos Essentials, "a Super-Wallet application that provides full management support for digital identity, contacts, decentralized storage, token spending, voting, and smart contract operations." *Id.* ¶ 6.[3]

Because Elastos is a "decentralized ledger entity," relevant information is in the possession of "Elastos token holders, people from the Elastos Foundation, including the defendants, and various different Elastos ecosystem partners." Tr. of Dec. 22, 2021 Conf. (12/22/21 Tr.) (Dkt. 92) at 12:1-12. Those individuals – including the 19 agreed-upon custodians – "used their personal devices for both Elastos and non-Elastos communications and information." Bleichmar Decl. Ex. 4 (April 13, 2022 letter from defendants' counsel), at 2. They had to do this because, according to defendants, "[t]here are no Elastos-issued devices," such as laptop computers or mobile phones. *Id.*; *see also* Declaration of Zachary S. Zwillinger (Zwillinger Decl.) (Dkt. 130) ¶ 12 ("Elastos does not issue devices to its employees or partners[.]"). Even the "official" Elastos social media

---

[3] Defendants' counsel later advised that Cyber Republic "is a separate legal entity," formed in Delaware as "Cyber Republic Operations LLC." Declaration of Javier Bleichmar (Bleichmar Decl.) (Dkt. 114) Ex. 6 (May 4, 2022 letter from defendants' counsel), at 10.

accounts, "such as Twitter, Facebook, YouTube, Instagram, etc.," were under the control of the "Elastos decentralized community." Bleichmar Decl. Ex. 4, at 6.[4]

Elastos does, however, maintain its own email servers, which were hosted in China by the Chinese company Tencent until "approximately April/May 2018." Bleichmar Decl. Ex. 4, at 2. Since then, Elastos's email accounts "and all related data" have been "hosted on Google" in the United States. *Id.* The Google servers contain "both email messages and Google drive documents." Bleichmar Decl. Ex. 6, at 3.

### A.    Procedural History

On December 9, 2021, the Hon. Gregory H. Woods, United States District Judge, denied defendants' motion to dismiss the Amended Complaint. (Dkt. 87.) On December 22, 2021, Judge Woods held an initial scheduling conference, *see* 12/22/21 Tr., and on January 2, 2022, he issued a Civil Case Management Plan and Scheduling Order. (Dkt. 91.) In accordance with that order, plaintiffs served their document demands, pursuant to Fed. R. Civ. P. 34, on January 26, 2022. Bleichmar Decl. Ex. 1. Defendants served written responses on February 25, 2022. *Id.* Ex. 3. On March 22, 2022, Judge Woods so-ordered the parties' Stipulated Confidentiality Agreement and Protective Order, which permits any party to designate documents produced in discovery as "confidential," thereby limiting their use and dissemination. *See* Prot. Order (Dkt. 100) ¶¶ 1-13. On May 4, 2022, defendants served amended responses to plaintiffs' document requests, expressly raising PIPL as a potential bar to production. Bleichmar Decl. Ex. 6, at ECF pp. 16-54.

---

[4] Defendants assert that Elastos "does not have policies or procedures in place to gain access to its employees' or partners' devices, and is therefore not legally entitled to access data from those sources." Zwillinger Decl. ¶ 12. However, they "have not refused . . . to produce any documents based on their objections that the materials are outside of their possession, custody, or control." *Id.*; *see also* Def. Mem. at 4 ("Defendants have not, to date, refused to produce any documents based on their objection that the data requested is not in their possession, custody, or control.").

On May 13, 2022, the parties jointly requested a pre-motion conference "concerning the application of Chinese law to document discovery in this matter." (Dkt. 107, at 1.) After a conference on May 26, 2022, Judge Woods set a briefing schedule for plaintiffs' motion to compel. (Dkt. 109.)

On June 2, 2022, plaintiffs timely filed the instant motion, supported by their memorandum of law, the Bleichmar Declaration, and the Expert Report of Laura Wen-yu Young (Young Rep.) (Dkt. 115) concerning Chinese law. On July 8, 2022, defendants filed their opposition brief, supported by the Zwillinger Declaration and the Expert Declaration of Jianwe (Jerry) Fang (Fang Decl.) (Dkt. 129) concerning Chinese law. On July 22, 2022, plaintiffs filed their reply brief (Pl. Reply) (Dkt. 136), supported by the Burry Declaration and the rebuttal Expert Report of Laura Wen-yu Young (Young Rebuttal Rep.) regarding Chinese law. (Dkt. 139.)

On September 22, 2022, Judge Woods referred the case to me for general pretrial management. (Dkt. 146.) On October 11, 2022, I extended the parties' deadline to complete fact discovery to February 13, 2023. (Dkt. 153.)

### B.   Defendants' PIPL-Based Objections

Defendants advised plaintiffs early on – even before discovery formally commenced – that they anticipated discovery difficulties because of restrictions in China. *See*, *e.g.*, Joint Ltr. dated Dec. 15, 2021 (Dkt. 89) at 3; 12/22/21 Tr. at 7:4-12. After defendants served their initial responses to plaintiffs' document requests, the parties held a series of meet-and-confer sessions. On April 13, 2022, defendants agreed to collect and produce documents from 19 of the 20 Elastos custodians identified by plaintiffs, even though, according to defendants, the list included many individuals

who had "no ongoing employment relationship with Elastos." Bleichmar Decl. Ex. 4, at 1-2.[5] Also

on April 13, defendants laid out their view of the constraints on document discovery imposed by

Chinese law, explaining that they had retained "a PRC law firm" to assist their litigation counsel

in complying with local law, and identifying "three buckets of documents," as follows:

1. For all data in China – regardless of whether it is for U.S.-based custodians or China-based custodians – we are required to 1) get prior written consent from each custodian; 2) perform a state secrets review; and 3) follow whatever process the PRC law firm deems appropriate for the new data transfer laws.

2. For data for U.S.-based custodians that is located in the U.S., none of the above requirements apply; we will be collecting and producing this data accordingly.

3. For data for China-based custodians that is located in the U.S., the consent requirement nonetheless applies.

Bleichmar Decl. Ex. 4, at 4-5. Defendants concluded that because Elastos, Han, their counsel, and

their e-discovery vendor "are all located in China, we cannot violate China law without risking

incurring significant financial and legal liability. As a result, we cannot collect, review, or produce

documents except as permitted by China law." *Id.*[6]

On May 4, 2022, Elastos served its amended objections and responses to plaintiffs'

document demands. Bleichmar Decl. Ex. 6, at ECF pp. 16-54. In General Objection No. 6,

defendants objected "to each Request and instruction to the extent that each Request or instruction

imposes obligations on Defendants that would require Defendants to violate Chinese law,"

including but not limited to PIPL. *Id.* at ECF p. 17. In response to each individual request,

---

[5] Defendants later acknowledged that Elastos "has or had some sort of employment or other economic relationship with each of the custodians," while declining to "detail each custodian's relationship with Elastos." Bleichmar Decl. Ex. 6, at 4.

[6] Defendants are represented in this action by Paul Hastings LLP, which has an office in Shanghai, China. Bleichmar Decl. Ex. 4, at 5. Defendants later identified the "PRC law firm" as the Zhong Lun Law Firm, where attorney Fang is a partner in the Shanghai office. *See* Fang Decl. ¶¶ 5, 13.

defendants stated that they would "take all reasonable steps to comply with their obligations under both the Federal Rules of Civil Procedure and Chinese Law." *Id.* at ECF pp. 22-53.

### C.     Information Withheld on the Basis of PIPL

By the time they filed their motion papers, defendants had "collected 879,126 documents from 17 custodians, both within and outside of China," reviewed them using broad search terms and an "inclusive approach," and produced 245,314 documents, including documents "in Defendants' own possession" (that is, documents collected from Elastos's Tencent servers in China and its Google servers outside of China) and "Elastos data in individual custodians' control," including email and text messages, as well as communications via WeChat, TikTok, Telegram, Twitter, Discord and Mailchimp. Zwillinger Decl. ¶¶ 14-19 & Ex. 1.

However, three of the eight custodians outside of the U.S. "did not provide their consent for the collection of their data." Zwillinger Decl. ¶ 25. Consequently, although defendants produced documents concerning these individuals from the Elastos Google servers, they did not collect or produce any of their data "stored on Tencent servers in China," or from their personal devices or accounts. *Id.* ¶¶ 25-26. The three U.S.-based custodians who refused to consent are Fay Li, who served as Chief Marketing Officer (CMO) for Elastos during the run-up to the ICO;[7] Clarence Liu, its "VP-Development"; and Kevin Zhang, described by plaintiffs as "Elastos Head of Developers Community." *See id.* ¶ 25; Pl. Chart at 2, 4, 6.

As for the 11 custodians located in China, defendants report that five consented to the collection of all of their relevant data, including their Elastos email accounts and their "personal

---

[7] On May 4, 2022, defendants advised that they "very recently received Fay Li's consent to collect, review, and produce her Tencent email." Bleichmar Decl. Ex. 6, at 1. But on June 8, 2022, they reversed that position, stating, "we have not been able to obtain consent from Fay Li . . . to collect any of [her] data." Bleichmar Decl. Ex. 8 (letter from defendants' counsel dated June 8, 2022), at 2. In their motion papers, defendants do not explain the seeming contradiction.

communications"; four consented to the collection of some but not all of their relevant data; one

refused to provide any consent; and one was never contacted, "[d]espite our best efforts," because

defendants could not locate him. Zwillinger Decl. ¶¶ 28-31. The individual who could not be found

is Dinge Hu, identified by plaintiffs as "Elastos' Ecosystem Development Director." Pl. Chart at 3.

The five PRC-based custodians who declined to provide full (or any) consent are:

- Ben Lee, the Elastos director and Operation Lead, who "[r]efused collection of social media (but did consent to collection of Elastos email, as well as his personal device)";

- Simon Cai, an Elastos Digital Asset Specialist, who "[r]efused collection of personal email account or personal device (but did consent to collection of Elastos email)";

- Yipeng Su, a former Elastos director, Chief Engineer, and Chief Architect, who "[r]efused collection of personal device, social media, or other sources or repositories (but did consent to collection of Elastos email)";

- Julie Zhu, a Digital Asset Specialist, who "[r]efused collection of personal device (but did consent to collection of Elastos email)"; and

- Hao Cheng, Elastos's PR Director, who "[r]efused collection of [his] Elastos email" and denied using any personal devices or account for Elastos business.

Zwillinger Decl. ¶ 31 & Ex. 2; Pl. Chart, at 1-5.

Neither side has provided a count, or even an estimate, of the number of documents that

defendants did not produce due to PIPL. This is due in part to defendants' contention that, absent

the necessary consent, they cannot even "collect the data," to determine "what is, in fact, in it," for

nonconsenting custodians. Tr. of May 26, 2022 Conf. (Dkt. 120) at 16:6-12; *see also id.* at 18:14-

16 ("we're not able to collect [data from the Elastos servers] for production purposes until we get

the consent from the custodians").

### D.     PIPL

PIPL was enacted to "protect[] the rights and interests on personal information, regulat[e]

personal information processing activities, and promot[e] reasonable use of personal information."

PIPL art. 1.[8] "Personal information" is defined broadly as "various information related to an identified or identifiable natural person recorded electronically or by other means, but does not include anonymized information." *Id.* art. 4. Personal information "processing" includes "personal information collection, storage, use, processing, transmission, provision, disclosure, and deletion, among others." *Id.* A "personal information processor" is "an organization or individual that autonomously determines the purpose and means of personal information processing." *Id.* art. 73, § 1.

PIPL applies to "the processing of personal information of natural persons within the territory of [China]." PIPL art. 3. It also applies to extraterritorial processing, that is, "the processing outside the territory of [China] of the personal information of natural persons within the territory of [China]," *id.*, but only under three circumstances:

(1)     where the processing is done "for the purpose of providing products or services for natural persons inside the People's Republic of China";

(2)     where the processing is done for the purpose of "analyzing or evaluating the behaviors of natural persons within the territory of the People's Republic of China"; and

(3)     under "any other circumstance as provided by any law or administrative regulation."

*Id.* art. 3, §§ 1-3.

Under PIPL, "[a] personal information processor can process personal information of an individual" only if one of seven circumstances exists. PIPL art. 13. Five of those "circumstances" are potentially relevant here:

(1)     the individual's consent has been obtained;

---

[8] All citations to PIPL are to the Personal Information Protection Law of the People's Republic of China (promulgated by the Standing Comm. Nat'l People's Cong., Aug. 20, 2021, effective Nov. 1, 2021) (China), available at http://en.npc.gov.cn.cdurl.cn/2021-12/29/c_694559.htm (English translation) (last visited Jan. 11, 2023).

> (3)     the processing is necessary for the performance of statutory duties or
>          obligations;
>
> (5)     the personal information is reasonably processed for news reporting, media
>          supervision, and other activities conducted in the public interest;
>
> (6)     the personal information disclosed by the individual himself or other legally
>          disclosed personal information of the individual is reasonably processed in
>          accordance with this Law; and
>
> (7)     other circumstances as provided by laws or administrative regulations.

PIPL art. 13, §§ 1, 3, 5, 6, 7. "Where personal information processing is based on individual consent, the individual consent shall be voluntary, explicit, and fully informed." *Id.* art. 14. Additionally, where a "personal information processor provides personal information for any party outside the [PRC], the processor shall inform the individuals of the overseas recipient's name and contact information . . . and shall obtain individual's separate consent." PIPL art. 39.

  If "a personal information processor infringes the rights or interests on personal information due to any personal information processing activity and cannot prove that [it] is not at fault," the processor "shall assume the liability for damages and other tort liability." PIPL art. 69. Administrative penalties may also be imposed, including fines ranging from ¥10,000 to ¥1,000,000, or – if "the circumstances are serious" – up to ¥50,000,000 "or not more than five percent of the previous year's turnover." PIPL art. 66.[9]

### 1.     Plaintiffs' Expert's Interpretation of PIPL

Laura Wen-yu Young is a U.S.-trained lawyer, admitted to practice in California, fluent in Chinese, and "registered as a foreign legal expert with China's Ministry of Justice." Young Rep. ¶ 5. Young is a partner at Wang and Wang, LLP, a law firm with offices in San Francisco and

---

[9] As of the date of this Opinion and Order, ¥1,000,000 equals approximately $145,000.

Shanghai, and has spent more than 30 years "advising Western companies regarding compliance with Chinese law." *Id.*

Young opines that PIPL does not bar defendants from "collecting, reviewing, or producing responsive business documents required by the Federal Rules of Civil Procedure, even where the individual personnel associated with such business documents have not provided express written consent[.]" Young Rep. ¶ 15. She reasons that defendants "are not a 'personal information processor' as defined by the PIPL when they store or collect their own Elastos business records," and that those business records, including emails, "are not 'personal information' as defined by the PIPL." *Id.* ¶ 16. With regard to the definition of "personal information processor," Young argues that it cannot be the case that every business that saves, collects, and stores its own business emails and other documents thereby becomes a "personal information processor," as that would make virtually every business a "personal information processor" and subject it to a host of onerous requirements – including obtaining individual consent from all email users, revocable at will – even for routine business handling of such records, which was "not the intent of the PIPL." *Id.* ¶ 25. Similarly, according to Young, although the definition of "personal information" in PIPL "seems to lack detail," *id.* ¶ 27, that is because it is "already defined in other Chinese statutes, such as the Civil Code," *id.* ¶ 28,[10] which limits "personal information" to information that can identify a natural person, such as names, birth dates, ID numbers, biometric information, and contact information (including email addresses). *Id.* (*citing* Civil Code art. 1034). Thus, in Young's view,

---

[10] All citations to the Civil Code are to the Civil Code of the People's Republic of China (promulgated by the Nat'l People's Cong., May 28, 2020) (China), available at http://en.npc.gov.cn.cdurl.cn/pdf/civilcodeofthepeoplesrepublicofchina.pdf (English translation) (last visited Jan. 11, 2023).

"business documents and emails between a company and its employees in China are not personal information under the PIPL." *Id.* ¶ 30.[11]

Even if PIPL does apply, Young continues, it does not bar defendants' production of business records related to persons located outside of China (regardless of where the records are), or business records that are themselves located outside of China, since the purpose of the production – compliance with the Federal Rules of Civil Procedure – does not fall into any of the "circumstances" listed in PIPL art. 3, §§ 1-3. Young Rep. ¶¶ 18-19, 35-36; *see also id.* ¶ 38 ("A business that stores its own business records, such as emails, does not do so for the purpose of analyzing and evaluating the behavior of the employees"). Even where both the business records and the individuals to whom they pertain are in China, Young opines, PIPL would not bar production in this case because consent is not required where the "processing of personal information" is "necessary for the performance of statutory duties or obligations" or "as provided by laws or administrative regulations." *Id.* ¶¶ 20, 44-45. Young reads these exceptions, found in PIPL art. 13, §§ 3 and 7, to include "processing" (that is, collection, search, review, and production) that is necessary for defendants to comply with the Federal Rules of Civil Procedure. *Id.* ¶¶ 44-45, 48.[12]

---

[11] Young acknowledges that names (and, the Court notes, email addresses) are specifically listed in Civil Code art. 1034, but argues that ordinary business emails – all of which, by definition, contain names and email addresses – could not have been intended to come within PIPL, or else "anomalous result[s]" would occur. Young Rep. ¶ 33. For example, a business could be frozen out of its own business records – or required to delete them – if the employee who wrote or transmitted them rescinded consent in accordance with PIPL arts. 15 and 43, or if, after the employee's death, the family demanded that records associated with the deceased be turned over or deleted, as permitted by PIPL art 49. Such an interpretation, Young argues, "is clearly nonsensical" and "is not the intention of the PIPL." Young Rep. ¶¶ 33-34.

[12] Young also argues that the discovery sought in this case is authorized by the exception set out in art. 13, § 5, because this lawsuit is "related to the protection of investors and the public interest," and by art. 13, § 6, because the Elastos personnel who sent the emails at issue here necessarily "disclosed" any personal information contained therein. Young Rep. ¶¶ 46-47. I find these

## 2. Defendants' Expert's Interpretation of the PIPL

Attorney Jianwei (Jerry) Fang was trained both in the U.S. and in China and is licensed to practice in New York and in the PRC. Fang Decl. ¶ 3. In addition to serving as expert for defendants, Fang and his firm advised defendants on how to comply with Chinese law and "led a team of qualified practitioners in Chinese law in conducting a Chinese law review of tens of thousands of documents collected [by defendants] prior to overseas provision." *Id.* ¶ 13.

Fang begins by opining that Young is not qualified to opine on PIPL because she has no Chinese legal degree and is not licensed to practice in the PRC. Fang Decl. ¶¶ 16-35.[13] He then asserts that the documents at issue here are "subject to the PIPL" because they contain "personal information" as defined therein and because Elastos is a "personal information processor" when it collects, reviews, and produces documents for litigation purposes. Fang Decl. ¶¶ 36-53. Fang agrees with Young that the definition of "personal information" in PIPL art. 4 is very broad, but asserts that this is consistent with the intention of the statute. *Id.* ¶ 41. As evidence of that intention, Fang points to PIPL art. 28, which prescribes additional protections for "sensitive personal information" such as "biometrics," "medical health status," and "financial accounts."

---

arguments unpersuasive because they prove too much. Virtually every litigant contends that its position is aligned with the "public interest." Similarly, a great deal of personal information – including genuinely sensitive matters concerning, for example, an individual's health or finances – requires protection precisely because that information was, at one point, "disclosed by the individual himself," for example, to his doctor or bank. If this type of disclosure furnished an exception to the limitations imposed by PIPL, that exception would threaten to swallow the otherwise-protective rule.

[13] The Court disagrees. Defendants do not identify any rule requiring a proposed expert on foreign law to be licensed as a practicing attorney in the relevant jurisdiction. In any event, where (as here) "the plain text of the statute" is available in English, that text necessarily takes precedence over whatever spin the parties' retained experts seek to put on it. *S.E.C. v. Gibraltar Glob. Sec., Inc.*, 2015 WL 1514746, at *2 (S.D.N.Y. Apr. 1, 2015); *see also Brit. Int'l Ins. Co. v. Seguros La Republica, S.A.*, 2000 WL 713057, at *7 (S.D.N.Y. June 2, 2000) (relying primarily on the translated text of a Mexican rule after noting that the competing opinions of the parties' experts "add little, if anything, to the plain language of the Rule, and essentially cancel each other out").

*Id.* ¶ 43. In this case, Fang asserts, the documents his team has collected and reviewed contained "many different types of personal information," including names, home and email addresses, identification and passport numbers, and cryptocurrency addresses. *Id.* ¶ 45.

Fang appears to agree with Young that a business does not become a "personal information processor" merely by maintaining an email server or other business data system. However, he states, when Elastos responds to plaintiffs' discovery requests by collecting, processing (with the help of a e-discovery vendor), reviewing (with the help of outside counsel), and producing documents – from its employees' personal devices and accounts as well as from its own servers – it is acting as a personal information processor covered by PIPL. Fang Decl. ¶¶ 47-53, 79.

Fang also disagrees with Young as to whether PIPL art. 3, § 2 renders the Chinese law applicable to documents that are outside of China but contain the personal information of individuals within China (such as those in defendants' Google servers). According to Fang, § 2 applies to such documents because "collection, review, and provision of these data would inevitably constitute 'analyzing or evaluating the behaviors of natural persons within the territory of the [PRC].'" Fang Decl. ¶ 67. Therefore, he concludes, defendants cannot engage in such processing in the absence of consent or another applicable exception. *Id.* ¶ 82.

Perhaps most significantly, Fang disagrees with Young as to whether any of the exceptions listed in article 13 of PIPL *other* than consent (art. 13, § 1) apply in this case. Fang says no, arguing that the other exceptions are "narrow" and inapplicable here. Fang Decl. ¶¶ 57-64. With respect to §§ 3 and 7, which permit processing of personal information "for the performance of statutory duties or obligations" and under "other circumstances as provided by laws or administrative regulations," respectively, Fang asserts that since "PIPL is a law of territorialism," it "must be interpreted such that only Chinese laws and regulations apply to the exceptions provided under

Article 13." *Id.* ¶ 58. Fang supports this conclusion, somewhat tautologically, by explaining that under China's Legislation Law, foreign laws "are not considered 'Chinese laws.'" *Id.* ¶ 62.[14]

## II.   ANALYSIS

### A.   Legal Standards

"[W]here the alleged obstacle to production is foreign law, the burden of proving what that law is and demonstrating why it impedes production falls on the party resisting discovery." *Doubleline Cap. LP v. Odebrecht Fin., Ltd.*, 2021 WL 4596561, at *8 (S.D.N.Y. Oct. 6, 2021) (quoting *Gibraltar Glob. Sec.*, 2015 WL 1514746, at *2). To satisfy this burden, "the party resisting discovery must provide the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law." *Wultz v. Bank of China Ltd.*, 298 F.R.D. 91, 96 (S.D.N.Y. 2014) (citations omitted). Among other things, that party must identify "the provisions of the foreign law, the basis for its relevance, and the application of the foreign law to the facts of the case." *Id.* (cleaned up).

If the foreign law conflicts with domestic law, the court must perform a comity analysis "to determine the weight to be given to the foreign jurisdiction's law." *Laydon v. Mizuho Bank, Ltd.*, 183 F. Supp. 3d 409, 413 (S.D.N.Y. 2016) (citations omitted). Conversely, in the absence of a "true conflict," this analysis is "unnecessary." *Gibraltar Glob. Sec., Inc.*, 2015 WL 1514746, at *4; *see also Yukos Capital S.A.R.L. v. Samaraneftegaz*, 592 Fed. App'x 28, 29 (2d Cir. 2015) ("International comity comes into play only when there is a true conflict between American law and that of a foreign jurisdiction.") (quoting *In re Maxwell Comm'n Corp. plc by Holman*, 93 F.3d

---

[14] In her supplemental report, Young largely reiterates the points made in her opening report. Additionally, Young and Fang spar over the meaning and import of a handful of Chinese judgments and administrative decisions, none of which – as described by the parties' experts – appear to address the issues now before this Court. *See* Young Rep. ¶¶ 50-53; Fang Decl. ¶¶ 72-73, 85, 88-89; Young Rebuttal Rep. ¶¶ 24-30.

1036, 1049 (2d Cir. 1996)); *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2017 WL 7512815, at *10 (S.D.N.Y. Dec. 29, 2017) ("Because I find no true conflict between Belgian law, on the one hand, and the requirements of this Court's discovery orders, on the other hand, there is no need for a comity analysis.").

Comity "is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *In re Maxwell Commc'n Corp.*, 93 F.3d at 1046 (quoting *Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895)); *accord Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co.*, 2009 WL 1055673, at *2 (S.D.N.Y. Apr. 17, 2009). Foreign "blocking statutes" do not "deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 544 n.29 (1987). However, American courts should "demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state." *Id.* at 546.

Courts conducting a comity analysis consider the following five factors:

(1)   the importance to . . . litigation of the documents or other information requested;

(2)   the degree of specificity of the request;

(3)   whether the information originated in the United States;

(4)   the availability of alternative means of securing the information; and

(5)   the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located.

17

*Weiss v. Nat'l Westminster Bank, PLC*, 242 F.R.D. 33, 42 (E.D.N.Y. 2007) (*citing Aerospatiale*, 482 U.S. at 544; Restatement (Third) of Foreign Relations Law § 442(1)(c) (1987)) (internal citations omitted); *see also Doubleline Cap. LP*, 2021 WL 4596561, at *8 (collecting cases). Courts in the Second Circuit also consider two additional factors:

> (6)    the hardship of compliance on the party or witness from whom discovery is sought; and

> (7)    the good faith of the party resisting discovery.

*Laydon*, 183 F. Supp. at 420; *Wultz*, 298 F.R.D. at 96; *Doubleline Cap. LP*, 2021 WL 4596561, at *9; *Royal Park Invs.*, 2017 WL 7512815, at *10. Courts may also consider "whether the person resisting discovery is a party to the litigation," and whether the requirements of another country's privacy laws are "absolute." *Laydon*, 183 F. Supp. 3d at 420 (*citing Tansey v. Cochlear Ltd.*, 2014 WL 4676588, at *2 (E.D.N.Y. Sept. 18, 2014)).

"Determination of a foreign country's law is an issue of law." *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 92 (2d Cir. 1998); *see also Kim v. Co-op. Centrale Raiffeisen-Boerenleebank B.A.*, 364 F. Supp. 2d 346, 349 (S.D.N.Y. 2005). In determining foreign law, courts "may consider any relevant material or source," Fed. R. Civ. P. 44.1, including testimony by foreign law experts. *Jonas v. Est. of Leven*, 116 F. Supp. 3d 314, 330 (S.D.N.Y. 2015). Although expert testimony "remains the 'basic mode of proving foreign law,'" *id.* (quoting *Bigio v. Coca-Cola Co.*, 2010 WL 3377503, at *4 (S.D.N.Y. Aug. 23, 2010), *aff'd*, 675 F.3d 163 (2d Cir. 2012)), a U.S. court "is not bound by [such] testimony, even if uncontradicted." *CE Int'l Res. Holdings, LLC v. S.A. Mins. Ltd. P'ship*, 2013 WL 2661037, at *5 (S.D.N.Y. June 12, 2013).

## B.    Defendants Did Not Waive Their PIPL-Based Objections

According to plaintiffs, defendants waived their PIPL-based objections because their original written discovery responses did not expressly invoke PIPL, and their amended responses

raised the objection generally rather than on a category-by-category basis, as is ordinarily required by Fed. R. Civ. P. 34(b)(2)(C). Pl. Mem. at 24-25. However, plaintiffs do not deny that defendants explained their PIPL-based objections early and often, including in their April 13, 2022 letter, which set out precisely how they believed PIPL constrained their document production, *see* Bleichmar Decl. Ex. 4, at 5; and their June 8, 2022 letter, which detailed, on a custodian-by-custodian basis, whose consent they received and what data sources they searched. *See id.* Ex. 8 (Exs. A-F thereto). Moreover, although "general objections should rarely be used," *Fischer v. Forrest*, 2017 WL 773694, at *3 (S.D.N.Y. Feb. 28, 2017), they are permissible where, as here, "each such objection applies to each document request." *Id.* I note as well that plaintiffs fail to identify any prejudice flowing from plaintiffs' asserted Rule 34 violations, and drop the issue entirely in their reply brief.

"Rule 34 does not contain the kind of automatic waiver provision for untimely objections that is found in the rule governing interrogatories." *Favors v. Cuomo*, 2013 WL 12358269, at *3-4 (E.D.N.Y. Aug. 27, 2013). Although "courts have reasoned that a Rule 33(b)(4) type waiver should be implied" into Rule 34, *id.* at *3 (collecting cases), they tend to reserve that remedy for situations involving lengthy delays (or failure to respond entirely) and demonstrable prejudice to the opposing party. *See, e.g.*, *id.* at *4 (defendants waived their objections to producing documents created after a certain date by failing to mention that objection until after plaintiffs filed their motion to compel); *see also Callaway Golf Co. v. Corp. Trade Inc.*, 2011 WL 1642377, at *2 (S.D.N.Y. Apr. 25, 2011) ("waiver is generally imposed only where the party is unable to provide an explanation for its late response," "fails to respond despite court intervention," or "fails to respond entirely") (collecting cases). Under the circumstances presented here, the Court declines

to impose the harsh remedy of waiver for defendants' failure to assert their PIPL-based defense in their original Rule 34(b)(2) response.

### C.      Defendants Have Adequately Identified the Documents In Dispute

Relying on a single out-of-Circuit case, plaintiffs argue that defendants cannot "meet their burden" of showing that PIPL bars the discovery sought because they "refuse to provide a log or any type of accounting identifying the documents they are withholding under PIPL." Pl. Mem. at 7-8 (*citing Philips Med. Sys. (Cleveland), Inc. v. Buan*, 2022 WL 602485, \*5 (N.D. Ill. Mar. 1, 2022)). Plaintiffs appear to have misread *Philips*, which stated (in dicta) that if defendants believed a responsive document contained "state secrets," such that its production would violate the State Secrets Law of the People's Republic of China, they could withhold the document and "produce a corresponding Rule 26(b)(5) privilege log." *Id*.[15] Nothing in *Philips* requires a Chinese litigant to violate PIPL by providing a document-by-document log of the documents which (if it is correct) it is barred not only from producing but also from collecting, searching, or otherwise reviewing. *See* Def. Mem. at 14 n.11 (defendants "are not capable of providing more detail than what they have provided").

In any event, the standard in the Second Circuit is clear: a litigant relying on a foreign blocking statute discharges its initial burden by describing "the provisions of the foreign law, the basis for its relevance, and the application of the foreign law to the facts of the case." *Wultz*, 298 F.R.D. at 96 (quoting *Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 207 (E.D.N.Y. 2007)). Here, defendants have adequately described "the application of foreign law to the facts of this case" by describing the *categories* of documents they have declined to search, review, or produce (for example, emails stored in the Tencent servers associated with custodians either inside or

---

[15] Defendants have not withheld any documents based on the State Secrets Law. Fang Decl. ¶ 95.

outside of China who have not consented to a search of their Elastos email accounts), and by explaining why they believe they cannot "process" those documents without running afoul of PIPL. Consequently, the Court will proceed to the merits of the dispute.

### D.   Defendants Are Engaged in Processing Personal Information

After carefully considering the English text of PIPL, as well as the competing views of the parties' experts, I am persuaded that the broad definition of "personal information" in PIPL art. 4 is intentional. Were it otherwise, there would be no need to define a narrower category of information as "sensitive personal information" in PIPL art. 28, and provide additional protections for that category. Young's contrary view – that the Chinese law cannot apply to "business documents" or "business communications," Young Rep. ¶ 26 – does not appear to be grounded in either the language or the structure of PIPL. *See Gibraltar Glob. Sec.*, 2015 WL 1514746, at *2 (expert's "*ipse dixit* does not warrant disregarding the plain text of the statute").

I note as well that while the documents in the Elastos servers may be "business" documents, defendants (assisted by their attorneys and e-discovery vendor) have also collected, searched, reviewed, and produced documents from a wide variety of devices and accounts that are owned or maintained by the individual custodians. Fang Decl. ¶ 45; *see also* Zwillinger Decl. Ex. 1 (summarizing documents collected by source). Those devices and accounts contained a mix of personal and business documents and communications, Fang Decl. ¶ 45, which would trigger the protections of PIPL even if the server searches did not.

Similarly, I am persuaded that by engaging in the procedures required by Rule 34 (including the collection, search, review, and production of documents from the individual custodians' personal devices and accounts), defendants, along with their attorneys and e-discovery vendor, are "processing" personal information, as that term is used in PIPL art. 3. This conclusion,

which is consistent with recent judicial interpretations of European privacy regulations,[16] does not

imply, as Young fears, the "anomalous," "nonsensical," and "absurd" result that every Chinese

business will be deemed a "processor," and hamstrung by PIPL, merely by generating and storing

its own business emails and other records in the ordinary course. *See* Young Rep. ¶¶ 25, 33, 38.

Plaintiffs again cite *Philips Med. Sys.*, 2022 WL 602485, at *6, this time for the proposition

that a company's business documents are not "personal information within the meaning of the

PIPL." Pl. Mem. at 9. In *Philips*, however, the court disposed of the Chinese defendants' PIPL

objections in a single paragraph, reasoning that PIPL did not prohibit them from "directing their

employees" to look for "*business* information stored on personal devices" while allowing those

employees to "screen out personal information from what they produce to the company." *Philips*

*Med. Sys.*, 2022 WL 602485, at *6 (emphasis in original). Here, Elastos itself has undertaken to

collect, search, review, and produce documents from multiple personal devices and accounts, some

of which belong to individuals who are no longer Elastos employees (or the equivalent), and many

---

[16] As many commentators have noted, the definitional provisions of PIPL resemble their counterparts in the European Union's General Data Protection Regulation (GDPR). *See, e.g.*, Xu Ke et al., *Analyzing China's PIPL and how it compares to the EU's GDPR*, The Privacy Advisor (Aug. 24, 2021), https://iapp.org/news/a/analyzing-chinas-pipl-and-how-it-compares-to-the-eus-gdpr/ (last visited Jan. 11, 2023) ("The definition of 'personal information' and 'processing of personal information' are defined similarly under both of the PIPL and the GDPR," while the Chinese term "personal information processing entity" is equivalent to the term "data controller" in the GDPR). American courts have acknowledged that, under the GDPR and similar European regulations, a litigant producing business emails and other electronic documents for discovery purposes is engaged in the "processing" of "personal information." *See*, *e.g.*, *In re Endo Int'l plc*, 2022 WL 16640880, at *6 (Bankr. S.D.N.Y. Nov. 2, 2022) (agreeing that Irish Chapter 11 debtors could redact certain information from their bankruptcy filings to comply with the GDPR, under which the debtors were "data controllers," and were engaged in "processing" the "personal information" of their equity holders and non-litigation claimants, including "names and contact information"); *Royal Park Invs.*, 2017 WL 7512815, at *4 (accepting the consensus of the parties' experts that "the copying and production" of business emails stored in Belgium, for use in a U.S. litigation, "constitutes 'processing,' and that 'personal data,' as that term is used in the [Belgian Data Privacy Act], includes employee names and professional email addresses").

of which contain personal as well as professional content, requiring Elastos to sort the one from the other as part of its "processing." *See* Fang Decl. ¶¶ 45, 48. The fact that the documents sought by plaintiffs are business rather than personal communications is appropriately weighed as part of any comity analysis, but does not, in my view, remove them from the reach of PIPL entirely. To the extent *Philips* can be read as concluding that PIPL can never reach a company's "business information," regardless of its specific content or location, I respectfully disagree.

E.    **Processing and Production of Documents and Data Held Outside of China Does Not Conflict With PIPL**

Notwithstanding the broad definitional terms employed in PIPL, I agree with plaintiffs and their expert that the Chinese law does not reach documents and data stored outside of China, such as the emails and other documents available on Elastos's Google servers. PIPL art. 3 states clearly that it governs the processing of such documents only when they contain the personal information of individuals within China *and* when one of three enumerated "circumstances" applies, including "analyzing or evaluating the behaviors of natural persons within the [PRC]." PIPL art. 3, § 2. Defendants argue, without any support outside of the statutory text, that § 2 applies because, after defendants produce the documents, *plaintiffs* will use them to "understand the conduct of Elastos custodians," that is, to "analyze" or "evaluate" their behavior. Def. Mem. at 10-11; Fang Decl. ¶ 67. Young, however, persuasively cites commentary provided by one of the drafters of PIPL to the effect that art. 3, § 2 was intended to reach activities such as "continuous recording and tracking of relevant personal information, and through subsequent processing technology the analysis or prediction of personal behavioral habits, interests, hobbies, or economic, health, credit status, etc., such as using user portrayals for marketing or making automatic decisions." Young Rebuttal Rep. ¶ 12 (referencing Heqing Yang, *Interpretation of the Personal Information Protection Law of the People's Republic of China* (2022)). As to documents and data stored outside of China, therefore,

I conclude that there is no true conflict between Chinese law and defendants' U.S. discovery obligations.

### F.     Processing and Production of Documents and Data Held Inside China, for the Purpose of Complying with U.S. Law, Does Not Conflict with PIPL

Whether PIPL permits defendants to produce documents and data held in their Tencent servers (or elsewhere in China) without the consent of each custodian is a closer question. Clearly, the law was intended to place greater constraints on those who handle personal information located within China. PIPL is also clear, however, that consent is not always required before such information may be processed. Article 13 contains seven exceptions, of which consent is only one. In this case, the parties disagree as to the applicability of the third and seventh exceptions, which permit the processing of personal information of an individual if "the processing is necessary for the performance of statutory duties or obligations," or under "other circumstances provided by laws or administrative regulations." PIPL art. 13, §§ 3, 7.

Defendants, as noted above, contend that these exceptions apply only when another *Chinese* law or regulation requires or permits the processing. Pl. Mem. at 10; Fang Decl. ¶¶ 58-61. Had that been the intent of the drafters, it could easily have been made clear in the text. But nothing in the language of PIPL itself supports defendants' interpretation. Moreover, Fang's general discussion of Chinese "territorialism" establishes only that "foreign laws . . . are not considered 'Chinese laws.'" *Id.* ¶ 62. That begs the question before this Court, which is whether §§ 3 and 7 impliedly refer only to "Chinese" laws. Defendants, who bear the burden of persuasion on this point, have failed to convince me that these provisions are so limited.

I note that at least one other federal court, addressing the same question presented here, was similarly unpersuaded. In *Cadence Design Sys., Inc. v. Syntronic AB*, 2022 WL 2290593 (N.D. Cal. June 24, 2022), the district court "decline[d] to limit Article 13's legal obligation

exception to obligations under Chinese law." *Id.* at *5 (holding that PIPL did not bar Syntronic Beijing from complying with the U.S. court's prior order to produce its computers for inspection in the United States, notwithstanding the lack of consent from the employees and former employees whose personal information was stored on the devices). After considering the competing declarations of the parties' Chinese law experts, the *Cadence* court based its decision primarily on the text of the law (observing that "nothing in PIPL itself indicates that [art. 13, § 3] is limited to Chinese law"), aided by common sense (reasoning that "inclusion of foreign legal obligations in the exception makes sense when at least some portions of the PIPL can apply extraterritorially to foreign companies outside of China, which would be subject to potentially contradictory duties under foreign law"). *Id.*; *see also NML Cap., Ltd. v. Republic of Argentina*, 2013 WL 491522, at *4 (S.D.N.Y. Feb. 8, 2013) (rejecting claim that the phrase "under law" in a Spanish statute "is limited to Spanish court orders" when the statute did not so state).

### G.    Comity Analysis

Because I find no true conflict between Chinese law, on the one hand, and the requirements of the Federal Rules of Civil Procedure, on the other hand, there is no need for a comity analysis. *Royal Park Invs.*, 2017 WL 7512815, at *10. Were a comity analysis required, however, it would not change my conclusion that defendants must produce all of the responsive documents in their possession, custody and control – including those in Elastos's Tencent and Google servers – with or without the consent of each individual custodian.

#### 1.    Importance of the Documents Requested

Defendants contend that the documents they have withheld based on PIPL "are not vital or crucial to the claims at issue," because the Amended Complaint "largely hinges on *public* statements made by those who allegedly offered unregistered securities." Def. Mem. at 15 (emphasis added). This argument is somewhat disingenuous, given that the Amended Complaint

was filed before plaintiffs had any discovery concerning defendants' *non-public* statements. Nor is it necessarily the case that "public statements" are the only – or even the best – evidence going to the *Howey* test, which defendants believe will be dispositive of plaintiffs' claims.[17]

Moreover, while defendants have produced a significant volume of documents, they have not produced (for example):

- Any documents at all from Hao Cheng, Elastos's PR Director, who is in China, because he refused to consent even to have his Elastos emails collected from the Elastos servers;

- Any documents *other* than those found on Elastos's Google servers from Fay Li, defendants' Chief Marketing Officer, who is in the United States – because she too refused to consent to any search or production; and

- Any social media communications (other than on WeChat) and any email communications (other than through his Elastos email address) of Ben Lee, Elastos's director and Operation Lead, who is in China – because he refused consent for a search of his social media accounts.[18]

*See* Zwillinger Decl. ¶¶ 25-31 & Exs. 1-2; Pl. Chart at 1-3.

Given the importance of these individuals' roles in the ICO, the Court concludes that their missing documents are undoubtedly relevant, and potentially "vital," to the parties' claims and defenses. This factor weighs in favor of production.

---

[17] The three elements of the *Howey* test, *see SEC v. W.J. Howey, Co.*, 328 U.S. 293, 298-99 (1946), are "(i) an investment of money (ii) in a common enterprise (iii) with profits to be derived solely from the efforts of others." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994). Given that the *Howey* analysis places emphasis on "economic reality," *U.S. Sec. & Exch. Comm'n v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 177 (S.D.N.Y. 2020) (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)), the internal communications and documents created by Elastos personnel concerning the ICO could prove to be as important as what they said publicly to potential investors.

[18] Although Ben Lee consented to the collection of his "personal device," Zwillinger Decl. ¶ 31 & Ex. 2 (which is presumably how defendants accessed his WeChat communications), they apparently accepted his representation that he did not use any personal email accounts for Elastos business. *Id.* Consequently, according to plaintiffs, defendants failed to search for or produce relevant communications from two personal email accounts through which Lee did in fact conduct Elastos business. Pl. Chart, at 1-2.

### 2.    Degree of Specificity of the Request

The second factor is neutral. Plaintiffs' document requests are broad, but defendants agreed to produce documents in response to "the vast majority of those requests," Def. Mem. at 16, and claim that they have done "everything in their power to collect and produce relevant documents," using an e-discovery vendor and search terms developed for that purpose. *Id.* at 1, 4-5. Those same search terms can be applied to the documents of additional custodians as directed by this Court.

### 3.    Whether the Information Originated in the United States

Defendants state that "[a]ll of the documents at issue . . . originated or are otherwise located in China." Def. Mem. at 17. Plaintiffs claim that defendants are also withholding "information stored in the United States," including documents on Elastos's Google servers that predate the 2018 email server transition, iPhone data available "through Apple iCloud storage," and data from the custodians' "U.S. based accounts at Twitter, Facebook, WhatsApp and other [American] communication platforms." Pl. Mem. at 17-18; *see also* Pl. Reply at 8-9. For purposes of the comity analysis, however, the pertinent question is not where the data is currently stored (or can be accessed); it is where it "originated." *Weiss*, 242 F.R.D. at 42. Based on the somewhat patchy record before me, it appears that most of the documents and data that defendants have declined to produce due to PIPL – including documents from the China-based custodians – originated in China. This factor therefore weighs in defendants' favor.

### 4.    Availability of Alternative Means of Securing the Information

As to documents in the personal possession of the three U.S.-based custodians who refused consent, non-party subpoenas (served on them or on their U.S.-based service providers) could provide an alternative means of obtaining the discovery sought. However, as to documents in Elastos's Google servers and drive, Rule 45 subpoenas served on Google would be significantly

more burdensome for plaintiffs (and more intrusive for defendants) than the Rule 34 party document requests that plaintiffs served on defendants.

As for Elastos's Tencent servers, the only alternative discovery method suggested by defendants is the Hague Convention, *see* Def. Mem. at 17-18, which, as defendants must know, is "not a viable alternative method" of securing discovery in China. *Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548, 557-60 (S.D.N.Y. 2012); *see also Inventus Power v. Shenzhen Ace Battery*, 339 F.R.D. 487, 503 (N.D. Ill. 2021) (reciting that "Chinese legal expert Jianwei Fang" explained why "the Hague would not be an effective method of securing discovery"). For the same reasons, plaintiffs have no realistic means of obtaining documents or data from the personal devices or WeChat accounts of non-consenting custodians in China, via the Hague Convention or otherwise. This factor therefore weighs in favor of compelling production by defendants.

### 5.     Respective Interests of the United States and China

The fifth factor is "the most important," *Wultz*, 910 F. Supp. 2d at 558 (quoting *Madanes v. Madanes*, 186 F.R.D. 279, 286 (S.D.N.Y. 1999)), and "carries the greatest weight." *In re Valsartan, Losartan, and Irbesartan Prod. Liab. Lit.*, 2021 WL 6010575, at *12 (D.N.J. Dec. 20, 2021). Here, the fifth factor weighs decidedly in favor of production. "[I]t has been repeatedly recognized that the United States has an 'obvious interest' in having its own procedural rules applied to discovery." *Laydon*, 183 F. Supp. 3d at 423 (quoting *Tansey*, 2014 WL 4676588 at *4). The United States also has a significant interest in "the protection of investors" and the promotion of "efficiency, competition, and capital formation." 15 U.S.C. § 77b(b). Both of those interests are particularly strong where, as here, foreign litigants have targeted United States investors and raised substantial funds in the United States. *See In re Valsartan*, 2021 WL 6010575, at *18 (finding the likely effect of PRC blocking laws on the U.S. market a "most important consideration" and

reasoning that "PRC defendants" should not "enter the U.S. market expecting a possible shield from unfavorable discovery").

Conversely, even if PIPL were a barrier to the discovery sought, China's interests would be relatively weak where, as here, the law is invoked by a Singaporean entity that had servers and personnel in China but did not even offer ELA Tokens to PRC residents, focusing its business efforts instead on the United States. Moreover, China's interest in the privacy of defendants' documents is neither absolute nor unqualified, in that PIPL contains numerous exceptions, some of which are discussed above, and is generally intended to promote "reasonable use" of personal information, PIPL art. 1, rather than prohibit all such use. This too weighs in favor of production. *See First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 22 (2d Cir. 1998). Any risk of *unreasonable use* "can be mitigated by the countervailing factors present in this case," *Wultz*, 298 F.R.D. at 103, such as the parties' Protective Order – and the availability of sealing orders for any truly sensitive personal information. (*See, e.g.*, Dkts. 166, 174; *see also infra* § II.H.)

### 6. Hardship of Compliance

Defendants have not demonstrated that they face a tangible risk of sanctions by the Chinese government for complying with this Court's discovery orders. Although Fang cites two cases in which Chinese governmental bodies found companies in violation of PIPL, the penalty assessed in each case was limited to an "official warning" or "order to rectify." Fang Decl. ¶ 72. Defendants cite *no* cases in which a party to U.S. litigation has been sanctioned under PIPL (or other Chinese privacy laws) for complying with the Federal Rules of Civil Procedure or obeying discovery orders by a U.S. court. This factor therefore weighs in favor of production. *See Wultz*, 910 F. Supp. 2d at 553-54 (granting motion to compel production from Bank of China, which "has apparently never been sanctioned by the Chinese government for complying with American court orders to produce documents in contravention of China's bank secrecy laws"); *In re Valsartan*, 2021 WL 6010575,

29

at *18 (compelling production, over an objection based on the SSL, where there was "very little direct evidence that shows a PRC government entity actually levying penalties" against large PRC defendants facing products liability litigation in U.S. courts).

### 7.    Good Faith of Party Resisting Discovery

Although the Court has no reason to doubt defendants' good faith in interposing PIPL as an objection to discovery regarding nonconsenting custodians, plaintiffs complain, with some justification, that defendants have made a number of factual assertions (for example, as to which custodians are in China, and which custodians consented to a search of their documents) that turned out to be inaccurate. *See* Pl. Mem. at 23. In addition, it appears that, as to at least some of the consenting custodians, defendants did not search all of the relevant devices or accounts. *Compare* Zwillinger Decl. Ex. 1 *with* Pl. Chart.[19] The final factor is therefore neutral.

Weighing all of the comity factors, I find that they militate in favor of production. Thus, even if there were a true conflict of laws, comity would not prevent this Court from ordering defendants to produce all of the otherwise discoverable documents within their possession, custody, and control – both within and without China – whether or not a custodian consents.

---

[19] Plaintiffs devote several pages of their reply brief (and the entire Burry Declaration) to this point, arguing that defendants are "withholding" documents even from custodians who furnished unqualified consent – primarily by failing to collect relevant emails from their personal devices or personal email accounts. *See* Pl. Reply at 1-3; Pl. Chart. These issues are highly fact-intensive and go considerably beyond the legal issue presented at the pre-motion conference and in plaintiffs' moving papers, which is "*whether Defendants can withhold responsive business documents in their possession, custody, or control on the grounds that they have not obtained 'express written consent' from their witnesses, as they claim is required under the PIPL.*" Pl. Mem. at 2 (emphasis in original). If they have not done so already, the parties must promptly meet and confer in good faith with respect to the documents that plaintiffs contend are being improperly withheld for non-PIPL reasons. If they are unable to resolve their disputes through negotiation, they may seek a discovery conference in accordance with Local Civ. R. 37.2 and my Individual Practices.

### H.    Sealing Motions

Plaintiffs filed a number of exhibits to their motion papers under seal, placing redacted versions on the public docket and requesting (on behalf of defendants, who designated the documents or information "confidential" when produced) that the unredacted versions remain sealed. (Dkts. 116, 135.) In each case, defendants followed up within the prescribed period to explain that the redacted information comprised personally identifiable information (email addresses and phone numbers) of non-parties. (Dkts. 119, 140.) The Court agrees that the redactions, which do not bear on the Court's determination of the motion to compel, are "essential to preserve higher values and [are] narrowly tailored to preserve that interest," *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006) (quoting *In re New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)). Consequently, the unredacted versions of the same documents will remain under seal.

## III.   CONCLUSION

For the foregoing reasons, it is hereby ORDERED that plaintiffs' motion to compel production of documents (Dkt. 112) is GRANTED. No later than 30 days from today's date, defendants shall produce all non-privileged documents within their possession, custody, or control that are responsive to plaintiffs' document requests but were not produced due to the Personal Information Protection Law of the People's Republic of China.

It is further ORDERED that plaintiffs' sealing motions (Dkts. 116, 135) are GRANTED.

Dated: January 11, 2023
       New York, New York                    **SO ORDERED.**

**BARBARA MOSES**
**United States Magistrate Judge**